UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> ACE BERMUDA INSURANCE, LTD.; <br> ARCH SPECIALTY INSURANCE COMPANY; <br> ASPEN SPECIALTY INSURANCE COMPANY; <br> COMMONWEALTH INSURANCE COMPANY; <br> FEDERAL INSURANCE COMPANY; <br> LEXINGTON INSURANCE COMPANY; <br> LIBERTY MUTUAL FIRE INSURANCE COMPANY; <br> CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON <br> and CERTAIN LONDON MARKET INSURANCE <br> COMPANIES subscribing to Policy Nos. <br> 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, <br> 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 <br> and GEP 2944; <br> MAIDEN SPECIALTY INSURANCE COMPANY; <br> MAXUM INDEMNITY COMPANY; <br> NAVIGATORS INSURANCE COMPANY; <br> PARTNER REINSURANCE EUROPE plc; <br> RSUI INDEMNITY COMPANY; <br> SCOR GLOBAL P&C SE; <br> STEADFAST INSURANCE COMPANY; <br> TORUS SPECIALTY INSURANCE COMPANY; and <br> WESTPORT INSURANCE CORPORATION, <br><br> Defendants. | Civ. Action No.: 14cv 7510 (RWS) <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff National Railroad Passenger Corporation ("Amtrak"), as its

complaint against Defendants ACE Bermuda Insurance, Ltd., Arch Specialty Insurance

Company, Aspen Specialty Insurance Company, Federal Insurance Company,

Commonwealth Insurance Company, Lexington Insurance Company, Liberty Mutual

Fire Insurance Company, Certain Underwriters at Lloyd's of London and Certain London

Market Insurance Companies subscribing to Policy Nos. 507/N11NA082240,

507/N11NA082241, 507/N11NA082242, 507/N11NA082244, 507/N11NA08244,

507/N11NA08245 and GEP 2944, Maiden Specialty Insurance Company, Maxum

Indemnity Company, Navigators Insurance Company, Partner Reinsurance Europe plc, RSUI Indemnity Company, Scor Global P&C SE, Steadfast Insurance Company, Torus Specialty Insurance Company and Westport Insurance Corporation (collectively, "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1. This action arises out of a dispute as to Defendants' contractual obligations under more than 25 first-party all-risk property insurance policies that Defendants sold to Amtrak in 2011 for substantial premiums.

2. Amtrak seeks a declaration as to the meaning of certain policy provisions that are actively in dispute. Amtrak also seeks a judicial determination that Defendants have breached their contractual obligations in connection with Amtrak's outstanding claim for losses following Superstorm Sandy.

3. Superstorm Sandy made landfall on the mid-Atlantic coastal region on October 29, 2012, during the policy period of the insurance policies sold by Defendants. A State of Emergency was declared in multiple states, including New York and New Jersey. The storm devastated the lives and livelihoods of citizens and businesses along the Eastern seaboard, causing more than $72 billion in losses. Its impact continues through today.

4. Either directly or indirectly, Superstorm Sandy had a substantial impact upon critical physical assets of Amtrak in and around New York City, including tunnels, bridges, track systems and power stations. These properties are essential to Amtrak's operation of trains along the Northeast Corridor ("NEC"), which is the busiest railroad in North America. These properties also are essential to other commuter rail services

-2-

provided by Long Island Railroad ("LIRR") and New Jersey Transit ("NJT") that are the City's lifeblood. The trains of both LIRR and NJT run on Amtrak's track and through Amtrak's tunnels.

5. As Superstorm Sandy approached New York on October 29, 2012, Amtrak was forced to shut down operations, which affected not only its own passenger rail service but also the passenger service of LIRR and NJT. Service into and out of New York City was suspended almost entirely for approximately five days. Weeks passed before Amtrak was able to restore regularly scheduled train service. These shutdowns, and Amtrak's emergency and interim efforts to resolve them, caused significant losses, including without limitation business interruption and extra expense.

6. During the storm, gale-force winds caused physical harm to Amtrak properties in a variety of ways. Tracks along the NEC were strewn with fallen trees and other debris; electrical and mechanical equipment, including at a power station in Kearney, New Jersey, were rendered useless by wind-driven water; and there was damage to the supports of a railroad bridge in Riverdale known as the Spuyten Duyvil Bridge, among other things.

