UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, <br><br>                 Plaintiff, <br><br>      vs. <br><br> ARCH SPECIALTY INSURANCE COMPANY; <br> ASPEN SPECIALTY INSURANCE COMPANY; <br> COMMONWEALTH INSURANCE COMPANY; <br> FEDERAL INSURANCE COMPANY; <br> LEXINGTON INSURANCE COMPANY; <br> LIBERTY MUTUAL FIRE INSURANCE COMPANY; <br> CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON <br> and CERTAIN LONDON MARKET INSURANCE <br> COMPANIES subscribing to Policy Nos. <br> 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, <br> 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 <br> and GEP 2944; <br> MAIDEN SPECIALTY INSURANCE COMPANY; <br> MAXUM INDEMNITY COMPANY; <br> NAVIGATORS INSURANCE COMPANY; <br> PARTNER REINSURANCE EUROPE plc; <br> RSUI INDEMNITY COMPANY; <br> STEADFAST INSURANCE COMPANY; <br> TORUS SPECIALTY INSURANCE COMPANY; and <br> WESTPORT INSURANCE CORPORATION, <br><br>                 Defendants. | Civ. Action No.:14-cv-7510 (JSR) |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING THE OCCURRENCE ENDORSEMENT**

---

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

UNDISPUTED FACTS ................................................................................. 4

ARGUMENT ................................................................................................ 8

I.      APPLICABLE LEGAL STANDARD AND RULES OF CONSTRUCTION ............. 8

II.     THE OCCURRENCE ENDORSEMENT PROVIDES FOR THE
AGGREGATION ONLY OF LOSSES THAT ARISE *DIRECTLY* FROM
ONE COMMON CAUSE, EVENT OR CATASTROPHE.................................... 10

III.    THE OCCURRENCE ENDORSEMENT SHOULD NOT BE READ AS IF IT
CONTAINED THE WORDS "DIRECTLY OR INDIRECTLY" ............................. 17

CONCLUSION ............................................................................................ 19

dcdocs-89163.10

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Album Realty v. American Home Assur.*,
80 N.Y.2d 1008 (1992) ............................................................................................ 12

*Antoine v. City of New York*,
56 A.D.3d 583 (2d Dep't 2008) .............................................................................. 10

*Atlantic Mut. Ins. Co. v. CSX Lines*,
432 F.3d 428 (2d Cir. 2005) ...................................................................................... 9

*Bird v. St. Paul*,
224 N.Y. 47 (1918) .................................................................................................. 13

*Bretton v. Mut. of Omaha Ins. Co.*,
110 A.D.2d 46 (1st Dep't 1985), *aff'd* 66 N.Y.2d 1020 ........................................ 9, 18

*Caliendo v. Travelers Indem. Co.*,
225 A.D.2d 574 (2d Dep't 1996) ............................................................................... 9

*Demerey v. Extebank Deferred Comp Plan (B)*,
216 F.3d 283 (2d Cir. 2000) ...................................................................................... 8

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
503 F. Supp.2d 699 (S.D.N.Y. 2007), *aff'd* 600 F.3d 190 (2d Cir. 2010) ............. 9, 10

*Garner v. N.Y. Cent. Mut. Fire Ins. Co.*,
96 A.D.3d 715 (2d Dep't 2012) ................................................................................. 9

*Hartford Accident & Indem. Co. v. Wesolowski*,
33 N.Y.2d 169 (1973) ................................................................................................. 9

*Home Ins. v. American Ins.*,
537 N.Y.S.2d 516 (1st Dep't 1989) ......................................................................... 13

*Horowitz v Am. Int'l Group, Inc.*,
498 F. App'x 51 (2d Cir. 2012) ............................................................................... 18

*Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.,*
19 F.3d 78 (2d Cir. 1994) ........................................................................................ 13

*Kosich v. Metro. Prop. & Cas. Ins. Co.*,
214 A.D.2d 992, 626 N.Y.S.2d 618 (4th Dep't 1995) ............................................. 13

*Kula v. State Farm Fire & Cas. Co.*,
212 A.D.2d 16, 628 N.Y.S.2d 988 (4th Dep't 1995) ............................................... 13

*Lavanant v. Gen. Acc. Ins. Co. of Am.*,
   79 N.Y.2d 623 (1992).................................................................................. 9

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990)........................................................................ 9

*New England Mut. Life Ins. Co. v. Doe*,
   93 N.Y.2d 122 (1999)................................................................................ 18

*Ocean Partners, LLC v. North River Ins. Co.*,
   546 F. Supp.2d 101 (S.D.N.Y. 2008).......................................................... 14

*Park Country Club of Buffalo, Inc. v. Tower Ins. Co.*,
   893 A.D.2d 408 (4th Dep't 2009)................................................................ 9

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*,
   472 F.3d 33 (2d Cir. 2006).................................................................... 13, 14

*Ports of Indiana v. Lexington Ins. Co.*,
   2011 U.S. Dist. LEXIS 130979 (S.D. Ind. Nov. 14, 2011) .................... 11, 18

*SEACOR Holdings, Inc. v. Commonwealth Ins. Co.*,
   635 F.3d 675 (5th Cir. 2011)..................................................................... 12

