UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>        Plaintiff,<br><br>    vs.<br><br>ARCH SPECIALTY INSURANCE COMPANY;<br>ASPEN SPECIALTY INSURANCE COMPANY;<br>COMMONWEALTH INSURANCE COMPANY;<br>FEDERAL INSURANCE COMPANY;<br>LEXINGTON INSURANCE COMPANY;<br>LIBERTY MUTUAL FIRE INSURANCE COMPANY;<br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and CERTAIN LONDON MARKET INSURANCE COMPANIES subscribing to Policy Nos. 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 and GEP 2944;<br>MAIDEN SPECIALTY INSURANCE COMPANY;<br>MAXUM INDEMNITY COMPANY;<br>NAVIGATORS INSURANCE COMPANY;<br>PARTNER REINSURANCE EUROPE plc;<br>RSUI INDEMNITY COMPANY;<br>STEADFAST INSURANCE COMPANY;<br>TORUS SPECIALTY INSURANCE COMPANY; and<br>WESTPORT INSURANCE CORPORATION,<br><br>        Defendants. | Civ. Action No.:14-cv-7510 (JSR) |

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING THE FLOOD SUBLIMIT**

---

# TABLE OF CONTENTS

                                                       **Page**

ARGUMENT .................................................................................................................. 1

I.     Defendants Fail To Show that Their 2011-12 Policies Include Storm Surge and Wind-Driven Water As Part of "Flood".. ........................................................... 2

II.    Defendants' Cases Are Inapposite. ....................................................................... 5

III.   Extrinsic Evidence, If Considered, Supports Amtrak's Interpretation. ................... 8

CONCLUSION ............................................................................................................. 10

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Great Lakes Int'l Trading, Inc. v. Travelers Prop. Cas. Co. of Am.*
   No. 3:13-cv-01522, 2014 U.S. Dist. LEXIS 165378 (D. Conn. Nov. 26, 2014)........... 6

*Leonard v. Nationwide Mut. Ins. Co.*,
   499 F.3d 419 (5th Cir. 2007) ................................................................................... 6

*New Sea Crest Healthcare Ctr., LLC v. Lexington Ins. Co.* ............................................. 5
   2014 U.S. Dist. LEXIS 86585 (E.D.N.Y., June 24, 2014)

*Newark Trust Co. v. Agricultural Ins. Co.*,
   237 F. 788 (3d Cir. 1916) ....................................................................................... 6

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
   563 F.3d 777 (9th Cir. 2009) ................................................................................... 6

*Tuepker v. State Farm Fire & Cas. Co*
   507 F.3d 346 (5th Cir. 2007) ............................................................................... 7,8

**ARGUMENT**

Defendants seek to maintain the untenable position that three different definitions of flood have the same meaning. To make this argument, Defendants avoid addressing the policy language at issue and focus their opposition on case law from other jurisdictions and a wide range of material including underlying facts, press releases and dictionaries. Defendants disregard the Policies' identification of windstorm and flood as separate risks and fail to explain why one Defendant expressly included sea surge and wind-driven water in the definition of "flood" whereas the others did not. Thus, Defendants are unable to demonstrate that this Court should deny Plaintiff National Railroad Passenger Corporation's ("Amtrak") request for the following rulings: (1) only one of the Policies defines wind-driven water or storm surge as "flood;" (2) if Amtrak's losses are proved at trial to have been caused by wind-driven water or storm surge, then they are subject to the flood sublimit under only that one policy and not any of the others; and (3) even if the flood sublimit applies to certain losses, it is limited to those losses caused by the specific peril of flood and does not apply to ensuing losses.[1]

Defendants further concede that Amtrak is entitled to the third requested ruling on ensuing loss.[2] Although Defendants are correct that a determination of what losses are ensuing is a factual issue, that does not prevent this Court from ruling as requested. Defendants' remaining contention is that some of their policies exclude flood altogether

---

[1] Motion for Partial Summary Judgment Regarding the Flood Sublimit ("Motion") at 4; 2-6; 18-20.

[2] Opp. Br. at 22 ("[I]t is true that the flood limit of liability has language that addresses ensuing loss.").

