UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL RAILROAD PASSENGER CORPORATION,

Plaintiff,

vs.

ARCH SPECIALTY INSURANCE COMPANY;
ASPEN SPECIALTY INSURANCE COMPANY;
COMMONWEALTH INSURANCE COMPANY;
FEDERAL INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY;
LIBERTY MUTUAL FIRE INSURANCE COMPANY;
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and CERTAIN LONDON MARKET INSURANCE COMPANIES subscribing to Policy Nos. 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 and GEP 2944;
MAIDEN SPECIALTY INSURANCE COMPANY;
MAXUM INDEMNITY COMPANY;
NAVIGATORS INSURANCE COMPANY;
PARTNER REINSURANCE EUROPE plc;
RSUI INDEMNITY COMPANY;
STEADFAST INSURANCE COMPANY;
TORUS SPECIALTY INSURANCE COMPANY; and
WESTPORT INSURANCE CORPORATION,

Defendants.

14 Civ. 7510 (JSR)

**MORE DEFINITE STATEMENT**

**JURY TRIAL DEMANDED**

Plaintiff National Railroad Passenger Corporation ("Amtrak"), in accordance with the Court's February 17, 2015 Order ("Order"), submits the following more definite statement:

1. Amtrak seeks consequential damages in the form of attorneys' fees and costs based on the Defendants' improper and undue delay in investigating, paying and communicating with Amtrak about Amtrak's claim for coverage of its losses following Super Storm Sandy that are at issue in this case. While these attorneys' fees and costs

were, and continue to be, unnecessary, Amtrak has not at this time identified other categories of unnecessary expenses.

2. Amtrak is entitled to those attorneys' fees as consequential damages under New York law because, among other things, it had to incur those fees in addition to its ordinary loss adjustment costs that are covered under the terms of the Policies[1] and due to the Defendants' breach of their duty of good faith and fair dealing.

3. The Defendants' wrongful, unjustified and inappropriate delay, failure to make partial/interim payments, failure to process and pay Amtrak's submissions in a timely fashion, improper treatment of Amtrak's claims for coverage and imposition of unwarranted and unduly burdensome requests for information that wrongfully divert Amtrak from its restoration efforts have all led to Amtrak having to file this lawsuit.

4. The New York Court of Appeals specifically has held that a policyholder is entitled to seek consequential damages from an insurance company that breaches its duty of good faith and fair dealing in delaying payment of insurance proceeds. *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187 (N.Y. 2008) ("*Bi-Economy*"). The Court expressly stated that "… implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" *Id.* at 194.

5. A policyholder may "bargain for the peace of mind, or comfort, of knowing that it will be protected in the event of a catastrophe." *Bi-Economy*, 10 N.Y.3d at 194

[1] The Policies are defined and described at paragraphs 41 through 68 of the Amended Complaint in this case. Those allegations are incorporated as if fully set forth herein.

(holding that a corporate policyholder is entitled to bargain for peace of mind through protective insurance coverage that is supposed to be provided promptly after a loss).

6. A policyholder also is specifically entitled to seek attorneys' fees based on an insurance company's breach of its duty of good faith and fair dealing in delaying payment, handling or resolution of a claim. *Panasia Estates v. Hudson Insurance Co.*, 10 N.Y.3d 200 (2008) (denying a motion to dismiss a claim for consequential damages that included attorneys' fees) ("*Panasia*"); *Richman v Harleysville Worcester Ins. Co.*, 2010 N.Y. Misc. LEXIS 6832, 2010 NY Slip Op 33811(U) (N.Y. Sup. Ct. Nov. 1, 2010) (denying a motion to dismiss plaintiff's claim for consequential damages that consisted of attorneys' fees) ("*Richman"*).

7. Additionally, a policyholder may recover attorneys' fees and costs in a suit against its insurance company where the insurance company has acted unreasonably in handling a claim for coverage. *New England Mut. Life Ins. Co. v. Johnson*, 155 Misc. 2d 680, 681 (N.Y. Sup. Ct. 1992) (awarding attorneys' fees and costs based on an unreasonable handling of the claim)(citing *Sukup v. State*, 19 N.Y.2d 519 (1967)).

