UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

NATIONAL RAILROAD PASSENGER      :
CORPORATION,                      :
                                  :
                    Plaintiff,    :
                                  :
        v.                        :
                                  :
ARCH SPECIALTY INSURANCE COMPANY;  :   14 Civ. 7510 (JSR)
ASPEN SPECIALTY INSURANCE COMPANY; :
COMMONWEALTH INSURANCE COMPANY;    :
FEDERAL INSURANCE COMPANY; LEXINGTON :
INSURANCE COMPANY; LIBERTY MUTUAL FIRE :
INSURANCE COMPANY; CERTAIN         :
UNDERWRITERS AT LLOYD'S OF LONDON and :
CERTAIN LONDON MARKET COMPANIES    :
Subscribing to Policy Nos. 507/N11NA08240, :
507/N11NA08241, 507/N11NA08242,    :
507/N11NA08244, 507/N11NA08244,    :
507/N11NA08245 and GEP 2944; MAIDEN :
SPECIALTY INSURANCE COMPANY; MAXUM :
INDEMNITY COMPANY; NAVIGATORS      :
INSURANCE COMPANY; PARTNER         :
REINSURANCE EUROPE plc; RSUI INDEMNITY :
COMPANY; STEADFAST INSURANCE COMPANY; :
TORUS SPECIALTY INSURANCE COMPANY; and :
WESTPORT INSURANCE CORPORATION,    :
                                  :
                    Defendants.   :
                                  :
                                  :
------------------------------------------------------------------------x

**DEFENDANT-INSURERS' LOCAL RULE 56.1 STATEMENT OF FACTS IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT – APPLICATION OF
FLOOD AND OCCURRENCE PROVISIONS**[1]

---

[1] All Insurer-Defendants join this motion, though Partner Re's participation in this brief is
without waiver of its motion for summary judgment [ECF No. 162], seeking dismissal on the
grounds that Partner Re reinsured Amtrak's captive insurer (non-party Passenger Railroad
Insurance, Ltd.) and Amtrak has no right of direct action against Partner Re.

Pursuant to Rule 56.1(a) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Arch Specialty Insurance Company ("Arch"), Aspen Specialty Insurance Company ("Aspen"), Commonwealth Insurance Company ("Commonwealth"), Federal Insurance Company ("Federal"), Lexington Insurance Company ("Lexington"), Liberty Mutual Fire Insurance Company ("Liberty Mutual"), Certain Underwriters at Lloyd's of London, and Certain London Market Companies Subscribing to Policy Nos. 507/N11NA08240 ("Lloyd's '240 Policy"), 507/N11NA08241 ("Lloyd's '241 Policy"), 507/N11NA08242 ("Lloyd's '242 Policy"), 507/N11NA08244 ("Lloyd's '244 Policy"), 507/N11NA08244 ("London Companies '244 Policy"), 507/N11NA08245 ("Inter Hannover") and GEP 2944 ("GEP"), Maiden Specialty Insurance Company ("Maiden Specialty"), Maxum Indemnity Company ("Maxum"), Navigators Insurance Company ("Navigators"), Partner Reinsurance Europe plc ("Partner Re"), RSUI Indemnity Company ("RSUI"), Steadfast Insurance Company ("Steadfast"), Torus Specialty Company ("Torus"), and Westport Insurance Corporation ("Westport") (together, "Insurers") submit this Statement of Facts in support of their motion for summary judgment regarding application of the flood provisions in the insurance policies at issue in this dispute (the "Policies").  There is no genuine issue to be tried regarding the following material facts:

**<u>The Policies and Amtrak's Manuscript Wording</u>**

1.      For the purposes of this Motion only, the operative contracts as to all Insurers' other than Partner Re (the "Policies") are attached to Amtrak's Amended Complaint as Exs. 1-18, 20-24.  The operative contract as to Partner Re, inclusive of endorsements issued by Partner Re, is attached to the Mondell Decl. as Ex. O.  For all purposes other than this motion, Insurers reserve and do not waive any disputes with Amtrak regarding the true and complete copies of

their policies, which are pled in Insurers' respective Answers, and relate principally to the omission of endorsements not material here.

2.     Amtrak and its broker-representatives prepared a draft insurance policy – the "Manuscript Wording" – that was included in the "Underwriting Submission" that they sent to each of the Insurers in the fall of 2011 and proposed as the basis for the policies Insurers underwrote.  *See* Mondell Decl., Exs. A ("Underwriting Submission"), B ("Manuscript Wording"), and C ("Target Program Snapshot").  *See also* Lestelle Decl., Ex. A (Deposition of Amtrak's Rule 30b(6) representative Cathy Rawlings ("Rawlings Tr.")) at 55:04–58:12, 70:03–16.

3.     The Manuscript Wording forms the basis for each of the Policies at issue here, subject to additional terms, conditions, limitations, and exclusions specified by each Insurer through declarations, amendments and endorsements.  *Compare* Mondell Decl., Ex. B (Manuscript Wording) with Policies; *see also* Mondell Decl., Exs. A (Underwriting Submission) at p. 5, and Lestelle Decl., Ex. A (Rawlings Tr.) at 57:08-58:12.

