UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>                          Plaintiff,<br><br>vs.<br><br>ARCH SPECIALTY INSURANCE COMPANY; ET AL.,<br><br>                          Defendants. | Civ. Action No.:14-cv-7510 (JSR)<br><br>**DECLARATION OF ALFRED CLOUTIER** |

I, ALFRED CLOUTIER, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am the Director of Track, for the National Railroad Passenger Corporation ("Amtrak"), plaintiff in the above-captioned action.  I submit this declaration in connection with Amtrak's Opposition to: (1) Defendants' Motion for Partial Summary Judgment Regarding Replacement of Benchwalls and Track Bed, and (2) Defendants' Motion for Summary Judgment Regarding Application of Flood and Occurrence Provisions.

2.      As Director of Track, I have personal knowledge of the following facts. If called upon to testify at trial, I would testify consistently with the following.

3.      Following Superstorm Sandy, which made landfall in the New York City area on or about October 29, 2012, the North and South Tubes of the North River Tunnel ("NRT") owned by Amtrak and Lines 1 and 2 of the East River Tunnel ("ERT") owned by Amtrak were all inundated with saltwater above the height of the benchwalls in those tunnels.

4.      After each tube was dewatered and returned to service, the current that runs through the rails was re-energized.  The electrical current, mainly direct current, together with the chlorides that were left behind on and beneath the rails, the

1

generally humid environment and the dampness remaining in the ballast, led to corrosion initiated by Superstorm Sandy.

5.     The electro-chemical corrosion was enhanced in part by the low level of resistivity that resulted from the environment, which included the damp ballast. Instead of acting as an insulator, the ballast allowed for current to pass and for stray currents to proceed to the rails and tie plates themselves.

6.     The electro-chemical corrosion was irreversible, permanent and damaged and eroded the rails along the tie plates.

7.     In the months following Superstorm Sandy, portions of the ballast eventually became drier because much of the tunnel environment is predominantly dry, except for isolated leaks in specific locations.  In September 2013, which was almost one year after the storm, Amtrak performed tests which tended to show that, by that time, the resistivity of the dry ballast did not appear to be different in the portions of the tunnels that had been inundated during Sandy than in the portions that had not inundated during that time.

8.     Defendants' Exhibit 13 contains a document entitled "Ballast Test Results from the East River and North River Tunnels" which attaches those test results, but those test results do not demonstrate that no electro-chemical corrosion took place in the inundated portions of the rails and tie plates immediately following Sandy or that those rails and tie plates were not permanently damaged from electro-chemical corrosion that took place at that time.  Those tests do not account or test for that electro-chemical corrosion.

9.     Additionally, those test results do not account for the ongoing

2

effects of the corrosion that was initiated by Superstorm Sandy at the time the rails were re-energized.

10.     I have conducted inspections of the rail in the tunnels both before and after Sandy.   Since Sandy, the corrosion that I have observed, such as scale on the rail and pitting on the rail, appears to be happening at an accelerated rate.  This is particularly noticeable in the South Tube of the North River Tunnel, where we installed new rail during 2011 and 2012, just before Sandy.  Since the rail there is so new, I would not have expected to see much, if any, corrosion by now, but that is what I am seeing.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 30, 2015
Philadelphia, Pennsylvania

_____
ALFRED CLOUTIER

3

dcdocs-89955.1