7. A wind-driven storm surge inundated Amtrak's tunnels under the East River and the Hudson River with seawater for the first time in their more than one hundred year history. These tunnels provide the only means of passage into and out of Manhattan for any train operated by Amtrak, LIRR and NJT.

8. The East River Tunnel ("ERT"), which consists of four tubes, two ventilation shafts and other structures, was inundated at mid-river up to the crowns of two tubes. The tunnel under the Hudson River, known as the North River Tunnel

-3-

("NRT"), consists of two tubes, a ventilation shaft, an egress shaft and other structures. Both NRT tubes were inundated at mid-river above the height of the bench walls.

9.     In ordinary circumstances, the Amtrak tunnels operate at capacity on a daily basis.

10.     The bench walls, which are concrete and steel structures, are essential components of the tunnels.  They run from portal-to-portal, providing emergency egress from trains if necessary, along with access to the full length of the tunnels.  They also house duct banks that are packed with cables, wires and other equipment, used either for the operation of trains or for the transport of communications, power and other services from one side of the river to the other.

11.     This storm surge, which was unprecedented, disabled the operations of Amtrak's signal and power systems within the tunnels and damaged various mechanical and electrical systems.

12.     As the storm subsided, Amtrak commenced the complex process of dewatering each tunnel.  This process took longer in the ERT than the NRT because the inundation of the ERT was more extensive.  Ultimately, Amtrak pumped more than 15 million gallons of water out of both tunnels combined.  By November 1, 2012, Amtrak was able to reopen the NRT for partial service.  Amtrak was able to do the same for the two affected ERT tubes by November 9, 2012.

13.     After the storm was over and the tunnels were dewatered, additional physical damage began to take place within each tunnel due to various forms of chemical attack.  This damage was caused by highly reactive salts, principally chlorides

-4-

and sulfates, that had thoroughly infiltrated essential tunnel components and were not removed by the dewatering.

14.     When the water was pumped out, these remaining chlorides and sulfates were exposed to oxygen and moisture in the air.  This exposure caused the chlorides to attack the steel reinforcement in the bench walls and the iron rails of the track bed.  It also caused the sulfates to attack the concrete itself.  Due to such damage, which is ongoing, there already has been one bench wall incident that required emergency repairs and led to train delays.

15.     On November 2, 2012, Amtrak provided timely notice to its property insurance companies that it had suffered and was suffering a variety of losses, both known and unknown.  Amtrak commenced the complex process of identifying and quantifying the full scope of its losses, drawing upon the assistance and expertise of Goodman, Gable & Gould, a public adjusting firm.

16.     Defendants engaged an adjuster of their own, York International, and have deluged Amtrak with exhaustive requests for information and inspections.  To date, Amtrak has responded to the best of its abilities to more than 80 extensive and detailed Requests for Information ("RFIs") and has opened its facilities to inspections by a wide variety of Defendant representatives.  Inspections at every damaged location have been done by Defendant representatives, including multiple inspections on the tunnels alone.

17.     Despite Amtrak's good faith cooperation with Defendants' multiple requests and demands, Amtrak has been unable thus far to recover more than a token amount of insurance proceeds.  To date, Amtrak has received partial and interim

-5-

payments of only $30 million. These payments fall far short of the more than $270 million that Amtrak submitted thus far to Defendants and the estimate of more than $504 million in losses that Amtrak provided to Defendants in 2013, in response to their request.

18.     In fact, most Defendants have taken the position affirmatively that Amtrak is not entitled to receive much, if anything, in excess of $125 million. Upon information and belief, these Defendants claim to base this position on the terms and conditions of their insurance policies.

19.     The plain language of those policies calls for Defendants to pay Amtrak's claim up to the limits of each policy, in an amount equal to Amtrak's claim for each occurrence. The per-occurrence limit is $675 million.

20.     Accordingly, there is an active dispute about the meaning of certain provisions of the insurance policies that can and should be resolved by this Court. Judicial resolution is needed for Amtrak to assess the amount of insurance coverage available for its losses following Superstorm Sandy. That assessment will enable Amtrak to make critical decisions about current and future railroad operations. These decisions will have a substantial impact on the hundreds of thousands of people who travel daily on the NEC, the LIRR and NJT, and upon the economy of the region as well.

21.     Moreover, Amtrak has been damaged by various actions of Defendants in breach of their contractual obligations, such as their failure to make or approve partial and interim payments of undisputed estimates and their exhaustive demands for information that have interfered with and delayed the recovery process.