*SR International Business Ins. Co. Ltd. v. World Trade Center Properties LLC*,
   222 F. Supp.2d 385 (S.D.N.Y. 2002), *aff'd* 467 F.3d 107 (2d Cir. 2006)................. 11

*Tower Ins. Co. of N.Y. v. Diaz*,
   58 A.D.3d 495 (1st Dep't 2009).................................................................. 9

*United States Fid. & Guar. Co. v. Annunziata*,
   67 N.Y.2d 229 (1986)................................................................................ 18

*Valley Nat'l Bank v. Greenwich Ins. Co.*,
   254 F. Supp. 2d 448 (S.D.N.Y. 2003)......................................................... 8

*Vargas v. Ins. Co. of N. America*,
   651 F.2d 838 (2d Cir. 1981)..................................................................... 10

*Venigalia v. Penn. Mut. Ins. Co.*,
   130 A.D.2d 974 (4th Dep't 1987)............................................................. 10

*Westview Assocs. v. Guar. Nat'l Ins. Co.*,
   95 N.Y.2d 334 (2000)............................................................................ 9, 18

*Zurich Amer. Ins. Co. v. ABM Indus., Inc.*,
   397 F.3d 158 (2d Cir. 2005)....................................................................... 9

dcdocs-89163.10

**STATUTES**

Rail Passenger Service Act of 1970 .................................................................................. 4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ........................................................................................................... 8

Fed. R. Civ. P. 56(a) ...................................................................................................... 8

dcdocs-89163.10

Plaintiff National Railroad Passenger Corporation ("Amtrak) submits this

Memorandum of Law in support of its Motion for Partial Summary Judgment Regarding

the Occurrence Endorsement (the "Motion").  Plaintiff respectfully requests that this

Court grant the Motion to resolve a basic issue of policy interpretation as a matter of

law.

## PRELIMINARY STATEMENT

This case involves Amtrak's insurance claim for its losses following Superstorm

Sandy.  It involves many, although not all, of the property insurance policies purchased

by Amtrak that were in effect from December 1, 2011 to December 1, 2012.[1]  In this

Motion, Amtrak seeks a declaration regarding the meaning of "occurrence," which is a

defined term in the insurance policies at issue (the "Policies").[2]  This Motion can be

decided at the outset of this Action because it rests solely upon the plain meaning of the

insurance policy language at issue.

As is typical with commercial property insurance programs, Amtrak's Policies are

subject to policy limits and deductibles on a "per occurrence" basis.  The Policies

include an endorsement (the "Occurrence Endorsement") that identifies what types of

losses are to be grouped together under a single set of policy limits.  When there is a

single "occurrence," the applicable policy limits are available only once and, typically,

---

[1]    Certain insurance companies have not been named as defendants because their policies call for
arbitration in lieu of litigation.

[2]    The definition of "occurrence" and the other terms relevant to this Motion are the same in all of
the Policies.  Accordingly, the issues raised in this Motion apply equally to all of the insurance
company Defendants (the "Insurance Companies") and all of the Policies that they sold to
Amtrak.

dcdocs-89163.10

only one deductible applies.  When there are multiple "occurrences," then the applicable policy limits may be available multiple times and multiple deductibles may apply.

Commercial property insurance policies typically define "occurrence" broadly to include "all losses or damages that are attributable *directly or indirectly* to one cause or to one series of similar causes."  All of the Amtrak Policies, however, define "occurrence" narrowly as "[a]ny insured loss or several insured losses arising *directly* from one common cause, event or catastrophe."  Based on its plain language, this definition allows aggregation only for those losses that arise *directly* from one common cause, event or catastrophe.  Losses that arise *indirectly* therefrom are grouped together under a separate set of policy limits, based on whatever cause, event or catastrophe they arise from directly.

This interpretation of the Policies is entirely consistent with New York law on causation.  In New York, unlike many other jurisdictions, causation is interpreted strictly as the immediate cause of a loss.  New York courts do not look back to the "metaphysical beginnings" of a loss in order to identify its cause.  Just as the Occurrence Endorsement looks to the one common cause, event or catastrophe from which losses arise directly, so do courts applying New York law.

The Insurance Companies wrongfully seek to avoid the consequences of the narrow approach toward aggregation that is set forth in the Occurrence Endorsement. As shown in their Answers, the Insurance Companies contend that all, or almost all, of the losses in Amtrak's claim necessarily constitute a single occurrence because they

bear some type of relationship to Superstorm Sandy.[3] But a mere relationship to Sandy, when indirect or attenuated, is not enough to warrant aggregation under the express terms of the Policies or under New York law. A substantial percentage of the losses identified in Amtrak's complaint did not arise directly from Sandy and, therefore, are not subject to aggregation.[4] Thus, the Insurance Companies acknowledge that a justiciable dispute exists regarding the meaning of the Occurrence Endorsement[5] – one that is ripe for judicial determination as a matter of law.