1

but they do not dispute that even those policies contain the "ensuing loss" clause, so that point does not bar the requested ruling either.[3]

## I. Defendants Fail To Show that Their 2011-12 Policies Include Storm Surge and Wind-Driven Water As Part of "Flood".

Despite the inapposite citations and extraneous information, the Defendants whose policies contain the so-defined Narrow Flood Definition and the Expanded Flood Definition ultimately fail to show that their policies include storm surge and/or wind-driven water as part of their policies' definition of flood. The only explanation that they offer for their failure to reference storm surge and wind-driven water in their flood definitions is that such specificity was not required. But the carefully drafted flood definition in the Westport policy puts the lie to that contention.[4] So does the fact that elsewhere in the policies, Defendants distinguish expressly between the perils of windstorm and flood.[5] Lexington Insurance Company ("Lexington"), in particular, has no explanation for why it included a "Named Storm" definition on the very page of the endorsement that added the Expanded Flood Definition[6] – yet failed to incorporate or reference any part of it into its expanded definition of Flood.[7]

---

[3]   Opp. Br. at 6, 22.

[4]   *See* Affidavit of Rhonda D. Orin ("Orin Aff."), submitted in support of Moving Br. at Ex. 26, Endorsement No. 13.  As noted in the Motion, the same language was included in the policy of an insurance company that is in the 2011-12 program, but subject only to arbitration.

[5]   *See* End. Nos. 3 and 6 to Orin Aff at Exs. 3-26, which distinguish between "Flood" and "Windstorm" in a list of perils specific to those endorsements.

[6]   *See* Orin Aff. at Exs. 3-25, Endorsement No. 13 ("The following definition of Named Storm is hereby added [:] A storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm or Tropical Depression").

[7]   By adding two subsections that focus exclusively and expressly on surface water, Lexington furthered the message that storm surge and wind-driven water were not included.  *See* Orin Aff. at Exs. 20-21.

2

Defendants' ultimate argument is therefore that all three definitions of Flood have the same meaning.[8] This argument interprets the "sea surge" and "wind-driven water" references in the Westport Insurance Company ("Westport") policy as superfluous: just a repetition of "the rising, overflowing or breaking of defenses of natural or manmade bodies of water."[9] That approach would be contrary to the New York law on policy construction.[10]

Defendants' reliance upon dictionaries,[11] letters,[12] press releases[13] and other uses of the term "flood" outside the scope of the policies underscores the deficiency in their definitions. There is no merit to their claim that colloquial usage controls because the Narrow Flood Definition can be found, in whole or part, in certain dictionaries. The issue is what the definitions mean in the context of the insurance policies, based on usage within the industry as a whole. If Defendants intended to rely upon colloquial usage, either from modern times or the days of Noah,[14] they should not have included definitions of flood in their policies.

---

[8]  Opp. Br. at 8.

[9]  Opp. Br. at 3, 20-21.

[10]  *See id.* As the discussion is nearly repeated verbatim in this Brief, to the extent that Defendants argue that the Policy is ambiguous and that *contra proferentem* should be applied, Amtrak incorporates the response set forth on page 8 of Reply Memorandum of Law in Further Support of Plaintiff's Motion for Partial Summary Judgment Regarding the Occurrence Endorsement.

[11]  Opp. Br. at 9-13.

[12]  Opp. Br. at 13-14.

[13]  Opp. Br. at 13.

[14]  *See* Opp. Br. at 14 n.16. While Amtrak appreciates the humor of the Court which stated that a proffered reading of flood would be "news to Noah," Amtrak's response is that – unlike Amtrak – Noah did not have an insurance policy that covered flood up to $125MM and storm surge up to $675MM.