8. Amtrak provided timely notice to Defendants of its actual and potential losses following Super Storm Sandy and Amtrak has complied with all the terms of the Policies at issue in this case.

9. Amtrak undertook as quickly as possible the enormous task of investigating and quantifying its losses and, in so doing, provided ongoing updates to its claim, partial and interim submissions of detail to support its claim and extensive access to the Defendants to conduct their own investigation and quantification of Amtrak's losses.

10. Amtrak engaged a public adjuster, Goodman Gable & Gould to assist in the processing of the claim. It also engaged the accounting firm Rollins Accounting and the engineering firm Continental Machinery, as well as a number of other professionals, to evaluate and document Amtrak's losses. Those professionals provided detailed information to the insurance companies, including the Defendants, which included thousands of pages of financial, inventory and other data to support Amtrak's claim. The expense of hiring those professionals is payable under the terms of the Policies.

11. In and around September 2013, Defendants had requested Amtrak to provide them with an estimate of its total losses. On September 26, 2013, Amtrak complied with this request by providing Defendants with a preliminary estimate that was based on the information then known, which Amtrak made clear did not yet include quantification of certain losses. That estimate was in excess of $504 million.

12. By January 21, 2014, Amtrak and its claim team had submitted data supporting over $260 million worth of documented losses, including line-item details for large inventories of damaged assets at numerous locations.

13. By as early as April 2014, the Defendants' own public adjuster recommended to Defendants, without telling Amtrak or Amtrak's claim team, that approximately $83 million of Amtrak's submitted claim was undisputed.

14. Each of the Policies requires the Defendants to "issue partial payment(s) of claim subject to the policy provisions, [which] shall not be less than the undisputed estimate of loss or damage between the Insured and the Company."

15. By as late as June 2014, the Defendants made only three insurance payments of $10 million each, separated by lengthy intervals.

16. Those payments were offered in October 2013, January 2014 and April 2014.

17. Amtrak requested that $75 million be paid by the Defendants as an undisputed amount of coverage, based on the voluminous information it had submitted in support of over $260 million of losses. There was no reasonable basis for the Defendants to refuse to pay these undisputed amounts, but they did not pay them.

18. Instead, in July 2014, the Defendants offered to advance an additional $20 million, but only on the unacceptable condition that Amtrak abandon its right to seek recovery for more than one occurrence.

19. On July 22, 2014, the Defendants' adjuster, with the express authorization of all Defendants, advised Amtrak's adjuster that Amtrak could receive another partial/interim payment of $20 million, but only if Amtrak agreed that all of its losses arose from a single occurrence and released certain primary insurance companies from any further obligation to Amtrak.

20. The Defendants knew at the time that Amtrak contended that its losses arise from more than one occurrence under the plain language of the Defendants' Policies and that Amtrak was continuing to assess the amounts of its losses, including to the structure of the tunnels at issue, in amounts over and above the losses that were then already documented to be above $260 million. Thus, the Defendants knew that there was no reasonable basis for their refusal to pay undisputed amounts far in excess of the amounts paid prior to July 22, 2014.

21. During this same time, the Defendants demanded that Amtrak respond with over eighty (80) requests for information that included requests for tens of

thousands of pages of documents, beyond the voluminous documentation that Amtrak's claim team already had provided to the Defendants.

22. Before July 22, 2014, one of the engineering firms that is part of the Defendants' claim team, Thornton Tomasetti, had conducted at least thirty nine (39) site inspections to assess Amtrak's losses at the locations at issue in this case.

23. The Defendants are fully aware that conducting inspections of Amtrak's facilities, especially the East River Tunnel ("ERT") and the North River Tunnel ("NRT"), burdened Amtrak with the inconvenience and expense of making its facilities repeatedly available for inspections. The multiple inspections of Amtrak's heavily utilized tunnels under the Hudson and East Rivers, the NRT and ERT respectively, involves shutting down the tunnels to train traffic and, often, interfering with other maintenance or construction work from being performed while the Defendants' claim team conducted its inspections.

24. Before and after July 22, 2014, the Defendants' adjuster reported that at least $83 million of Amtrak's claims that had been submitted with extensive documentation by January 21, 2014 were undisputed and should be paid. Thus, the information available to the Defendants demonstrated that there was no reasonable basis for their refusal to pay the $75 million of undisputed coverage requested by Amtrak.