4.     It was the goal of Amtrak's brokers to minimize the extent of any changes to the Manuscript Wording they proposed on Amtrak's behalf.  *See* Mondell Decl., Ex. A (Underwriting Submission) at p. 5 (requiring that insurers identify any proposed deviation from the Manuscript Wording), and Ex. J (Oct. 24, 2011 email sent by Marsh broker Ben Tucker ("Marsh email")) [MAIDEN00003131] ("we are requesting all markets support the same form and endorsements (per submission)").

5.     Amtrak's brokers – Marsh and Price Forbes – kept the negotiations with each Insurer separate and did not tell other Insurers when one of the Insurers requested a change. Mondell Decl., Ex. F (Deposition of Marsh broker Sharon Walker ("Walker Tr.")) at 163:2-20,

and Ex. G (Deposition of Price Forbes broker James Masterton ("Masterton Tr.")) at 95:8-16.

**The Flood Provisions and Definitions**

6.      Each of the Policies incorporates a provision from the Manuscript Wording titled

"EARTHQUAKE AND FLOOD," which provides in relevant part:

Each loss by earthquake or flood shall constitute a single loss hereunder if:

(1) [addressing earthquake]

(2) any flood occurs within a period of the continued rising or overflow of any river(s) or
stream(s) or other bodies of water and the subsidence of same within their normal
confines; or

(3) any flood results from any tidal wave or series of tidal waves caused by any one
disturbance.

*See* Mondell Decl., Ex. B at 26-27, ¶ 13.A.

7.      This provision (¶ 13 "EARTHQUAKE AND FLOOD") of the Manuscript

Wording also includes a definition for the peril of "Flood": "Flood is defined as a rising and

overflowing of a body of water onto normally dry land."  This definition is incorporated in the

following policies and is subject to each policy's full terms, conditions, limitations, exclusions,

and endorsements:

- Arch Policy No. ESP0047205-00, Am. Compl., Ex. 1 [ECF No. 65-1]

- Aspen Policy Nos. PXA4VP611 and PX5705611, Am. Compl., Exs. 2 and 3 [ECF Nos.
65-2 and 65-3]

- Commonwealth Policy No. US9434, Am. Compl., Ex. 4 [ECF Nos. 65-4 – 65-11]

- Federal Policy No. 6684888, Am. Compl., Ex. 5 [ECF Nos. 65-12 – 65-16]

- Liberty Mutual Policy No. YS2-L9L-447676-011, Am. Compl., Ex. 8 [ECF No. 65-25]

- Certain Underwriters at Lloyd's of London and Certain London Market Insurance
Companies subscribing to Policy Nos. 507/N11NA08244 (Lloyd's), incorporating the
terms of the Maiden Specialty policy, 507/N11NA08244 (Companies), incorporating the
terms of Lloyd's '244, Inter Hannover Policy No. 507/N11NA08245, incorporating the
terms of the Maiden Specialty policy, and GEP 2944, Am. Compl., Exs. 12-15 [ECF Nos.
65-29, 65-30, 65-31 and 65-32]

- Maiden Specialty Policy No. S1LPY0151600S, Am. Compl., Ex., 16. [ECF No. 65-33]

- Maxum Policy No. MSP 6014096-02, Am. Compl., Ex. 17. [ECF No. 65-34]
- Navigators Policy No. NC10ILM016908-01, Am. Compl., Ex. 18. [ECF Nos. 65-35 – 65-40]
- Partner Re Reinsurance Contract No. B0507N11NA08246, Mondell Decl., Ex. O.
- RSUI Policy Nos. NHT374082 and NHT374083, Am. Compl., Exs. 20 and 21. [ECF Nos. 65-42 and 65-43]
- Steadfast Policy No. IM 9805201-00, Am. Compl., Ex. 22. [ECF No. 65-44]
- Torus Policy No. 41794A111APR, Am. Compl., Ex. 23. [ECF No. 65-45]

**8.**     Lexington Policy Nos. 084144000 (Am. Compl., Ex. 6 [ECF Nos. 65-17 – 65-23])

and 084144282 (Am. Compl., Ex. 7 [ECF No. 65-24]), and certain policies that incorporate the

Lexington wording, namely: Certain Underwriters at Lloyd's of London and Certain London

Market Insurance Companies subscribing to Policy Nos. 507/N11NA08240 (Am. Compl., Ex. 9

[ECF No. 65-26]), 507/N11NA08241 (Am. Compl., Ex. 10 [ECF No. 65-27]) and

507/N11NA08242 (Am. Compl., Ex. 11 [ECF No. 65-28]), used the following flood definition,

which is set forth in Endorsement 13 to the Lexington Policies:

> The term Flood shall mean a temporary condition of partial or complete inundation of normally dry land from
>
> (1)     the overflow of inland or tidal waters outside the normal watercourse or natural boundaries
> (2)     the overflow, release, rising, back-up, runoff or surge of surface water; or
> (3)     The unusual or rapid accumulation or runoff of surface water from any sour[ce].
>
> A Tsunami shall not be considered Flood as defined above