-6-

## PARTIES

22.     Plaintiff National Railroad Passenger Corporation, also known as Amtrak, is a corporation organized under the Rail Passenger Services Act of 1970 and the laws of the District of Columbia, with its principal place of business at 60 Massachusetts Avenue, N.E., Washington, DC, 20002.

23.     Upon information and belief, Defendant ACE Bermuda Insurance, Ltd. ("ACE") is a corporation organized outside the United States and its principal place of business is located outside the United States.

24.     Defendant Arch Specialty Insurance Company ("Arch Specialty") is a corporation organized and existing under the laws of the state of Nebraska and its principal place of business is located in New York, New York.

25.     Defendant Aspen Specialty Insurance Company ("Aspen") is a corporation organized and existing under the laws of the state of North Dakota and its principal place of business is located in Rocky Hill, Connecticut.

26.     Upon information and belief, Defendant Commonwealth Insurance Company n/k/a Northbridge General Insurance Corp. ("Commonwealth") is a corporation organized outside the United States and its principal place of business is located outside the United States.

27.     Defendant Federal Insurance Company ("Federal") is a corporation organized and existing under the laws of the state of Indiana and its principal place of business is located in Warren, New Jersey.

28.     Defendant Lexington Insurance Company ("Lexington") is a corporation organized and existing under the laws of the state of Delaware and its principal place of business is located in Boston, Massachusetts.

29.     Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") is a corporation organized and existing under the laws of the state of Wisconsin and its principal place of business is located in Wausau, Wisconsin.

30.     Defendants identified herein as Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. 507/N11NA08240,       507/N11NA08241,       507/N11NA08242,       507/N11NA08244, 507/N11NA08244,[1] 507/N11NA08245 and GEP 2944 ("Lloyd's") are individuals and/or entities who are or were underwriting members of Lloyd's of London or London Market Companies that subscribed to Policy Nos. 507/N11NA082240, 507/N11NA082241, 507/N11NA082242, 507/N11NA08244 and GEP 2944.  Upon information and belief, the Lloyd's Defendants are residents of countries outside the United States.

31.     Defendant Maiden Specialty Insurance Company ("Maiden") is a corporation organized and existing under the laws of the state of North Carolina and its principal place of business is located in Mount Laurel, New Jersey.

32.     Defendant Maxum Indemnity Company ("Maxum") is a corporation organized and existing under the laws of the state of Delaware and its principal place of business is located in Alpharetta, Georgia.

33.     Defendant Navigators Insurance Company ("Navigators") is a corporation organized and existing under the laws of the state of New York and its principal place of business is located in Stamford, Connecticut.

---

[1] There are two policies that have different subscribers, but the same policy number.

34.     Upon information and belief, Defendant Partner Reinsurance Europe plc ("Partner Re") is a corporation organized outside the United States, with its principal place of business located outside the United States.

35.     Defendant RSUI Indemnity Company ("RSUI") is a corporation organized and existing under the laws of the state of New Hampshire and its principal place of business is located in Atlanta, Georgia.

36.     Upon information and belief, Defendant Scor Global P&C SE ("Scor Re") is a corporation organized outside the United States, with its principal place of business located outside the United States.

37.     Defendant Steadfast Insurance Company ("Steadfast") is a corporation organized and existing under the laws of the state of Delaware and its principal place of business is located in Schaumburg, Illinois.

38.     Defendant Torus Specialty Insurance Company ("Torus") is a corporation organized and existing under the laws of the state of Delaware and its principal place of business is located in Jersey City, New Jersey.

39.     Defendant Westport Insurance Corporation ("Westport") is a corporation organized and existing under the laws of the state of Missouri and its principal place of business is located in Overland Park, Kansas.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Amtrak is incorporated and has its principal place of business in the District of Columbia and Defendants are incorporated and have their principal places of business in other states and countries, and the matter in controversy exceeds the sum or value of $75,000. This

-9-

Court also has jurisdiction under 28 U.S.C. § 1349, because Amtrak is a federally-chartered corporation and more than 50 percent of its stock is owned by the United States.

41.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein asserted occurred in this District, a substantial part of property that is the subject of the action is situated in this District and because Defendants conduct business in this District.