It is hornbook law that insurance policies are to be interpreted in accordance with their plain language. Words in insurance policies are treated as having meaning; words that are missing are not treated as if they were there. Here, where the Policies define "occurrence" to mean losses "arising *directly* from" one common cause, event or catastrophe, an occurrence does not encompass losses arising *indirectly* from that common cause, event or catastrophe. Directly means directly – even if the result is that Amtrak's losses constitute more than one "occurrence" and more than one set of limits

---

[3]    *See, e.g.,* Answers and Affirmative Defenses of Defendants Commonwealth Insurance Company, International Insurance Company of Hannover SE, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Maiden Specialty Insurance Company, Steadfast Insurance Company at ¶¶ 62-63 and Affirmative Defenses Nos. 2-3.

[4]    By this Motion, Amtrak is not asking this Court to quantify Amtrak's covered losses or decide which of those losses arose directly or indirectly from certain causes or events. Those questions involve disputed issues of fact that are not subject to partial summary judgment at this time. But no factual questions are involved in addressing the meaning of the Occurrence Endorsement.

[5]    *See* Answers and Affirmative Defenses of Defendants Arch Specialty Insurance Company; Aspen Specialty Insurance Company; Commonwealth Insurance Company; Federal Insurance Company; International Insurance Company of Hannover SE; Lexington Insurance Company; Liberty Mutual Fire Insurance Company; Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. 507/N11NA08241, 507/N11NA08242, 507/N11NA08244 and GEP 2944, Torus Specialty Insurance Company and Westport Insurance Company; Maiden Specialty Insurance Company; Maxum Indemnity Company; Navigators Insurance Company; Steadfast Insurance Company at ¶¶100, 103; *accord* Partner Re's Answer and Affirmative Defenses at ¶¶100-105.

accordingly applies.  Any dispute between the parties on the narrow wording of the Occurrence Endorsement should be resolved in Amtrak's favor under New York law.

Based on the Policies' plain language and the New York law on both causation and policy interpretation, Amtrak seeks partial summary judgment declaring that all losses arising *directly* from one common cause, event or catastrophe constitute a single occurrence, grouped together under a single set of policy limits, and losses arising *indirectly* from that cause, event or catastrophe constitute separate occurrences, grouped together based on whatever cause(s), event(s) or catastrophe(s) that they arise from directly.  For all of the reasons discussed in detail below, Amtrak respectfully requests that the Motion be granted.

## UNDISPUTED FACTS

Amtrak is a government-owned entity created under the auspices of the Rail Passenger Service Act of 1970.  *See* Annual Report Fiscal Year 2012, copy attached as Ex. 1 to the Affidavit of Rhonda D. Orin ("Orin Aff."), at p. 5.  Congress created Amtrak in 1970 to take over, and independently operate, the nation's intercity rail passenger services.  *Id.*

Amtrak annually purchases an "all-risk" property insurance program to protect its critically important and valuable property.  For the policy period at issue in this Action, Amtrak purchased a tower of "all-risk" property insurance policies.  *See* Orin Aff. Ex. 2.[6] Each of the Policies provides broad coverage for "all risk of direct physical loss of or

---

[6]      A one-page coverage chart is offered for the Court's convenience, as it provides a succinct depiction of all the Amtrak policies.  But if the Insurance Companies object on grounds that the chart presents factual issues, the graphic can be disregarded.  Copies of the actual Policies at issue in this Action are attached to the Orin Aff. as Exs. 3-26.

damage to property described herein . . . except as hereinafter excluded." *See* Orin Aff. Exs. 3-26, at ¶9. Collectively, the Policies provide a total of $675,000,000 in coverage on a "per occurrence" basis – meaning that Amtrak can collect up to $675,000,000 for each occurrence, as defined therein. *See* Orin Aff. Exs. 2, 3-26.

Each of Amtrak's Policies contains an endorsement that defines "occurrence" as follows:

> Any insured loss or several insured losses *arising directly from* one common cause, event or catastrophe and during the period of this insurance. If such loss or several losses are attributable to several causes in an unbroken chain of causation, the cause which triggered the chain of causation is understood to be the common cause, event or catastrophe. All such loss or losses shall be added up and the result shall be treated as one occurrence irrespective of the period of time or area within which such losses occur. In case of uncertainty over scientific issues, the parties agree to seek expert advice from a neutral and recognized organization.

*See* Orin Aff. Exs. 3-26, at Endorsement No. 9 (emphasis supplied).

The Occurrence Endorsement serves the purpose of identifying what types of losses are to be grouped together, or aggregated, under a single set of policy limits. For example, the policy limits of Policy No. 084144000 sold by Lexington Insurance Company ("Lexington") are 28% of $125,000,000. *See* Orin Aff. Ex. 20, at ¶¶1-2. The Lexington policy then provides:

> This Company shall not be liable for more than its proportion [28%] of $125,000,000 in any one occurrence . . .

*See id.* at ¶3. Thus, for each "occurrence," as defined in the policy, Lexington is obligated to pay up to 28% of $125,000,000.[7]

---

[7] The other Insurance Companies participating in that $125,000,000 layer of the insurance program are obligated to pay the remaining 72% of the $125,000,000 in limits for each "occurrence." Other insurance companies share the remaining limits in a comparable fashion.