Defendants' focus on a "single loss" provision in Paragraph 13.A of their policies is equally misplaced. That provision, which is not part of the flood definition, reinforces that storm surge and wind-driven water are not part of "flood." Subparagraph (2) identifies as a "single loss" the time it takes for a river, stream or other body or water to rise up, overflow its banks and eventually subside back to its normal size. These concepts (overflow, subsidence, banks and boundaries) are consistent with the limited nature of the definitions at issue. But it would be a stretch to make them fit wind-driven water and storm surge, requiring leaps that are inconsistent with the specificity that is required in policy language – like being specific about "river(s) and stream(s)," but treating oceans as an "other" body of water that overflows its banks. This is true for various reasons, including the basic fact that oceans do not overflow, given their size and virtually unlimited capacity to dissipate water. It would not be normal policy construction to use the overflow and subsidence of "river(s) or stream(s) or other bodies of water" as an indirect means of identifying storm surge, in lieu of the many alternatives regularly used by insurance companies, including Defendants.[15]

Defendants' reference to Paragraph 8.A(3) is a red herring. That paragraph makes clear that when a Tsunami results from an earthquake ("disturbance"), they are treated as a "single loss." Even if the reference was to lunar tides, as Defendants now suggest, the pull of the moon is different from wind-driven water or storm surge – and tides do not cause the ocean to overflow.

The starting point of any insurance analysis is the policy language and this case is no exception. Since the policies had three different definitions of flood, and only one

---

[15]  *See e.g.*, Moving Br. at n. 40-41.

4

expressly included sea surge and wind-driven water, losses arising directly from storm surge and /or wind-driven water are subject to the flood sublimit in that policy alone.

## II. Defendants' Cases Are Inapposite.

The cases cited by Defendants are inapposite for many reasons. Most involve the interpretation of exclusions for water-related damage, which include "flood" as part of a laundry list of excluded damage from water. Amtrak's definition of "flood" is entirely different and, therefore, how storm surge fits into exclusions for water-related damage is irrelevant here. Thus, the hodgepodge of authorities that Defendants cite (mostly from the Fifth Circuit or cases citing Fifth Circuit cases) are inapplicable.

In terms of New York law, Defendants' citations to *New Sea Crest Healthcare v. Lexington Ins. Co.* are misleading.[16] Defendants fail to disclose the key fact that, in *New Sea Crest*, Lexington expressly defined "flood" as "storm surge" and included "whether driven by wind or not."[17] Lexington offers no explanation for why it was specific about these risks with New Sea Crest, but not Amtrak. Defendants' citation to *New Sea Crest* without acknowledging the difference in policy language, after Amtrak extensively briefed the issue in the Motion, speaks for itself.

The same is true for Defendants' extensive reliance on the Fifth Circuit authority about homeowners' policies with broad exclusions for water-related losses "whether or

---

[16] *See* Opp. Br. at 10.

[17] *See* Moving Br. at 13-14 ("The Eastern District's emphasis on the exact words of the definition was in accord with the New York practice of strict enforcement of policy language").

5

not driven by wind," including anti-concurrent causation provisions.[18]  Again, the flood definitions in the Amtrak Policies do not include any of these terms.

Defendants' citation to the Ninth Circuit decision in *Northrop Grumman Corp. v. Factory Mut. Ins. Co.* is also misplaced.[19]  As an initial matter, that decision was both decided under California law and is not binding upon this Court.[20]  It also is inapposite as, unlike here in either the Narrow Flood Definition or the Expanded Flood Definition, the definition in *Northrop Grumman* – which is not quoted by Defendants -- begins with the undefined term "flood," just like the water-damage exclusions in the Fifth Circuit cases.[21]  The structure of that definition enabled the Ninth Circuit to rely on the Fifth Circuit decisions, including *Leonard v. Nationwide Mut. Ins. Co.*,[22] that interpreted "flood" in the colloquial sense.[23]  The absence of the term "flood" in all but one policy at issue in this Motion therefore further limits the value of *Northrop Grumman*.

---

[18]  *See* Moving Br. at 14-16.  The cases cited by Defendants on pp. 10-11 were either distinguished by Amtrak in the moving brief or are predicated upon cases or reasoning that was distinguished by Amtrak in the moving brief.  *See, e.g., Newark Trust Co. v. Agricultural Ins. Co.*, 237 F. 788 (3d Cir. 1916) (flood damage from hurricane was excluded under policy that excludes "any loss or damage caused generally by water, <u>even when 'driven by wind</u>.'").  Similarly, in *Great Lakes Int'l Trading, Inc. v. Travelers Prop. Cas. Co. of Am.*, the finding that flood was excluded was not significant, as the issue was not flood coverage but the lack of coverage for an excluded location. No. 3:13-cv-01522, 2014 U.S. Dist. LEXIS 165378 (D. Conn. Nov. 26, 2014) (applying New Jersey law).