25. The Defendants unreasonably and wrongfully refused to provide Amtrak, however, with such payment and further unreasonably and wrongfully refused to provide Amtrak with their position on the extent or amount of the losses that Defendants believed were at issue, let alone that were undisputed.

26. Prior to the filing of this lawsuit against the Defendants, the Defendants had paid only $30 million and, in violation of the terms of each Policy at issue in this case, offered to pay an additional $20 million, but only on the unacceptable condition that Amtrak waive its rights to seek coverage for multiple occurrences.

27. No other payment or offer of unconditional payment was made from April 2014 through the time Amtrak filed this lawsuit on September 19, 2014.

28. Prior to the filing of this lawsuit against the Defendants, the Defendants refused to provide Amtrak with their position as to the extent or amount of the losses Amtrak suffered following Super Storm Sandy. The Defendants' refusal to provide this vital information allowed the Defendants to perpetuate the false position that there were no further undisputed amounts to be paid under the Policies. It additionally left Amtrak unable to engage in meaningful discussions with the Defendants regarding the extent of the claim and what further amounts should be paid or as to how to resolve potentially disputed amounts of the claim.

29. The effect of the Defendants' treatment of Amtrak's claim for insurance coverage, as the Defendants intended it to be, was to delay resolution of the claim, delay payment of even the undisputed portions of the claim and to leave Amtrak without information to move resolution of the claim forward.

30. Amtrak was forced to file this lawsuit and incur unnecessary legal expenses, including attorneys' fees and costs, to obtain the coverage that the Defendants were obligated, and remain obligated, to provide under the terms of the Policies for *undisputed* amounts. The Defendants' refusal to pay these amounts was unreasonable, wrongful, unjustified and inappropriate.

31. The attorneys' fees include both fees paid to outside counsel and fees paid for additional in-house counsel needed to address the Defendants dilatory tactics and refusal to pay coverage for Amtrak's losses.

32. It was not until after filing this lawsuit that Amtrak was provided with information it had demanded from the Defendants as to the Defendants' documentation of the extent and amount of the losses they contend are at issue.

33. The Defendants' ongoing unreasonable refusal to pay coverage, including their refusal to pay the undisputed amounts of Amtrak's well-documented losses, foreseeably led to the filing of this lawsuit.

34. Amtrak's losses are significant and Amtrak needs to recover the amounts of the coverage it is owed in order to recover from the damages and losses it suffered following Super Storm Sandy.

35. The Defendants refused to pay even the amounts of those losses that they admittedly could not dispute and engaged in tactics to stonewall Amtrak's claim, delay the resolution of the claim process and further refused to provide any information to identify their position as to the submitted losses, let alone as to the undisputed amounts of Amtrak's claim. At the same time the Defendants engaged in this conduct, their own adjuster had identified amounts that they were required to pay under the terms of the Policies.

36. It was not until after Amtrak filed this lawsuit that the Defendants provided documents that even arguably outline their positions as to Amtrak's claim for coverage for its losses following Super Storm Sandy.

37. It also was not until after Amtrak filed this lawsuit that the Defendants, through counsel and in response to requests from Amtrak's public adjuster to the Defendants' adjuster for a full explanation of the Defendants' position as to the amount of the losses at issue, declared the adjustment process to be concluded. As of December 15, 2014, Amtrak had still not received an explanation of the Defendants' position as to the amount and scope of the losses the Defendants' considered to be at issue.

38. The attorneys' fees required to combat the Defendants' dilatory and stonewalling tactics are separate and apart from the ordinary loss adjustment expenses associated with presenting the claim to Defendants in accordance with the terms of the Policies. Those ordinary loss adjustment expenses include, without limitation, the fees of Goodman, Gable & Gould, Rollins Accounting, Continental Machinery and other professionals needed to, among other things, investigate and quantify the claim with supporting documentation.

39. Further, the ordinary loss adjustment expenses paid to Goodman, Gable & Gould, Rollins Accounting, Continental Machinery and other professionals needed to investigate and quantify Amtrak's claim should have led to prompt payment of, in the very least, undisputed amounts by the Defendants and to the exchange of information concerning disputed amounts.