*E.g.*, Am. Compl., Ex. 7 (Lexington '282 Policy) at 46 [ECF No. 65-24].   The excerpted

language is part of ¶13 "EARTHQUAKE AND FLOOD" in those policies and is subject to each

policy's full terms, conditions, limitations, exclusions, and endorsements.  *Id.*

**9.**     Westport Policy No. 31-3-74264 (Am. Compl., Ex 24 [ECF No. 65-46])

incorporated the following definition of Flood which is set forth in Endorsement 13 to the

Westport Policy: "Flood is defined as surface water, flood waters, waves, tide or tidal waters, sea

5

surge, tsunami, the release of water, the rising, overflowing or breaking of defenses of natural or manmade bodies of water, or wind driven water, regardless of any other cause or [e]vent contributing concurrently or in any other sequence of loss." The excerpted language is part of ¶ 13 "EARTHQUAKE AND FLOOD" and is subject to that policy's full terms, conditions, limitations, exclusions, and endorsements. *Id.*

**The Flood Sublimit**

10. The Manuscript Wording contains a $125 million sublimit of liability for flood in any one policy year, providing that the maximum recoverable for flood loss from all insurers participating in Amtrak's 2011-2012 property insurance program combined is $125 million. Mondell Decl., Ex. B (Manuscript Wording) at ¶ 3 ("Limits of Liability") and ¶ 4.D ("Program Limits of Insurance")).

11. The Policies each incorporate the flood sublimit language:

> With respect to the perils of flood and earthquake, this Company shall not be liable, per occurrence and in any one policy year, for more than its proportion of $125,000,000, which shall apply separately to each peril as referred to in Section 13. . . . Even if the peril of flood or earthquake is the predominant cause of loss or damage, any ensuing loss or damage not otherwise excluded herein shall not be subject to any sublimits or aggregates specified in this Clause B[.]

*See* Policies.

12. Those Insurers who participate in the primary $125 million in limits incorporate the flood sublimit language in the "Limits of Liability" section of their policies. Am. Compl., Exs. 1 (Arch), 2 (Aspen Policy No. PXA4VP611), 5 (Federal), 6 (Lexington Policy Nos. '4000 Policy), 8 (Liberty Mutual), 9 (Lloyd's '240), 10 (Lloyd's '241), 17 (Maxum), 18 (Navigators), 20 (RSUI '082 Policy), and 21 (RSUI '083 Policy).

13. Those Insurers who participate above that level (the "Excess Insurers") recognize the flood sublimit in the "Program Limits of Insurance" section of their policies. Am. Compl.,

6

Exs. 3 (Aspen Policy No. PX5705611), 4 (Commonwealth), 7 (Lexington '282 Policy), 11 (Lloyd's '242), 12 (Lloyd's '244), 13 (Companies '244), 14 (Inter Hannover '245), 15 (GEP 2944), 16 (Maiden Specialty), 22 (Steadfast), 23 (Torus), and 24 (Westport); Mondell Decl., Ex. O (Partner Re).

14.     The sublimit for flood was recognized by Amtrak and its brokers as a key feature of Amtrak's insurance placement.  *See* Mondell Decl., Exs. C (Target Program Snapshot) (stating that the excess layers "exclude[] all Earthquake or Flood"), J (Marsh email) [MAIDEN00003131] (Amtrak's broker seeking quotes from underwriters on 2011-2012 "submission" and noting among the terms called out in his cover e-mail "the following sublimits . . . 1. Earthquake/Flood - $125M"), and K (Oct. 12, 2011 email sent by Charlotte Todd, Price Forbes broker, to certain Insurers ("Price Forbes email")) at DOC0002072-3 (Amtrak's broker seeking quotes from insurers on "2011 Property Submission" and noting among the terms called out in her cover e-mail "Catastrophe Sublimits: . . . USD $125,000,000 Flood (Annual Aggregate)").  *See also* Mondell Decl., Ex. F Walker Tr. 40:8-14 (Amtrak's broker testifying to understanding that there was a maximum of $125 million in flood coverage).

15.     Amtrak considered an option for obtaining higher limits for flood insurance in exchange for additional premium, but ultimately did not pursue that option.  See Mondell Decl., Ex. J (Marsh email) [MAIDEN00003131] ("We are requesting markets consider offering the following options at this renewal . . . 1.  Earthquake/Flood - $300M"), and Ex. F (Walker Tr.) at 32:10-33:14 (testifying that sublimits higher than $125 million "never happened.  The markets would not support it.").

**The Flood Exclusions**

16.     Many of the excess layer policies within the insurance program (*i.e.*, those that are

excess of $125 million in underlying limits, above the level of the flood sublimit) adopted an

insuring provision that expressly **excludes** flood.  Specifically:

- Aspen Policy No. PX5705611 provides: "Perils Covered: All Risk of Direct Physical Loss or Damage Excluding Flood and Earthquake".  *See* Am. Compl., Ex. 3 at 4 [ECF No. 65-3].