42.     Personal jurisdiction is proper in New York because Defendants agreed under the terms of the insurance contracts at issue to submit, at Plaintiff's request, to the jurisdiction of a Court of competent jurisdiction within the United States.  Personal jurisdiction also is proper in New York because at all relevant times, Defendants operated, conducted, engaged in or carried on a business or business venture in this state, there is the requisite nexus between the business and this action, and because Defendants engage in substantial and not isolated activity within New York.

## BACKGROUND

### *The Insurance Policies*

43.     ACE sold two insurance policies to Amtrak, with policy numbers NPRC 01281P01A and NPRC 01281P01B (the "ACE Policies"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  True copies of the ACE Policies are attached hereto as Exhibits 1 and 2.

-10-

44.     Arch Specialty sold an insurance policy to Amtrak, policy number ESP0047205-00 (the "Arch Specialty Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Arch Specialty Policy is attached hereto as Exhibit 3.

45.     Aspen Specialty sold two insurance policies to Amtrak, with policy numbers PXA4VP611 and PX5705611 (the "Aspen Specialty Policies") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  True copies of the Aspen Specialty Policies are attached hereto as Exhibit 4 and 5.

46.     Commonwealth sold an insurance policy to Amtrak, policy number US9434 (the "Commonwealth Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Commonwealth Policy is attached hereto as Exhibit 6.

47.     Federal sold an insurance policy to Amtrak, policy number 6684888 (the "Federal Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Federal Policy is attached hereto as Exhibit 7.

48.     Lexington sold two insurance policies to Amtrak, with policy numbers 084144000 and 084144282 (the "Lexington Policies") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or

-11-

damage to Amtrak's interest in all real and personal property. True copies of the Lexington Policies are attached hereto as Exhibits 8 and 9.

49.    Liberty Mutual sold an insurance policy to Amtrak, policy number YS2-L9L-447676-011 (the "Liberty Mutual Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. A true copy of the Liberty Mutual Policy is attached hereto as Exhibit 10.

50.    Lloyd's sold at least seven insurance policies to Amtrak, including policy numbers 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 and GEP 2944 (collectively, the "Lloyd's Policies") and a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. True copies of these Lloyd's Policies are attached hereto as Exhibits 11 through 17.

51.    Maiden sold an insurance policy to Amtrak, policy number S1LPY0151600S (the "Maiden Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. A true copy of the Maiden Policy is attached hereto as Exhibit 18.

52.    Maxum sold an insurance policy to Amtrak, policy number MSP 6014096-02 (the "Maxum Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property. A true copy of the Maxum Policy is attached hereto as Exhibit 19.

53.    Navigators sold an insurance policy to Amtrak, policy number NC10ILM016908-01 (the "Navigators Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.   A true copy of the Navigators Policy is attached hereto as Exhibit 20.

54.    Partner Re sold an insurance policy, policy number NRPC-N11NA08246 (the "Partner Re Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property and that identified Amtrak as the "Named Insured" and provided that "Loss, if any, shall be adjusted with and payable to National Railroad Passenger Corporation." A true copy of the Partner Re Policy is attached hereto as Exhibit 21.

55.    RSUI sold two insurance policies to Amtrak, with policy numbers NHT374082 and NHT374083 (the "RSUI Policies") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.   True copies of the RSUI Policies are attached hereto as Exhibits 22-23.

56.    Scor Re sold an insurance policy, policy number NRPC-N11NA08243 (the "Scor Re Policy"), with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property and that identified Amtrak as the "Named Insured" and provided that "Loss, if any, shall be adjusted with and payable to National Railroad Passenger Corporation." A true copy of the Scor Re Policy is attached hereto as Exhibit 24.

-13-

57.    Steadfast sold an insurance policy to Amtrak, policy number IM 9805201-00 (the "Steadfast Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Steadfast Policy is attached hereto as Exhibit 25.

58.    Torus sold an insurance policy to Amtrak, policy number 41794A111APR (the "Torus Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Torus Policy is attached hereto as Exhibit 26.

59.    Westport sold an insurance policy to Amtrak, policy number 31-3-74264 (the "Westport Policy") with a policy period of December 1, 2011 to December 1, 2012, to protect against all risk of physical loss or damage to Amtrak's interest in all real and personal property.  A true copy of the Westport Policy is attached hereto as Exhibit 27.

60.    The above-referenced policies (collectively, the "Policies") generally use or adopt the same terms, conditions and exclusions.