The Policies' definition of "occurrence" includes only losses that arise "directly" from one common cause, event or catastrophe. *See* Orin Aff. Exs. 3-26, at Endorsement No. 9. The absence of the word "indirectly" stands out when compared to other parts of the Policies. For example:

- Paragraph 10.I excludes coverage for nuclear radiation or radioactive contamination, "whether such loss be *direct or indirect, proximate or remote;*"

- Endorsement No. 1 excludes "Loss of, damage to or loss of use of property *directly or indirectly* resulting from sub-surface operations of the Insured . . .";

- Endorsement No. 2 excludes "Damage or Consequential Loss *directly or indirectly* caused by, consisting of, or arising from the failure of any computer, data processing equipment, media microchip, operating system microprocessors (computer chip), integrated circuit or similar device, or any computer software, whether the property of the Insured or not, and whether occurring before, during or after the year 2000 . . . . Such Damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence";

- Endorsement No. 3 excludes "Damage or Consequential Loss *directly or indirectly* caused by, consisting of, or arising from: 1. Any functioning or malfunctioning or the internet or similar facility. . . ";

- Endorsement No. 7 excludes "loss, damage, cost or expense of whatsoever nature *directly or indirectly* caused by, consisting of, or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto"; and

- Endorsement No. 12 excludes "loss, damage, cost or expense of whatsoever nature *directly or indirectly* caused by, consisting of, or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss."

*See, e.g.,* Orin Aff. Ex. 20, at Endorsement Nos. 1, 2, 3, 7, 12 and ¶10.I (emphasis supplied).

Other subsections of the Policies use the term "directly" by itself, just like the

Occurrence Endorsement. For example:

- Business interruption coverage for interruption of research and development activities is limited to "the actual loss sustained of the continuing fixed charges and expenses, including Ordinary Payroll, *directly* attributable to such research and development activities"; and

- Rental value coverage is limited to "loss sustained by the Insured resulting *directly* from loss, damage, or destruction covered herein during the term of this policy to real and personal property as described in Clause 7.A. but not exceeding the reduction in rental value charges and expenses which do not necessarily continue."

*See, e.g.,* Orin Aff. Ex. 20, at ¶¶7.B(3), 7.D(1) (emphasis supplied).

Also like the Occurrence Endorsement, the Policies group losses based on the

strength or weakness of their nexus to particular circumstances for the sake of applying

sublimits. For example, each of the Policies contains a flood sublimit that applies only

to losses that arise specifically "with respect to the peril[ ] of flood." That sublimit,

however, does not encompass losses that ensue therefrom:

Even if the peril of flood or earthquake is the predominant cause of loss or damage, *any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits* or aggregates specified in this Clause B;

*See* Orin Aff. Exs. 3-26, at ¶3.B (emphasis supplied).

All of the Policies contain an express provision called "Policy Authors" which

states:

Regardless of who may have drafted or prepared this policy, or any portions thereof, the provisions contained herein shall be deemed to have been authored by this [Insurance] Company.

*See* Orin Aff. Exs. 3-26, at ¶39.  Some of the Policies delete this provision by endorsement.[8]

## ARGUMENT

I.    **APPLICABLE LEGAL STANDARD AND RULES OF CONSTRUCTION**

Summary judgment may be granted where it is shown that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Partial summary judgment is specifically contemplated in the caption to Rule 56(a).[9]

One of the main virtues of partial summary judgment is to eliminate the delay and expense of futile pre-trial and trial proceedings.[10]  Accordingly, Rule 56 does not require that any discovery take place before a motion for partial summary judgment can be granted.[11]  On the contrary, under the Federal Rules, "a party can file a motion for summary judgment at any time."  Fed. R. Civ. P. 26.

---

[8]    *See* Lexington Policy Nos. 084144000 and 084144282 (Orin Aff. Exs. 20-21, at Endorsement No. 13); Liberty Mutual Insurance Company Policy No. YS2-L9L-447676-011 (Orin Aff. Ex. 22, at Endorsement No. 12);  Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies (Lloyd's) subscribing to Policy Nos. 507/N11NA08240, 507/N11NA08241 and 507/N11NA08242 (Orin Aff. Exs. 23-25); and Westport Policy No. 31-3-74264 (Orin Aff. Ex. 26, at Endorsement 13).

[9]    *See* annotation to 2010 Amendments, Effective December 1, 2010, Subdivision (a), second paragraph.

[10]   *See* Manual for Complex Litigation (Fourth), §11.34 (Federal Judicial Center 2004) ("Summary judgment may eliminate the need for further proceedings or at least reduce the scope of discovery or trial").

[11]   *Demerey v.  Extebank Deferred Comp Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000); *Valley Nat'l Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448, 451 (S.D.N.Y. 2003) (granting summary judgment to plaintiff who moved "[p]romptly after filing the complaint").

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.[12]  Where, as here, the only issue is the proper application of language in a contract, the court may grant summary judgment where the contractual language is "plain and unambiguous."[13]  If the language is unambiguous, its construction is a matter of law, to be decided by the Court, and the parties' intent is to be determined from the text of the contract itself.[14]

Plain language used in an insurance contract is given its plain and ordinary meaning.[15]  Moreover, it is black letter law that all terms in an insurance contract must be given meaning in order to avoid treating certain terms as "mere surplusage."[16]

Even where a policy is ambiguous, as long as it does not require reference to extrinsic evidence, its interpretation is still a matter of law for the court to decide.[17]  Further, the ambiguity must be resolved in favor of the policyholder.[18]  This rule "is

---

[12]   *Atlantic Mut. Ins. Co. v. CSX Lines*, 432 F.3d 428, 433 (2d Cir. 2005).