[19]  563 F.3d 777 (9th Cir. 2009), cited *passim* throughout the Opp. Brief.

[20]  *Id.* at 783, n.3.

[21]  *Id.* at 783 ("The first word used to define the term Flood in the excess policy was "flood").

[22]  *See infra* n. 18.

[23]  499 F.3d 419, 424 (5th Cir. 2007).

While acknowledging that Defendants' cases are distinguishable,[24] Defendants nevertheless attempt to resuscitate their applicability.  First, Defendants argue that whether the word flood is defined or not is a "distinction without a difference."[25]  This position is contrary to their earlier admission that: "Where the interpretation of an insurance policy is at issue, the court first looks to policy language."[26]  Indeed, policy language matters[27] and decisions interpreting flood as an undefined term are distinguishable.

Second, Defendants argue that the inclusion of anti-concurrent causation clauses in the cases they cite is a "red herring" because "Amtrak is not asking the Court to determine whether wind or water" caused the damage.[28]  What Defendants overlook is that, in many of those cases, the determination of no coverage arose from the application of anti-concurrent causation provisions rather than the meaning of Flood.[29]

Third, Defendants argue that the absence of references to storm surge or wind in their cases is irrelevant.[30]  This argument misses the point.  In looking for insight about policy language by reviewing court decisions, it is extremely relevant – before citing a holding -- to consider if the policy language is on point.  For example, Defendants cite

---

[24] *See* Opp. Br. at 19-21.

[25] *See* Opp. Br. at 19.

[26] *See* Opp. Br. at 8.

[27] *See infra* n.17.

[28] *See* Opp. Br. at 20.

[29] *See*, *e.g.*, *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419 (5th Cir. 2007).  As set forth in the Moving Brief at 16, the Fifth Circuit's decision not to find coverage rested on the finding that anti-concurrent causation clauses are enforceable in Mississippi.

[30] *See* Opp. Br. at 20.

7

*Tuepker v. State Farm Fire & Cas. Co.*, with the following parenthetical: "flood provisions 'accurately describe the influx of water into the [insureds'] home that was caused by Katrina storm surge.'"[31] What Defendants fail to note is that the prior sentence, defining "Water Damage Exclusion," states that "water damage includes damages caused by, among other things, flood….'<u>all whether driven by wind or not</u>.'"[32] This fact renders the holding irrelevant here.

For all of these reasons, the cases cited by Defendants fail to establish that the three different definitions of flood in the Policies should be read as just one.

### III. Extrinsic Evidence, If Considered, Support Amtrak's Interpretation.

Defendants have relied on extrinsic evidence in opposing the Motion.[33] Should this Court resort to extrinsic evidence, the limited amount of evidence developed thus far shows that the Motion should be granted.

Of primary significance is that, despite Defendants' protestations about the sufficiency of their policy language, they switched en masse in November 2011 to an even more specific version of the Westport definition.[34] In the renewal policies for the 2012-13 policy year, which took effect on December 1, 2012, the Westport definition was incorporated into the standard policy.[35] In addition to incorporating the terms "sea

---

[31]   *See* Opp. Br. at 10, citing *Tuepker v. State Farm Fire & Cas. Co.*, 507 F.3d 346, 352 (5th Cir. 2007).

[32]   *See Tuepker*, 507 F.3d at 352 (emphasis added).

[33]   *See, e.g.*, Opp. Br. at 12-14, 22 n.24.

[34]   *See, e.g.*, Ex. A to the Affidavit of Cathy H. Rawlings in Further Support of Amtrak's Motion, sworn to on January 14, 2014 ("Rawlings Aff."), at Endorsement 17.