40. As set forth above, the Defendants refused to pay coverage amounts, including undisputed amounts, despite that Amtrak, Goodman, Gable & Gould, Rollins Accounting, Continental Machinery and other professionals had provided significant and detailed support for Amtrak's claimed losses and also had engaged in responding to the

Defendants' burdensome requests for information and in providing the Defendants with repeated access to the property at issue.

41. By engaging in dilatory tactics, refusing to pay undisputed amounts and refusing to provide information to Amtrak about their basic positions as to the amount of the loss at issue, the Defendants breached their duty of good faith and fair dealing under the Policies at issue.

42. The Defendants were fully aware of the importance of the timing of payment to Amtrak for covered losses. The terms of the Policies themselves set forth that not only was Business Interruption coverage provided for the time that Amtrak could not operate at full capacity, but the Policies further provide Time Element coverage and require immediate payment of all undisputed amounts of a claim. Based on these terms alone, the Defendants were aware that the timing of payment under the Policies is an important part of the coverage provided. They were fully aware that any delay by the Defendants or delayed payment of a claim or any portion of a claim could lead to Amtrak suffering consequential damages.

43. The New York Court of Appeals has held that he very purpose of coverage terms such as Business Interruption coverage "would have made the [insurance company] aware that if it breached its obligations under the contract to investigate in good faith and pay covered claims it would have to respond in damages" for losses suffered by the policyholder as a result of a breach. *Bi-Economy*, 10 N.Y.3rd at 195. Accordingly, in *Bi-Economy* the policyholder was permitted to pursue consequential damages based on the insurance company's delay in paying a claim. Similarly, in *Panasia*, the Court of Appeals applied *Bi-Economy* and affirmed the denial

of an insurance company's motion to dismiss a policyholder's request for consequential damages. *Panasia*, 10 N.Y.3d 200.

44. The natural and foreseeable consequence of the Defendants' refusal to pay undisputed amounts and refusal to provide information as to their position on the extent and amount of Amtrak's losses, and the Defendants' additional ongoing delay tactics, including the requests for voluminous amounts of information and repeated and duplicative inspections of property was that Amtrak would seek relief through the judicial process by filing a lawsuit for the coverage it is entitled to receive.

45. In order to respond to the Defendants' breach of their duty of good faith and fair dealing under the Policies at issue, Amtrak needed to file this lawsuit and engage counsel, both outside counsel and in-house counsel, to do so. These expenses are separate from and beyond the ordinary loss adjustment expenses incurred by Amtrak to present its claim to the Defendants.

46. Amtrak is entitled to recover its attorneys' fees for its outside counsel and in-house counsel that were incurred because of the Defendants' refusal to pay Amtrak's covered losses following Super Storm Sandy.

47. Those covered losses far exceed the amounts paid prior to Amtrak's filing of this lawsuit.

48. The Defendants cannot dispute that attorneys' fees are recoverable as consequential damages for their breach of their duty of good faith and fair dealing under the Policies. *See Bi-Economy*, 10 N.Y.3d 187. Courts have denied motions to dismiss claims for attorneys' fees as consequential damages based upon an insurance

company's failure to pay coverage owed under an insurance policy. *See Richman*, 2010 N.Y. Misc. LEXIS 6832, N.Y. Slip Op. 33811 (N.Y. Sup. Ct. Nov. 1, 2010).

WHEREFORE, Plaintiff National Railroad Passenger Corporation seeks consequential damages for attorneys' fees and costs, as well as the other relief set forth in the Amended Complaint (Docket No. 65).

Dated: February 20, 2015

By: /s/

Rhonda D. Orin, Esq. (RO-0359)
rorin@andersonkill.com
Daniel J. Healy, Esq. (DH-7396)
dhealy@andersonkill.com
Marshall Gilinsky, Esq. (MG-8398)
mgilinsky@andersonkill.com
**ANDERSON KILL, L.L.P.**
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
Telephone: 202-416-6500

Finley T. Harckham, Esq. (FH-8219)
fharckham@andersonkill.com
**ANDERSON KILL, P.C.**
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-278-1000

*Attorneys for Plaintiff*