- Lloyd's Policy '242 provides that the "TYPE" of covered risk is "All risks of direct physical loss or damage excluding flood, earthquake, terrorism, boiler explosion and machinery breakdown."  *See* Am. Compl., Ex. 11 at 3 [ECF No. 65-27]

- Lloyd's Policy '244 provides that the "TYPE" of covered risk is "All risks of direct physical loss or damage excluding flood, earthquake, terrorism, boiler explosion and machinery breakdown."  *See* Am. Compl., Ex. 12 at 3 [ECF No. 65-29].

- London Companies Policy '244 provides that the "TYPE" of covered risk is "All risks of direct physical loss or damage excluding flood, earthquake, terrorism, boiler explosion and machinery breakdown."  *See* Am. Compl., Ex. 13 at 2 [ECF No. 65-30].

- Inter Hannover Policy No. '245 provides that the "TYPE" of covered risk is: "All risks of direct physical loss or damage excluding flood, earthquake, terrorism, boiler explosion and machinery breakdown."  *See* Am. Compl., Ex. 14 at 3 [ECF No. 65-31].

- Partner Re Reinsurance Contract No. B0507N11NA08246 provides that the type of risk covered is "Facultative reinsurance covering all risks of direct physical loss or damage excluding flood, earthquake, terrorism, boiler explosion and machinery breakdown."  *See* Mondell Decl., Ex. D at 6.

**17.**    As the provisions cited in paragraph 16, above, demonstrate, there is no "ensuing

loss" exception to the flood exclusions.

**18.**    Amtrak's broker, Price Forbes, testified that it prepared the documents that are

Lloyd's Policy '242, Lloyd's Policy '244, London Companies Policy '244, Inter Hannover

Policy No. '245, and that the documents were provided for review by Marsh and/or Amtrak.

Mondell Decl., Ex. G (Masterton Tr.) at 44:03--51:14.  As to the provisions excluding flood, no

revisions were requested.  *Id.*

**19.**    Amtrak and its broker-representatives provided to Insurers a "Target Program

Snapshot" outlining the intended structure for Amtrak's insurance program as part of Amtrak's

Underwriting Submission.  *See* Mondell Decl., Ex. C (MMC-AM0007439); *see also* Mondell

Decl., Ex. E (Plaintiff's Response to Defendants' First Set of Requests for Admission ("Amtrak Admissions")) at Responses 61-65.  The chart states that the excess layers "exclude[] all Earthquake or Flood."  *Id.*; *see also* Mondell Decl., Ex. F (Walker Tr.) at 39:22-40:14 (Amtrak's broker testifying to understanding that excess layer policies in Amtrak's 2011-2012 property insurance program excluded flood coverage), and Ex. G (Masterton Tr.) at 30:12-32:04 (same); Lestelle Decl., Ex. A (Rawlings Tr.) at 82:06-83:06**.**

**The Occurrence Definition**

20.     Amtrak's insurance program provides overall per-occurrence limits of $675 million, excess of a $10 million deductible.  *See* Policies; Mondell Decl., Ex. B (Manuscript Wording) ¶ 3(A) ("This Company shall not be liable for more than its proportion of the [sic] in any one occurrence of $675,000,000"), ¶ 3(B), ¶ 4 (setting out deductible, subject to certain exceptions not applicable here).

21.     Each of the Policies incorporates an endorsement (the "Occurrence Endorsement") from the Manuscript Wording that defines the term "Occurrence" as:

> Any insured loss or several insured losses arising directly from one common cause, event or catastrophe and during the period of this insurance.  If such loss or several losses are attributable to several causes in an unbroken chain of causation, the cause which triggered the chain of causation is understood to be the common cause, event or catastrophe.  All such loss or losses shall be added up and the result shall be treated as one occurrence irrespective of the period of time or area within which such losses occur.

Mondell Decl., Ex. B at Endorsement 9.

**Amtrak's Sandy Flooding Claim**

22.     Amtrak's operative allegations regarding its insurance claim are set out in its Amended Complaint.  *See* Mondell Decl., Ex. E (Am. Compl.).  Among these:

> a.   During Sandy, "[a] wind-driven storm surge inundated . . . with seawater" four of its six tunnels under the East and Hudson Rivers.  Am. Compl. ¶¶ 7-8;

     b.   In the "dewatering" of the tunnels, Amtrak ultimately "pumped more than 15 million gallons of water" from them.  Am. Compl. ¶ 12.  "[H]ighly reactive salts, principally chlorides and sulfates" from the saltwater floodwaters, "had thoroughly infiltrated essential tunnel components and were not removed by the dewatering."  *Id*. at ¶ 13;

     c.   When the tunnels were dewatered, the salts "were exposed to oxygen and moisture in the air," which "caused the chlorides to attack" tunnel components.  *Id*. at ¶ 14;

     d.   Amtrak seeks in excess of $1.1 billion from Insurers.  *Id*. at ¶¶ 93, 116;

     e.   Amtrak claims "ensuing" loss, but the nature of the purported ensuing loss is not identified.  *See, e.g.*, *id*. at ¶ 82;

     f.   Amtrak claims that its "losses arise from more than one occurrence", though Amtrak does not specify in its pleading how many occurrences it claims.  *Id*. at ¶ 95.