61.    The Policies obligate Defendants to cover all risk of physical loss or damage to Amtrak's interest in all real and personal property, except as excluded by the Policies.  Amtrak's covered property includes, but is not limited to, bridges, tunnels, trestles, right of way, catenary, track and roadbed, rolling stock, locomotives, electrical transmission systems (including central instrument hut, transformers, frequency converters, substations/ switch stations), maintenance of way equipment and other property owned, used, leased or intended for use by Amtrak, or hereafter constructed,

-14-

under repair, erected, installed, or acquired, including while in course of construction, erection, repair, installation and assembly.

62.    The Policies, along with policies not at issue in this Action because they are subject to arbitration, collectively provide coverage up to $675,000,000 for each occurrence.

63.    The Policies define "occurrence" in part as "[a]ny insured loss or several insured losses arising directly from one common cause, event or catastrophe."  Based on this plain language, losses that arise indirectly from such circumstances are not subject to aggregation.

64.    The Policies also provide that damage to buildings, structures, fixtures, machinery, equipment and other items "shall be valued at the replacement cost new on the same premises, as of the date of replacement."

65.    No limitations are set within this provision on the scope and meaning of "replacement cost new."  Among other things, this provision is not subject to the same terms that apply to the replacement of "rolling stock," such as locomotives.  With regard to rolling stock, but not with regard to buildings, structures, fixtures, machinery or equipment, coverage is not provided for "replacement cost new" but rather for the "cost of new units of like kind and quality as of the date of replacement."

66.    The Policies also obligate Defendants to provide coverage for business interruption, extra expense, rental value and a variety of time-element extensions and coverage extensions, including but not limited to service interruption, contingent time element, civil authority, ingress/egress, increased cost of construction, debris removal, consequential loss, expediting expense and loss adjustment expenses.    Amtrak

-15-

suffered some or all of these losses on or after the storm. Amtrak expects to continue to suffer some or all of these losses in the future.

67.     Each of the Policies establishes a sublimit for flood and earthquake, subject to a flood definition. While there are a number of different flood definitions in the various Policies, none of them encompass the factual circumstances at issue, particularly Sandy's unprecedented wind-driven storm surge.

68.     Each of the Policies contains the following exception to that sublimit: "Even if the peril of flood or earthquake is the predominant cause of loss or damage, any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits or aggregates specified in this Clause B." Thus, even if this sublimit were applicable, a substantial portion of Amtrak's losses would fall within this carve-out.

69.     Each of the Policies requires Defendants to "issue partial payment(s) of claim subject to the policy provisions, [which] shall not be less than the undisputed estimate of loss or damage between the Insured and the Company."

70.     This provision requires Defendants to issue partial/interim payments in amounts that are not less than undisputed estimates. It obligates Defendants to make and approve partial/interim payments to Amtrak that far exceed the $30 million that Amtrak has been paid thus far. Nevertheless, Defendants have disregarded this obligation.

71.     Many of the Policies contain a provision called "Policy Authors," which states: "Regardless of who may have drafted or prepared this policy, or any portions thereof, the provisions contained herein shall be deemed to have been authored by this Company."

-16-

72.     This provision is consistent with the common law of *contra proferentem*, which calls for contract terms to be construed against insurance company drafters and in favor of coverage in the event of ambiguity.

### Superstorm Sandy

73.     On or about October 22, 2012, the National Weather Center issued a Tropical Storm Watch for a storm that was developing and moving through the Caribbean.

74.     The storm moved northeast, parallel to the coast of the southeastern United States, before turning northwest toward the mid-Atlantic states where it merged with existing weather patterns.

75.     On or about October 29, 2012, when the Policies were in full force and effect, the storm, which came to be known as "Superstorm Sandy," reached the New York area and made landfall as a post-tropical cyclone near Brigantine, New Jersey.

76.     Gale-force winds from the storm drove an unprecedented storm surge up the NEC and straight into New York City. In fact, the highest storm surge of the entire storm occurred in and around the New York metropolitan area.

77.     In the waning hours of October 29, 2012, a storm surge in excess of nine feet was reported at the Battery on the southern tip of Manhattan, above a high tide of more than five feet. The highest recorded point in that area was more than 14 feet, far exceeding all records.

### Amtrak's Insurance Claim

78.     On November 2, 2012 – while consumed with the aftermath of the storm – Amtrak gave timely notice to Defendants of actual and/or potential losses. Defendants,

-17-

through their representatives, acknowledged coverage by making several partial/interim payments toward Amtrak's losses.