[13]   *Zurich Amer. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 164 (2d Cir. 2005).

[14]   *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990); *Caliendo v. Travelers Indem. Co.*, 225 A.D.2d 574, 574 (2d Dep't 1996); *Park Country Club of Buffalo, Inc. v. Tower Ins. Co.*, 893 A.D.2d 408, 409 (4th Dep't 2009).

[15]   *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 503 F. Supp.2d 699, 702 (S.D.N.Y. 2007), *aff'd* 600 F.3d 190 (2d Cir. 2010) (*citing Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

[16]   *Westview Assocs. v. Guar. Nat'l Ins. Co.*, 95 N.Y.2d 334, 339 (2000) ("*Westview*").  *See also Bretton v. Mut. of Omaha Ins. Co.*, 110 A.D.2d 46, 50 (1st Dep't 1985), *aff'd* 66 N.Y.2d 1020 ("*Bretton*") ("a policy's terms should not be assumed to be superfluous or to have been idly inserted").

[17]   *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172 (1973).

[18]   *Lavanant v. Gen. Acc. Ins. Co. of Am.*, 79 N.Y.2d 623, 629 (1992); *Garner v. N.Y. Cent. Mut. Fire Ins. Co.*, 96 A.D.3d 715, 716 (2d Dep't 2012); *Tower Ins. Co. of N.Y. v. Diaz*, 58 A.D.3d 495, 496 (1st Dep't 2009).

enforced even more strictly when the language at issue purports to limit the [insurance] company's liability."[19]

To defeat summary judgment, the Insurance Companies must show that their interpretation is the only reasonable and fair construction of the insurance policy language at issue.[20]

## II.    THE OCCURRENCE ENDORSEMENT PROVIDES FOR THE AGGREGATION ONLY OF LOSSES THAT ARISE *DIRECTLY* FROM ONE COMMON CAUSE, EVENT OR CATASTROPHE

An "occurrence" under Amtrak's Policies encompasses only those losses that "arise *directly* from one common cause, event or catastrophe."  *See* Orin Aff. Exs. 3-26, at Endorsement No. 9 (emphasis supplied).  All losses arising "directly" from a given occurrence are grouped together under one set of limits.  It follows that losses that arise "indirectly" from that common cause, event or catastrophe fall outside of that occurrence and are grouped based on the specific circumstance they arise from directly.[21]  As this Court has ruled with regard to insurance contracts, "plain language must be given its plain meaning" as a matter of law.[22]

---

[19]    *Venigalia v. Penn. Mut. Ins. Co.*, 130 A.D.2d 974, 975 (4th Dep't 1987).

[20]    *Antoine v. City of New York*, 56 A.D.3d 583, 584-85 (2d Dep't 2008); *Vargas v. Ins. Co. of N. America*, 651 F.2d 838 (2d Cir. 1981) (under New York law, "an ambiguous provision in an insurance policy is construed most favorably to the insured and most strictly against the insurer" and the question on summary judgment is whether "the insurer's interpretation of the contract [is] the only reasonable and fair construction").

[21]    Amtrak will undertake to prove at trial that chloride and sulfate damage in Amtrak's tunnels under the East River and the Hudson River, which began to occur after the storm was over and the tunnels had been pumped out, constitute indirect losses that cannot be aggregated with the losses that arose directly from the storm itself. *See, e.g.,* Amended Complaint at ¶¶12-14, 77-80, 97. While those fact issues are not before this Court at this time, they are referenced to illustrate the reason for, and importance of, the judicial determination being requested.

[22]    *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 503 F. Supp.2d 699, 702 (S.D.N.Y. 2007), *aff'd* 600 F.3d 190 (2d Cir. 2010).

The Occurrence Endorsement in the Policies is much narrower than the definition of occurrence commonly used in other property insurance policies. It is common for property policies to define "occurrence" to include all loss arising "directly or indirectly" out of one cause or a series of similar causes. For example, certain property policies insuring the World Trade Center on September 11, 2001 defined "occurrence" as follows:

> "Occurrence" shall mean all losses or damages that are attributable *directly or indirectly* to one cause or to one series of similar causes. All such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur.[23]

Other policies define occurrence as all losses "arising out of one event," without any reference to "directly" or "indirectly." For example, Defendant Lexington has sold insurance policies that define "occurrence" as follows:

> The term "occurrence" shall mean any one loss, disaster, casualty or series of losses, disasters, or casualties, *arising out of* one event. When the term applies to loss or losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake, volcanic eruption, riot, riot attending a strike, civil commotion, vandalism and malicious mischief, or terrorism, one event shall be construed to be all losses arising during a continuous period of 72 hours. When filing proof of loss, the Insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which may not be earlier than the time when the first loss to covered property occurs.[24]

In contrast to the common and broad wordings that define "occurrence" to include losses caused "directly or indirectly" by, or "arising from" (without any modification)  a

---

[23]    *SR International Business Ins. Co. Ltd. v. World Trade Center Properties LLC*, 222 F. Supp.2d 385, 398 (S.D.N.Y. 2002), *aff'd* 467 F.3d 107 (2d Cir. 2006) (emphasis supplied).