[35]   *See id.*

surge" and "wind driven water," the definition now included an additional sentence that identified flood as including "Storm Surge caused by named Windstorm" and added an anti-concurrent causation provision.[36] Had such language had been included in the definitions at issue here, Defendants presumably would not have spent the majority of their opposition brief discussing dictionaries, press releases and inapposite cases.

Second, Amtrak's broker confirmed recently that Amtrak's flood sublimit did not include storm surge until the policy year <u>following</u> Superstorm Sandy. On April 1, 2014, Amtrak Risk Manager Philip Balderston sent the following email to Marsh Vice President Sharon Walker and received the following response:

> "I want to confirm that Amtrak did not have a sublimit on storm surge until the 12/1/2012-13 policy year when the definition of flood was expanded to include storm surge."
>
> "Phil – that is generally correct."[37]

When Amtrak completed the purchase of the 2011-12 Policies, the late Douglas Cook, who was Risk Manager at the time, reviewed the scope of the coverage with Ms. Walker of Marsh. In response to his questions,[38] she confirmed that Lexington had <u>broadened</u> what is identified here as the Narrow Flood Definition – which supports Amtrak's position that the definitions are different and refutes Defendants' contention that they are the same.[39] She confirmed that the expansion was a disadvantage:

---

[36] This is the language that Defendants identify here as totally unnecessary. *See supra* at n. 16.

[37] *See* Ex. B to the Rawlings Aff. Ms. Walker noted that a few policies have broader definitions, as is standard in the insurance industry. *See id.* Her comment confirms the general view of the effect of failing to specify storm surge or wind within an insurance policy's definition of Flood.

[38] This exchange also confirms that the narrow scope of the Flood sublimit was important to Amtrak at the time it purchased the policies that ultimately were in effect during Sandy.

[39] *See* Opp. Br. at 8, 14-16.

> "While the Lexington changes broaden the earthquake and flood definitions, they also make the broader definition a part of the sublimit. Is that a disadvantage?"
>
> "Since both are sublimited to $125M I do not think it is not a significant issue, but it is certainly a disadvantage . . . These definitions are fairly standard in the property market, even though we try to push back on them."[40]

The same is true for correspondence exchanged between Marsh and Westport in connection with Westport's 2011-12 policy. On October 25, 2011, Westport advised Marsh that it would go forward with Amtrak only if it was allowed to change what is identified here as the Narrow Flood Definition.[41] Marsh agreed, but only "grudgingly."[42]

These documents are just a few examples of the extrinsic evidence that has been developed thus far on the issue of storm surge. They are completely consistent with the rulings that Amtrak seeks here.[43] If an insurance company intended to subject a storm surge to sublimits or exclusions, it had to do so expressly. Only Westport did so here and the other Policies cannot be construed as if they had done the same.

## CONCLUSION

For all of the foregoing reasons, Amtrak respectfully requests that this Court grant the Motion in its entirety.

---

[40] *See* Ex. C to the Rawlings Aff.

[41] *See* Ex. D to the Rawlings Aff.

[42] *See* Ex. E to the Rawlings Aff.

[43] If this Court allows further briefing to Defendants following the close of discovery, Amtrak requests the right to supplement this briefing as well. Defendants' request for *sua sponte* relief on various issues (*e.g.* Opp. Br. at 3, 8) is unwarranted and should be denied.

10

Dated:   January 15, 2015

        By:   /s/
      Rhonda D. Orin, Esq. (RO-0359)
      rorin@andersonkill.com
      Daniel J. Healy, Esq. (DH-7396)
      dhealy@andersonkill.com
      Marshall Gilinsky, Esq. (MG-8398)
      mgilinsky@andersonkill.com
      **ANDERSON KILL, L.L.P.**
      1717 Pennsylvania Avenue, N.W.
      Washington, DC  20006
      Telephone:  202-416-6500

      Finley T. Harckham, Esq. (FH-8219)
      fharckham@andersonkill.com
      Peter A. Halprin, Esq. (PH-2514)
      phalprin@andersonkill.com
      **ANDERSON KILL, P.C.**
      1251 Avenue of the Americas
      New York, NY  10020
      Telephone:  212-278-1000

      *Attorneys for Plaintiff*