**23.**    A "very substantial" portion (*i.e.*, well over half) of Amtrak's $1.1 billion claim is to replace "the bench walls and the track structure in their entirety."  *See* Mondell Decl., Ex. G (December 12, 2014 letter from Amtrak adjuster Randy Goodman with one-page enclosure summarizing Amtrak's claim ("Goodman letter, Dec. 12")); Lestelle Decl., Ex. B (Goodman Tr.) at 25:20-26:04.

**24.**    Amtrak has power-washed neither the East River Tunnel nor the North River Tunnel since Sandy.  *See* Mondell Decl., Ex. E (Amtrak Admissions) at Responses 15, 30.  Both of those tunnels resumed operation in early November 2012, just days after Sandy.  *Id*. at Responses 24, 39; Mondell Decl., Ex. Q ("Amtrak to re-open three tunnels to Penn Station New York by late Friday, Nov. 9," Nov. 7, 2012 ("Amtrak news release, Nov. 7, 2012")) at 1, 2 (stating that North River-South Tube had "re-opened" on Oct. 31 and announcing that other three flooded tunnels would all be open by Nov. 9th).

**25.**    Insurers have made payments totaling $50 million for Amtrak's claim, which includes the per-occurrence policy limits of certain insurers who participate on a primary $50

million layer.  Mondell Decl., Ex. W (Deposition of Trevor Self, Insurer Beazley Furlonge's

corporate representative ("Self Tr.")) at 118:17-21 (testifying Beazley has made payments "up to

the amount of our primary limit of $50 million.").

***The flooding of Amtrak's East River Tunnel tubes and North (Hudson) River Tunnel tubes***

26.     The portals for Amtrak's East River Tunnel tubes are located near the East River.

Mondell Decl., Ex. H (Deposition of Amtrak engineer Richard Bernaski ("Bernaski Tr.")) at

42:6-15; Lestelle Decl., Ex. H  ("Executive Leadership Committee Presentation on the Super

Storm Sandy Insurance Claim" ("Leadership Presentation")) at [AMT00053403, 5] (maps

showing "East River Tunnel Eastern Portals" adjacent to East River, and Ex. A (Rawlings Tr.) at

194:09-13.

27.     During Sandy, the level of the East River rose and the water overflowed the banks

of that body of water.  *See* Mondell Decl., Ex. P  (NHC Sandy report) at 18 ("Flood waters

reached the corner of Canal and Hudson streets and portions of the East Village, partly because

of overflow along the East River"), and 8 (describing storm tide of "9.40 ft . . . at the Battery on

the southern tip of Manhattan" and the "following inundations, expressed *above ground level*,

[that] were prevalent along the coast due to storm tide:  Staten Island and Manhattan 4 – 9 ft")

(emphasis in original).

28.     The portals for Amtrak's North River Tunnel tubes are located near the Hudson

River.  Lestelle Decl., Exs. H (Leadership Presentation) at [AMT00053403-4] (showing "North

River Tunnel Western" and "Eastern" portals adjacent to Hudson River), D (Deposition of

Amtrak's Rule 30(b)(6) representative on engineering topics Glenn Sullivan ("Sullivan Tr.")) at

92:20-24, and C (Deposition of Amtrak engineer Stephen Wilchek ("Wilchek Tr.")) at 354:08-

16; Mondell Decl., Ex. H (Bernaski Tr.) at 41:21-42:05.  *See* Lestelle Decl., Ex. D (Sullivan Tr.)

at 27:09-28:09 (acknowledging appearance as corporate representative for engineering topics).

29. During Sandy the level of the Hudson River rose and the water overflowed the banks of that body of water. *See* Mondell Decl., Ex. P (NHC Sandy report) at 10 ("As storm surge from Sandy was pushed into New York and Raritan Bays, sea water piled up within the Hudson River and the coastal waterways . . . ."; *see also id.* at 13, 17 (referring to flooding from the Hudson River); Mondell Decl., Ex. N ("LIRR Storage Yards Flooding Investigation", HAKS ("LIRR Investigation") ("Superstorm Sandy caused significant flooding for [certain rail yards used by LIRR and Amtrak trains] . . . The flooding, which damaged railroad systems and infrastructure in the storage yards, is believed to have been caused by the storm surge from the Hudson River, which came across 12th Avenue and flooded the West Side Yard to approximately 4 feet of water…); Lestelle Decl., Ex. D (Sullivan Tr.) at 86:02-11 (testifying that the LIRR's Engineering department was conducting an investigation of the LIRR West Side Yard and the source of the water that entered the North River Tunnels).

30. The water that inundated the East River Tunnel tubes and North River Tunnel tubes came from the East River and Hudson River. *See* Lestelle Decl., Exs. E (Deposition of Amtrak employee Steven Falkenstein ("Falkenstein Tr.") at 50:21-51:09 (testifying to understanding that inundation of East River and North River tunnels came from the East River and Hudson River, respectively), and C (Wilchek Tr.) 353:13-354:16 (testifying that the water that inundated the North River Tunnels during Sandy "was coming from the Hudson River."); *see also* paragraphs 25, 26, 27, and 28, above.