79.    Amtrak has fully complied, and continues to comply, with all of the terms and requirements of the Policies.

80.    Amtrak's losses included, among other things, the business interruption and extra expense that Amtrak suffered because of the shutdown of service and the extraordinary efforts that were undertaken to restore regular train service as soon as possible.

81.    Additional losses included the costs of dewatering the ERT and the NRT, and making temporary and permanent repairs of damaged structures and property, including electrical and mechanical equipment that had been submerged.

82.    Subsequent to the storm, Amtrak began to suffer losses from chloride attack and sulfate attack on essential components of the ERT, including the bench walls, the track structure and limited portions of the tunnel liner.  These physical losses are continuing.

83.    The remedy for such damage includes the replacement of the bench walls and the track structure in their entirety.  Amtrak will suffer ongoing business interruption and other losses in connection with the ERT when it receives insurance proceeds and undertakes such work.  Until then, temporary repairs should continue to be done.

84.    Subsequent to the storm, Amtrak also began to suffer losses from chloride attack and sulfate attack on essential components of the NRT.  Such chemical attack already has led to a bench wall incident that led to train delays and emergency repairs.

-18-

85.     The damage to the NRT is continuing.   The remedy includes the replacement of the bench walls and the track structure, which will lead to further business interruption losses.  Temporary repairs in the interim are needed as well.

86.     Amtrak also suffered, is continuing to suffer and/or expects to suffer a variety of consequential, ensuing and other losses.

87.     From the time of the storm, Amtrak and its representatives have worked closely with the loss adjusters and other representatives of Defendants in connection with the adjustment, calculation and payment of Amtrak's covered losses.

88.     Amtrak has provided, and continues to provide, Defendants and their representatives with access to all locations requested for inspections, extensive amounts of documentation and prompt responses of all questions posed, to the best of Amtrak's knowledge and ability.

89.     In July 2013, Amtrak submitted documentation evidencing approximately $54 million in preliminary and partial losses.  Subsequently, Defendants' adjuster sent Amtrak an Interim and Partial Proof of Loss for $10 million, advising that the agreed losses were at least $20,000,000 and Amtrak would be paid $10 million, with a $10 million credit to Amtrak's deductible, if Amtrak signed it.

90.     Amtrak ultimately signed a revised version of the Proof of Loss. Accordingly, the primary insurance companies paid Amtrak $10 million and credited the remainder to Amtrak's $10 million deductible.

91.     Subsequent submissions were made by Amtrak to Defendants on the following dates:  January 21, 2014, March 3, 2014, May 12, 2014, May 16, 2014, June

-19-

16, 2014, July 7, 2014 and July 16, 2014.  These eight submissions documented more of Amtrak's claim, in the amount of $270,471,497.

92.     As a result, Amtrak was provided with a total of two more $10 million partial/interim payments.  In each case, Defendants' adjuster followed the same process as above:  offering a set amount to Amtrak, preparing a draft proof of loss in that amount, and then providing payment in that amount following receipt of an Interim and Partial Proof of Loss that Amtrak signed. The second such proof was prepared on or about December 16, 2013 and the third was prepared on or about March 7, 2014.

93.     Amtrak has asked Defendants for partial/interim payments in the amount of $75 million.   Despite repeated requests by Amtrak, there have been no further payments.

94.     In and around September 2013, Defendants asked Amtrak to provide them with an estimate of its total losses.  On September 26, 2013, Amtrak complied with this request by providing Defendants with a preliminary estimate that was based on the information then known.  Although Amtrak made clear to Defendants that certain losses had not yet been quantified, the estimate was in excess of $504 million.

95.     On October 24, 2013, a few weeks after receiving that estimate, certain Defendants reserved their rights to deny coverage for all losses.  They based this reservation on grounds that:  (a) Amtrak's losses arise overwhelmingly from the peril of flood; (b) there are program sublimits of $125 million for losses arising from the peril of flood; and (c) therefore, no insurance companies with limits above $125 million will have much, if any, liability.

-20-

96.     Since that date, Amtrak has advised Defendants that it has retained an engineering firm named HNTB to provide a structural assessment of the ERT and the NRT. As HNTB has been conducting its assessment, Amtrak has been allowing Defendants access to the ERT and the NRT to conduct assessments of their own.