[24]    *See, e.g., Ports of Indiana v. Lexington Ins. Co.*, 2011 U.S. Dist. LEXIS 130979 at * 38-39 (S.D. Ind. Nov. 14, 2011) (emphasis added).

common cause or disaster, Amtrak's Policies group only those losses "arising *directly from*" a common cause, event or catastrophe.

Research reveals no cases on the meaning of "arising directly from" in the occurrence definition of a property insurance policy. The closest case on point was decided by the Fifth Circuit in *SEACOR Holdings, Inc. v. Commonwealth Ins. Co.*[25] *SEACOR* involved the determination of what deductible applied to losses that followed Hurricanes Katrina and Rita. That case required the Court to interpret the meaning of the phrase "loss caused directly by the peril of a 'Named Windstorm.'"[26]

The Fifth Circuit started the analysis by noting that words in a contract must be given their generally prevailing meaning[27] – a principle that holds true under New York law as well. After noting that "the policy does not define 'loss caused directly by,'" the Court turned for guidance to the Louisiana law on causation.[28] That same approach, applied here to the interpretation of "arising directly from," would direct this Court's attention to the New York law on causation – which calls for a narrow interpretation of the phrase.

In New York, unlike many other jurisdictions, causation is interpreted strictly as the immediate cause of a loss.[29] A New York court will not look back to the

---

[25]    635 F.3d 675 (5th Cir. 2011) ("*SEACOR*").

[26]    *Id.* at 678.

[27]    *See id.* at 680 ("When those words are clear, explicit, and lead to no absurd consequences, the contract must be interpreted within its four corners and no parol evidence is permitted").

[28]    *See id.* at 682.

[29]    *See Album Realty v. American Home Assur.*, 80 N.Y.2d 1008, 1009-11 (1992) (where freezing caused sprinkler head to rupture, which in turn resulted in water damaging premises, cause of loss was the release of water, not the freezing; "freezing was [not] the proximate, efficient and

metaphysical beginnings of a loss in order to identify its cause.[30]  Pursuant to this strict

interpretation, courts in New York regularly find the cause of a loss to coincide with the

damage itself.  For example, in *Parks Real Estate Purchasing Group v. St. Paul Fire

and Marine Ins. Co.*,[31] the issue was whether contamination at a building near the World

Trade Center was caused by a cloud of particulate matter that arose as the towers

collapsed or by the collapse itself.  This Court found the cause to be the particulate

cloud instead of the collapse of the towers – a determination that was upheld by the

Second Circuit.[32]  In fact, the Second Circuit quoted this Court's holding and reasoning

at length in its affirming opinion:

> [The] invitation to move beyond the direct cause of the loss – the
> contamination itself – would lead [] down a slippery slope of
> causation.
>
> Once the efficient cause inquiry passes the airborne particulate
> matter, there is no particular reason to stop at the collapse of the
> [World Trade Center].  The efficient cause of [Park's] loss could be
> the first hijacked plane that struck the [World Trade Center]; it could
> also be the second.  It could be the explosion of the airplanes' fuel
> tanks, or the resulting fires which caused the [World Trade
> Center's] structural supports to buckle, or the design of those very
> supports.  It could even be the prevailing winds, or lack thereof,

---

dominant cause of the flooding"); *Bird v. St. Paul*, 224 N.Y. 47, 53 (1918) ("Especially in the law of insurance, the rule is that you are not to trouble yourself with distant causes") (Cardozo, J.); *Kula v. State Farm Fire & Cas. Co.*, 212 A.D.2d 16, 628 N.Y.S.2d 988, 991 (4th Dep't 1995) (although other jurisdictions consider the "proximate cause" of a loss to be the event that sets other events in motion, New York looks to the "most direct and obvious cause" of the damage).

[30]   *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.,* 19 F.3d 78, 81 (2d Cir. 1994).  *See also Kosich v. Metro. Prop. & Cas. Ins. Co.*, 214 A.D.2d 992, 626 N.Y.S.2d 618, 618 (4th Dep't 1995) (A court must not examine or identify "the event that merely set[s] the stage for [a] later event") (internal quotation marks omitted); *Home Ins. v. American Ins.*, 537 N.Y.S.2d 516, 517 (1st Dep't 1989) (where steam in duct resulted in electrical arcing, the loss resulted from the arcing, not the steam; "the steam merely set the stage for the later event, and therefore, the escape of steam was the remote and not the proximate cause of the loss").

[31]   472 F.3d 33 (2d Cir. 2006) ("*Parks Real Estate*").

[32]   *Id.* at 49.

which allowed the particulate matter to reach the Property instead of being held up or indeed sent in the opposite direction . . .