31. Amtrak's corporate representative on insurance topics testified to her argument that the water that entered the tunnels under the rivers was "ocean water that was blown in" and that the ocean is not a "body of water." Lestelle Decl., Ex. A (Rawlings Tr.) at 192:21-193:04

(testifying, in response to the question "Would you agree that the ocean is a body of water?" "No, not under this definition of a body of water. We're talking about rivers and streams, and lakes and ponds." *See id*. at 341:14-342:05.  There is no definition of "body of water" in the Policies.  *See* Policies.  Asked to explain the facts of how the water got in the tunnels, Amtrak's corporate representative testified:   "A.   Storm surge and wind-driven water.    Q.  . . . Did that come from either the Hudson River or the East River? [Objection]     A.   I -- I -- I'm not an expert in that area.  I can't explain how that happened."  Lestelle Decl., Ex. A (Rawlings Tr.) at 328:03-12; *see id.* at 194:19-195:04 (A.   "The reports all say that the water that came in was storm surge, wind-driven water from the ocean.     Q.   The ocean doesn't touch the portal to the East River Tunnel, does it?    A.   I think this is an area of expertise regarding the event.  I -- can tell you what I know about this event and what others know about it, but you may be asking me something beyond my expertise."); *see also id*. at 441:14-444:14 (testifying that Amtrak's experts "haven't explain[ed]" to her all the "fancy details of how" the water got from the ocean into Amtrak's tunnels).

32.     Amtrak's broker testified to an understanding that the ocean is a body of water and that flooding does not require the rising and overflow of a particular type of body of water.  Mondell Decl., Ex. F (Walker Tr.) at 156:22-157:21, 237:09-238.

***Amtrak's references to its "flood" loss, in accord with National Hurricane Center's Report***

33.     Amtrak and its various representatives have repeatedly referred to Sandy damage as due to flooding in the context of evaluating and addressing its insurance claim.  By way of example:

> a.  On November 15, 2012, Amtrak Director of Risk Management Philip Balderston, a member of the team preparing Amtrak's Sandy claim, sent an email to be relayed to Insurers that attached a "Preliminary Loss Estimate to Underwriters".  Mondell Decl., Ex. M ("Balderston email, Nov. 15, 2012") [DOC0012294].  In

the email, Mr. Balderston described Amtrak's claim as follows: "The most significant property damage occurred from flooding of both of two tunnels between NY and NJ under the Hudson River [and] flooding of two of the four tunnels under the East River in New York City . . ."  *Id.*;

b. On January 4, 2013, Mr. Balderston wrote an email to Mr. Falkenstein and others to arrange a site inspection for the Insurers' adjuster that "would include the flooded East and North River tunnels".  Lestelle Decl., Ex. I ("Balderston email, Jan. 4, 2013") at [MMC-AM0016375];

c. Amtrak prepared a PowerPoint presentation, which it provided to the Insurers' adjuster in January of 2013 [*see* AMT00218656], in which Amtrak repeatedly described the impacts of Sandy from "flooding".  Lestelle Decl., Ex. J (Sandy PowerPoint presentation, January 2013) [AMT00218657].  The presentation refers to preparations made in anticipation of flooding from Sandy and the impacts of that flooding on fourteen pages, including a photograph showing the "Water Source That Flooded North and South Tubes", *id.* at [AMT00218666], and a photograph of "ERT Flooding – Line 1 East River Portal".  *Id.* at [AMT00218668]; and

d. In a June 26, 2013 email, Amtrak Director of Risk Management Cathy Rawlings wrote to Amtrak personnel attempting to schedule an inspection of one of the North River Tunnels, and stating that the tunnels "were build [sic] by a different contractor and were flooded differently".  Lestelle Decl., Ex. G ("Rawlings email") at [AMT00049433].

**34.**   According to Amtrak's corporate representative on insurance topics, the inundation that resulted from Sandy's storm surge was a "flood" consistent with a layperson's understanding of the term.  Lestelle Decl., Ex. A (Rawlings Tr.) at 163:15-165:20 ("Q.   So, that use of 'flood' in the early goings was a layperson's use of 'flood'?     A.   Yes.").  *See also* Lestelle Decl., Ex. C (Wilchek Tr.) at 355:12-25 (testifying that "[t]he Midtown Tunnel was -- that structure was flooded with water" and, in response to the question "Did some of [the New York City subway] tunnels flood?     A.   Yes.").

**35.**   Amtrak also refers to Sandy damage as "flood" in multiple public statements:

a. announcing Amtrak's plans to re-open three tunnels "which were significantly flooded"; noting that "storm surge flooded four of six" tunnels and that "three of the four flooded tunnels were severely damaged by the salt water", Mondell Decl., Ex. Q (Amtrak news release, Nov. 7, 2012) at 1, 2;