97.     Recently, Amtrak advised Defendants of its intention to finalize the HNTB assessment, include it in the claim and update its $504 million estimate to incorporate HNTB's findings, as well as other additional losses.

98.     On July 22, 2014, Defendants' adjuster, with the express authorization of all Defendants, advised Amtrak's adjuster that Amtrak could receive another partial/interim payment of $20 million, but only if Amtrak agrees that all of its losses arose from a single occurrence and releases certain primary insurance companies from any further obligation to Amtrak.

99.     Amtrak has not agreed to these conditions because, among other things, its losses arise from more than one occurrence under the plain language of Defendants' insurance policies.

### *A Justiciable Case and Controversy*

100.    Based on the above circumstances, a justiciable case and controversy exists about the meaning of a variety of policy terms and provisions.

101.    One such term is "occurrence." All of the policies limit "occurrence" to losses "arising directly from" one common cause, event or catastrophe. This plain language makes clear that losses arising *indirectly* from such circumstances are not subject to aggregation.

-21-

102. Defendants have taken a position about the term occurrence that is contrary to this plain language. Not only did Defendants attempt to impose conditions beyond the Policies' terms, but they also undertook to prevent Amtrak from seeking coverage for whatever amount ultimately constitutes its full claim.

103. A justiciable case and controversy also exists about the applicability or inapplicability of a program flood sublimit. Many Defendants have taken the position that a program flood sublimit applies to Amtrak's losses such that Amtrak is not entitled to recover much more than $125 million on its claim.

104. This position, however, is contrary to the plain language of the flood sublimit. That sublimit is governed in each policy by a definition of "flood." The vast majority of these definitions do not include storm surges or wind-driven waves within their scope. In any event, the alleged program flood sublimit establishes coverage for "any ensuing loss or damage not otherwise excluded herein." Thus, even if the sublimit applied to some of the Policies, a substantial amount of Amtrak's losses would fall outside of its scope.

105. Accordingly, there is an active dispute about the meaning of these and other terms and provisions of the insurance policies that can and should be addressed by judicial resolution.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

106. Amtrak repeats and realleges the allegations set forth in paragraphs 1 through 105 as though fully set forth herein.

107. An actual and justiciable controversy has arisen between Amtrak and Defendants as to the meaning of a variety of key terms and provisions in the Policies,

-22-

including without limitation the definition of occurrence, the meaning of flood, the applicability and existence of flood sublimits, the carve-out for ensuing loss and the obligation to make and approve partial/interim payments in undisputed amounts on an ongoing basis.

108.   Resolution of this controversy will establish Amtrak's right to recover payments up to the limits of all insurance policies at issue for property damage, business interruption and other covered losses arising directly from the gale-force winds, including wind-driven storm surge, of Superstorm Sandy.

109.   Resolution of this controversy also will establish Amtrak's right to recover payments up to the limits of all insurance policies at issue for property damage, business interruption and other covered losses arising directly from the ongoing chemical attack to essential components of the ERT.

110.   Such resolution further will establish Amtrak's right to recover payments up to the limits of all insurance policies at issue for property damage, business interruption and other covered losses arising directly from the ongoing chemical attack to essential components of the NRT.

111.   To date, Defendants have failed or refused to acknowledge their contractual obligations to pay the vast majority of Amtrak's covered losses under their insurance policies for each occurrence at issue.  Defendants have refused to make or approve partial/interim payments without attaching unacceptable conditions even for undisputed estimates.

112.   Many Defendants also expressly reserved their rights to deny coverage on grounds that all of Amtrak's losses arise solely from flood and therefore are subject to

-23-

sublimits far less than the full amount of coverage promised and owed under the Policies.

113.    By reason of the foregoing, an actual, substantial and justiciable controversy exists between Amtrak and Defendants regarding the claim and a judicial declaration is necessary and appropriate so that the parties may ascertain their respective rights and duties.

114.    Amtrak seeks a judicial declaration by the Court that Amtrak is entitled to coverage up to the full limits of each Defendant's insurance policy for each occurrence that gives rise to covered losses; that Amtrak's losses are not subject to a flood sublimit in any insurance policy at issue; that Defendants are obligated to make and approve partial/interim payments to Amtrak on an ongoing basis; and resolving any other disputes over policy terms and provisions that arise in the course of this action.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

115.    Amtrak repeats and realleges the allegations set forth in paragraphs 1 through 114 as though fully set forth herein.