Because efficient cause analysis can become so easily and obviously attenuated, courts look for the dominant, direct cause of the loss, not an event that is merely connected to a result.[33]

*Newmont Mines v. Hanover Ins. Co.* provides another example of New York's strict approach toward causation.[34]  There, the Second Circuit construed the terms "occurrence" and "any one loss, disaster or casualty," which the Court found to be interchangeable.[35]  The Court held that where the weight of snow and ice on the roof of a mining facility caused two distinct portions of the roof to collapse approximately three days apart, the policyholder's losses constituted two separate occurrences – such that two sets of policy limits applied.[36]

The fact that New York cases look to the most immediate and direct cause of loss when evaluating property insurance claims dovetails with the Policies' limitation of "directly" in the Occurrence Endorsement.

The straightforward application of "arising directly from" also is consistent with the construction of the Policies as a whole.  As one example, the flood sublimit also groups losses based on the strength or weakness of their nexus to particular

---

[33]   *Id.* at 40.  *See also Ocean Partners, LLC v. North River Ins. Co.*, 546 F. Supp.2d 101, 103 (S.D.N.Y. 2008) (under facts similar to *Parks Real Estate*, holding that a building near the World Trade Center was impacted by "materials generated from the collapse of the Twin Towers" and rejecting an insurance company argument "that the collapse of the WTC was the 'efficient' cause of the loss").

[34]   784 F.2d 127 (2d Cir. 1986).

[35]   *Id.* at 134 (While "occurrence" was undefined in one of the policies and "any one loss, disaster or casualty" was used in the other, the Court held: "No party to this litigation has suggested that the difference between the italicized language in each of the two policies requires dissimilar analysis").

[36]   *Id.* at 136-37.

circumstances.  That sublimit applies only to losses that arise specifically "with respect to the peril[ ] of flood."  As noted above, it expressly does *not* encompass losses that ensue therefrom:

> Even if the peril of flood or earthquake is the predominant cause of loss or damage, *any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits* or aggregates specified in this Clause B.

*See* Orin Aff. Exs. 3-26, at ¶3.B (emphasis supplied).  The distinction drawn between flood losses and ensuing losses, where only the former are subject to the sublimit, is analogous to the distinction drawn in the Occurrence Endorsement between losses that arise directly versus indirectly from one common cause, event or catastrophe – only direct losses are subject to aggregation under one set of policy limits.

Application of the plain meaning of "arising directly from" is further supported by the other terms in the Occurrence Endorsement itself.  The first sentence of the endorsement establishes the requirement for the aggregation of "any insured loss or several insured losses" that arise directly from a particular circumstance.  *Id.* at Endorsement No. 9.  The second and third sentences then make clear that aggregation is required for "such loss or [several] losses" even if they arise from several causes in a chain of causation.  *Id.*  The use of the phrase "such loss" in the second and third sentences clearly refers back to the clause in the first sentence about "[a]ny insured loss or several insured losses" – specifically, those losses that must "aris[e] *directly* from one common cause, event or catastrophe" in order to constitute a single occurrence.  *Id.* (emphasis added).  Accordingly, the repeated references in the second and third sentences of the Occurrence Endorsement reinforce the point that  for certain losses to

be grouped as part of a single occurrence, "such loss or several losses" must "aris[e] directly from" that occurrence.

Other examples of the narrow meaning of "arising directly from" in the Occurrence Endorsement can be found in the multiple occasions when the Policies choose between the terms "directly"[37] or "directly or indirectly."[38] There is every reason to believe, and no reason to dispute, that in each such circumstance, the Policies mean exactly what they say. In fact, if this Court were to rule that "directly" has a broad meaning as used in the Occurrence Endorsement, or that it can fairly be interpreted as indistinct from "directly or indirectly," that ruling could have implications for many other sections of the Policies.

Because directly means directly under the plain language of the Policies and the New York law on causation, this Court should enter partial summary judgment declaring

---

[37] *See, e.g.,* Orin Aff. Ex. 20, at ¶¶7.B(3) (limiting business interruption coverage for interruption of research and development activities to "the actual loss sustained of the continuing fixed charges and expenses, including Ordinary Payroll, *directly* attributable to such research and development activities"); 7.D(1) (limiting rental value coverage to "loss sustained by the Insured resulting *directly* from loss, damage or destruction . . .") (emphasis supplied).

[38] *See, e.g.,* Orin Aff. Ex. 20, at ¶10.I (excluding coverage for nuclear radiation or radioactive contamination, "whether such loss be *direct or indirect*, proximate or remote") (emphasis added); Endorsement No. 1 (providing that limited pollution coverage shall not apply to property damage "*directly or indirectly* resulting from sub-surface operations of the Insured") (emphasis added); Endorsement No. 2 (excluding coverage for damage or consequential loss "*directly or indirectly* caused by, consisting of, or arising from" a Y2K-type of computer bug) (emphasis added); Endorsement No. 4 (excluding coverage for damage or consequential loss "*directly or indirectly* caused by, consisting of, or arising from" internet malfunctions) (emphasis added); Endorsement No. 7 (excluding coverage for "loss, damage, cost or expense of whatsoever nature *directly or indirectly* caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto") (emphasis added); Endorsement No. 12 (excluding coverage for "loss, damage, cost or expense of whatsoever nature *directly or indirectly* caused by, resulting from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss") (emphasis added).

that only those losses arising *directly* from one common cause, event or catastrophe constitute a single occurrence, and that any losses arising *indirectly* from that cause, event or catastrophe are not part of that same occurrence – such that separate policy limits up to $675,000,000 apply for each separate "occurrence," as defined, that is proved at trial.