14

b. describing "storm surge" damage to East River and North River tunnels and
noting that two of the four East River tunnels "were fortunately not *flooded*."
Further:  "The wisdom of these investments became apparent when we found
ourselves with four flooded tunnels"; and "[b]ecause the damage in the two
flooded East River tunnels was more extensive . . . ."  Mondell Decl., Ex. T
(Testimony of Amtrak President and CEO Joseph Boardman before the Senate
Committee on Commerce, Science, and Transportation Subcommittee on Surface
Transportation and Merchant Marine Infrastructure, Safety, and Security Hearing,
Dec. 6, 2012 ("Boardman testimony")) at 3, 7, 9;

c. describing flow of "flood waters" and "flooding" of tunnels, Mondell Decl., Ex. R
(Amtrak "2012 Environment and Sustainability Summary") at 17;

d. discussing "[t]he storm surge in New York" and stating that tunnels "were
flooded", Mondell Decl., Ex. U (cover letter summarizing Amtrak's Fiscal Year
(FY) 2014 General and Legislative Annual Report sent by Boardman to Vice
President Joseph R. Biden, Jr. and Speaker of the House of Representatives John
Boehner on March 27, 2013 ("Boardman letter")) at 5;

e. repeatedly referring to flood damage caused by Sandy, including stating "The
storm flooded four of the six underwater tunnels in the New York City area [and]
flooded electrical power substation 41 in Kearny, New Jersey" and noting that
"The unprecedented flooding of Amtrak's New York City rail tunnels . . .
highlighted the serious need for vital improvements, improved resiliency, and
redundant capacity that will protect the existing Penn Station tunnel system from
floods and other emergencies.  Since no two flooded locations were breached in
exactly the same way, a combination of solutions is needed to prevent future
flooding . . . ."  Mondell Decl., Ex. V (Amtrak "Fiscal Year 2014 Budget Request
Justification", May 2013 ("Budget Request")) at 12; and

f. stating that "[t]he storm surge flooded" Amtrak's tunnels with "brackish water,"
and the tunnels "were shown to be vulnerable to sea water immersion", Mondell
Decl., Ex. S  (Amtrak news release, "Construction Begins to Preserve Possible
Pathway of New Train Tunnels into Penn Station, New York", Sept. 23, 2013
("Amtrak news release, Sept. 23, 2013")) at 2-3.

36.    Ms. Rawlings testified that she instructed others within Amtrak not to use the

term "flood" in connection with Amtrak's Sandy claim, and that it was important to her to

distinguish between "flood" and "storm surge" because: "I was concerned that if we called this,

an event that involved wind-driven water and storm surge, a flood, that I could be limiting the

available insurance coverage."  Lestelle Decl., Ex. A (Rawlings Tr.) at 167:22-168:17.

37.    The National Hurricane Center (NHC) issued a report regarding Sandy, Mondell

Decl., Ex. P (NHC, Eric Blake, et al., "Tropical Cyclone Report: Hurricane Sandy" (Feb. 12, 2013)), which contains the following quotes:

- "Significant flooding due to storm surge (with some contribution from rainfall) occurred in parts of the Hudson River Valley . . . ." *Id.* at 9 ;
- "Rainfall did contribute, along with storm surge, to the flooding in New York and New Jersey adjacent to the Hudson River." *Id.* at 13;
- "The storm surge also pushed water into New York bay and up the Hudson River, causing massive flooding . . . ." *Id.* at 17;
- "storm surge flooding that inundated eight [New York City Metropolitan Transit Authority (MTA)] tunnels"; *Id.* at 18.
- "Flood waters reached the corner of Canal and Hudson streets and portions of the East Village, partly because of overflow along the East River (Fig. 30c), and hundreds of buildings were flooded in Manhattan." *Id.*

***Amtrak's "ensuing loss" and multiple-occurrence theories***

38.     As of July 2014, Amtrak's representative wrote to Insurers that Amtrak had not determined whether any portion of its claimed loss was "ensuing", nor whether it was claiming more than one occurrence. *See* Mondell Decl., Ex. L (July 3, 2014 letter from Goodman to Insurers' adjuster Robert Steller) at [DOC0005472] ("You have been advised that AMTRAK is considering the multiple occurrences issue (as well as whether any portion of its loss is "ensuing" or "consequential") and will make a determination once its investigations are complete.").

39.     Cathy Rawlings is Amtrak's Risk Manager, Rule 30(b)(6) corporate representative on insurance topics, and the person responsible for the team preparing Amtrak's Sandy claim.  Lestelle Decl., Ex. A (Rawlings Tr.) at 07:23-08:01, 362:18-22.

40.     Ms. Rawlings testified as follows regarding the loss occurrences claimed:

The first occurrence that we're claiming is that we experienced damage from wind-driven water in four tunnels and a large number of other locations in the New York/New Jersey area.  The second occurrence is that we have chlorides, chlorides attacking the two North River tunnels, in particular the concrete, the

16

bench walls, and the track and roadbed.  The third occurrence is the chlorides attacking the east, two East River tunnels; in particular, again, the concrete, the bench walls, and the track and the roadbed.

Lestelle Decl., Ex. A (Rawlings Tr.) at 132:19-133:09.  *See id*. at 338:09-22.

41.     Ms. Rawlings was unable to identify the ensuing loss claimed when given Amtrak's own claim summary.  *See* Lestelle Decl., Ex. A (Rawlings Tr.) at 262:05–263:09 (testifying, after identifying the document she would look to in order to determine whether Amtrak is claiming ensuing loss, as follows: "Q.  And as – as you sit here, are you able to identify anything that does refer to ensuing loss? A.  Not the way he's got it broken out currently.  Q.  Is there any part of it that you think may include ensuing loss? . . . A.  I don't know.").