116.    The Policies are valid and enforceable contracts providing insurance coverage for Amtrak's losses from wind, wind-driven storm surge, ongoing chemical attack in the ERT, ongoing chemical attack in the NRT and any other damage.

117.    Amtrak has suffered direct physical loss to its property and that loss is covered under the terms of the Policies.

118.    Amtrak has complied and continues to comply with all of the terms of the Policies, including the requirement of notice and the duty to cooperate.

-24-

119.    Defendants have a contractual duty "to issue partial payment(s) of claim subject to the policy provisions, [which] shall not be less than the undisputed estimate of loss or damage between the Insured and the Company."

120.    Amtrak has submitted evidence to Defendants establishing more than $270 million in losses, as well as an estimate of more than $504 million in losses as of September 24, 2013 which is to be supplemented with additional identified and measured losses.

121.    Amtrak has asked Defendants, including but not limited to those with limits up to $75 million, for the approval of partial/interim payments in that amount -- a sum that is supported by substantial documentation and is either undisputed or is not the subject of a reasonable dispute.

122.    Thus far, Amtrak has received only $30 million in partial/interim payments from the Defendants in Amtrak's primary layer of coverage:  Federal, Lexington, Liberty Mutual, Lloyd's (regarding 507/N11NA08240 and 507/N11NA08241) and Navigators.

123.    Defendants, including Federal, Lexington, Liberty Mutual, Lloyd's (regarding 507/N11NA08240 and 507/N11NA08241) and Navigators, have refused to make or approve further partial/interim payments unless Amtrak agrees to the unacceptable condition of acknowledging the existence of only one occurrence.

124.    The failure and refusal to make or approve further partial/interim payments, when Amtrak's covered losses far exceed the requested sum, constitute a breach of the terms of the Policies.  The same is true for the decision to condition further partial/interim payments on the improper mandate that Amtrak agree to forgo its right to full coverage.

-25-

125.    As a result of these breaches, Amtrak is suffering damages equal to the sums it would be entitled to recover under the Policies.

126.    In addition, Amtrak is suffering consequential damages due to Defendants' wrongful, unjustified and inappropriate delay, failure to make partial/interim payments, failure to process and pay Amtrak's submissions in a timely fashion, improper treatment of Amtrak's claims for coverage and imposition of unwarranted and unduly burdensome requests for information that wrongfully divert Amtrak from its restoration efforts.

127.    Amtrak accordingly requests entry of judgment for breach of contract, awarding the payment of damages in an amount equal to the amount owed under each of the Policies and consequential damages, each in amounts to be proven at trial.

WHEREFORE, Amtrak prays for judgment as follows:

(a)    A declaration that Amtrak is entitled to coverage up to the full limits of each Defendant's insurance policy for each occurrence that gives rise to covered losses;

(b)    A declaration that Amtrak's losses are not subject to a flood sublimit in any insurance policy at issue;

(c)    A declaration that Defendants are obligated to make and approve partial/interim payments to Amtrak on an ongoing basis, and resolving any other disputes over policy terms and provisions that arise in the course of this action;

(d)    An order finding that Defendants have breached the Policies by failing to pay or approve the payment of undisputed sums;

(e)    A judgment in favor of Amtrak and against Defendants for the amount Amtrak is entitled to receive under the Policies, in an amount to be proven at trial;

(f)    A judgment awarding Amtrak actual damages, compensatory damages, consequential damages, pre-judgment interest, post-judgment interest, attorneys' fees and costs, each in amounts to be proven at trial; and

-26-

(g)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Amtrak demands a trial by jury on all issues so triable.

Dated:   September 17, 2014

By:    _____
          Rhonda D. Orin, Esq. (RO-0359)
          rorin@andersonkill.com
          Daniel J. Healy, Esq. (DH-7396)
          dhealy@andersonkill.com
          Marshall Gilinsky, Esq. (MG-8398)
          mgilinsky@andersonkill.com
          **ANDERSON KILL, L.L.P.**
          1717 Pennsylvania Avenue, N.W.
          Washington, DC  20006
          Telephone:  202-416-6500

          Finley T. Harckham, Esq. (FH-8219)
          fharckham@andersonkill.com
          **ANDERSON KILL, P.C.**
          1251 Avenue of the Americas
          New York, NY  10020
          Telephone:  212-278-1000

          *Attorneys for Plaintiff*