III.  **THE OCCURRENCE ENDORSEMENT SHOULD NOT BE READ AS IF IT CONTAINED THE WORDS "DIRECTLY OR INDIRECTLY"**

Despite the plain meaning of "arising directly from" in the Occurrence Endorsement, the Insurance Companies misconstrue an "occurrence" to encompass *all* losses arising from a common cause, event or catastrophe – whether those losses arise from it  directly or indirectly.[39]  As noted above, this construction improperly reads the definition as if it says "directly or indirectly," even though the words "or indirectly" are not there.  Because the Insurance Companies' construction would rob the Occurrence Endorsement of its plain meaning, it should be rejected and the plain meaning of "directly" should be enforced as a matter of law.

There is no basis in law or fact for interpreting the absence of the words "or indirectly" as inconsequential.  When the Insurance Companies wanted to use the phrase "directly or indirectly" in the Policies, they did so.  Indeed, the Policies use that phrase no less than six times.[40]  These examples demonstrate that the Policies mean

---

[39]  *See, e.g.,* Answers and Affirmative Defenses of Defendants Commonwealth Insurance Company, International Insurance Company of Hannover SE, Lexington Insurance Company, Liberty Mutual Fire Insurance Company, Maiden Specialty Insurance Company, Steadfast Insurance Company at ¶¶ 62-63 and Affirmative Defenses Nos. 2-3.

[40]  *See supra n.37.*

what they say. The Policies say "directly" when they mean "directly." When they mean "directly or indirectly," then that is what they say.

Under well-established New York law, clear and unambiguous insurance policy provisions "must be given their plain and ordinary meaning, and courts should refrain from rewriting the agreement."[41] Thus, under New York law, courts must reject attempts by insurance companies to rewrite terms of an insurance policy after a loss occurs. Just as the Court of Appeals would not redefine the word "exist" to mean "unmanifested existence" in *New England Mut. Life Ins. Co. v. Doe*, this Court should not redefine "directly" to mean "directly or indirectly" here.[42]

Moreover, it is not just the absence of the words "or indirectly" that make it clear that indirect losses are not part of an "occurrence." The inclusion of the word "directly" is a limitation all on its own. The Occurrence Endorsement easily could have been written without using the word "directly" to modify "arising from" – but it was not.[43] Thus, the limiting effect of the word cannot be ignored. Any other approach would treat policy language as "mere surplusage" in contravention of New York law.[44]

---

[41]    *United States Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229 (1986); *Horowitz v Am. Int'l Group, Inc.*, 498 F. App'x 51, 53 (2d Cir. 2012).

[42]    *See New England Mut. Life Ins. Co. v. Doe*, 93 N.Y.2d 122, 130 (1999) (rejecting the insurance company's attempt to rewrite the unambiguous terms of the insurance policy after the loss occurred, and holding: "Exist means exist. We will not limit the definition of the word exist, or redefine it, to mean "unmanifested existence").

[43]    Indeed, Lexington used this type of open-ended formulation in policies sold to other policyholders during this same time period, so such wording was readily available at that time. *See, e.g., Ports of Indiana v. Lexington Ins. Co.*,2011 U.S. Dist. LEXIS 130979 at * 38-39 (S.D. Ind. Nov. 14, 2011) (defining "occurrence" to mean "any one loss, disaster, casualty or series of losses, disasters, or casualties, arising out of one event . . . .").

[44]    *See Westview Assocs.*, 95 N.Y.2d at 339 (2000); *see also Bretton*, 110 A.D.2d at 50 (1st Dep't 1985), *aff'd*  66 N.Y.2d 1020 ("a policy's terms should not be assumed to be superfluous or to have been idly inserted").

The plain language of the Occurrence Endorsement provides that losses are aggregated when they "arise *directly* from" one common cause, event or catastrophe. Under New York's black letter rules of construction, directly means directly. Accordingly, this Court should enter partial summary judgment declaring that all losses arising *directly* from one common cause, event or catastrophe constitute a single occurrence, and that any losses arising *indirectly* from that cause, event or catastrophe are not part of that same occurrence.

## **CONCLUSION**

For all of the foregoing reasons, Amtrak respectfully requests that this Court grant the Motion in its entirety.


Dated:   December 18, 2014

By:   /s/
_____
Rhonda D. Orin, Esq. (RO-0359)
rorin@andersonkill.com
Daniel J. Healy, Esq. (DH-7396)
dhealy@andersonkill.com
Marshall Gilinsky, Esq. (MG-8398)
mgilinsky@andersonkill.com
**ANDERSON KILL, L.L.P.**
1717 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone:  202-416-6500

Finley T. Harckham, Esq. (FH-8219)
fharckham@andersonkill.com
**ANDERSON KILL, P.C.**
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212-278-1000

*Attorneys for Plaintiff*