42.     Randy Goodman is Amtrak's hired "public adjuster", a claims advocate who is being reimbursed as a percentage of any insurance recovery, and Amtrak's Rule 30(b)(6) corporate representative witness on topics relating to Amtrak's claim.  Lestelle Decl., Ex. B (Deposition of Randy Goodman ("Goodman Tr.")) at 7:12-24, 8:20-24, 16:16-17:10, and Ex. C (Wilchek Tr.) at 246:03-20.

43.     Mr. Goodman testified that Amtrak is claiming three occurrences, one of which relates solely to the East River Tunnel, one of which relates solely to the North River Tunnel, and one of which is everything else.  Lestelle Decl., Ex. B (Goodman Tr.) at 180:13-181:08.  *See id*. at 42:25-43:12.

44.     Ms. Rawlings testified that Amtrak is claiming separate occurrences for the East River Tunnel and North River Tunnel even though the type of damage alleged is the same because: "the two tunnels were -- they're distanced apart, they were built by different contractors, they were pumped out at different times, and they had different amounts of water in them that came from different directions."  Lestelle Decl., Ex. A (Rawlings Tr.) at 402:19-403:14; *see id*.

at 411:07-18.

45.     Although Amtrak's claimed occurrences for the East River Tunnel and North River Tunnel are labeled by Ms. Rawlings as "chlorides attacking," *see* paragraph 46 below, Ms. Rawlings acknowledges that the chlorides were introduced to the tunnels by storm surge and wind-driven water. *See* Lestelle Decl., Ex. A (Rawlings Tr.) at 136:04-19, 147:21-148:18 (testifying that chlorides in the tunnel came from the "wind-driven water" from Sandy). *See also* Am. Compl. ¶ 13-14.

46.     Amtrak's corporate representatives testified that the "everything else" occurrence is for damage caused by storm surge and wind-driven water.  *See* Lestelle Decl., Exs. A (Rawlings Tr.) at 206:14-207:12, 441:09-17 ("The wind moved the water.  [The wind] didn't come in the tunnels"), and B (Goodman Tr.) at 182:18-183:04 (testifying "everything else" occurrence does not include any alleged wind damage in the absence of storm surge).

47.     Mr. Goodman testified that the entirety of Amtrak's Saltwater Claim would be asserted as "ensuing loss" only if Amtrak's argument that those losses are a separate occurrence is rejected. *See id.* at 45:12-46:06, 71:12-72:09.  *See also*, Lestelle Decl., Ex. H (Leadership Presentation) at [AMT00053419-20] (explaining in presentation on Sandy claim – prepared after Amtrak retained counsel, *see* [AMT00053417], that "An 'indirect' loss might be a separate occurrence" and "If Not a Second Occurrence", then "Chloride harm might be an ensuing loss").

Dated: New York, New York
        March 9, 2015

                                    ROPES & GRAY LLP

                                    By:   /s/ Catherine A. Mondell
                                    Catherine A. Mondell

(catherine.mondell@ropesgray.com)
800 Boylston Street
Boston, MA  02199
Telephone: (617) 951-7000

Evan P. Lestelle
(evan.lestelle@ropesgray.com)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000

*Attorneys for Defendants Partner Reinsurance Europe plc, Torus Specialty Insurance Company, Westport Insurance Corporation, and Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. GEP 2944, 507/N11NA08242, 507/N11NA08244, and 507/N11NA08244.*

All other signatories listed, and on whose behalf this filing is submitted, consent to its filing.

MOUND COTTON WOLLAN & GREENGRASS

By:   /s/ Costantino P. Suriano
Costantino P. Suriano
(csuriano@moundcotton.com)
Bruce R. Kaliner
(bkaliner@moundcotton.com)
One New York Plaza
New York, New York 10004
Telephone: (212) 804-4200

*Attorneys for Defendants Commonwealth Insurance Company, Lexington Insurance Company, Maiden Specialty Insurance Company, Steadfast Insurance Company, and International Insurance Company of Hannover SE.*

BRUCKMANN & VICTORY, L.L.P

By:   /s/ Arjang Victory
Arjang Victory (victory@bvlaw.net)
Timothy G. Church (church@bvlaw.net)
420 Lexington Avenue, Suite 1621
New York, NY 10170

Tel: (212) 850-8500

*Attorneys for Defendants Arch Specialty Insurance Company, Aspen Specialty Insurance Company, Federal Insurance Company, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. 507/Nl1NA08240 and 507/N11NA08241, Maxum Indemnity Company, Navigators Insurance Company, and RSUI Indemnity Company.*

FINAZZO COSSOLINI O'LEARY MEOLA & HAGER, LLC

By:    /s/  Christopher  S.  Finazzo _____

Christopher S. Finazzo
(christopher.finazzo@finazzolaw.com)
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel: (646) 378-2033

*Attorney for Defendant Liberty Mutual Fire Insurance Company.*

20