UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
NATIONAL RAILROAD PASSENGER             :
CORPORATION,                            :
                                        :
                        Plaintiff,    :
                                        :
               v.                   :
                                        :
ARCH SPECIALTY INSURANCE COMPANY;       :   14 Civ. 7510 (JSR)
ASPEN SPECIALTY INSURANCE COMPANY;      :
COMMONWEALTH INSURANCE COMPANY;         :
FEDERAL INSURANCE COMPANY; LEXINGTON    :
INSURANCE COMPANY; LIBERTY MUTUAL FIRE  :
INSURANCE COMPANY; CERTAIN              :
UNDERWRITERS AT LLOYD'S OF LONDON and   :
CERTAIN LONDON MARKET COMPANIES         :
Subscribing to Policy Nos. 507/N11NA08240,  :
507/N11NA08241, 507/N11NA08242,         :
507/N11NA08244, 507/N11NA08244,         :
507/N11NA08245 and GEP 2944; MAIDEN     :
SPECIALTY INSURANCE COMPANY; MAXUM      :
INDEMNITY COMPANY; NAVIGATORS           :
INSURANCE COMPANY; PARTNER              :
REINSURANCE EUROPE plc; RSUI INDEMNITY  :
COMPANY; STEADFAST INSURANCE COMPANY;   :
TORUS SPECIALTY INSURANCE COMPANY; and  :
WESTPORT INSURANCE CORPORATION,         :
                                        :
                        Defendants.   :
                                        :
                                        :
------------------------------------------------------------------------x

              **DEFENDANT-INSURERS' REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT –**
           <u>**APPLICATION OF FLOOD AND OCCURRENCE PROVISIONS**</u>

**TABLE OF CONTENTS**

          **Page**

I.    The Policies Are Unambiguous and Case Law is Equally Clear: "Storm Surge" is Part of "Flood" ................................................................................................................ 2

II.   The Two Unpublished Cases Amtrak Relies Upon Are Inapposite ....................................... 3

III.  Amtrak's Extrinsic Evidence Does Not Change the Result.................................................. 4

IV.  There Is No "Ensuing Loss" Here ....................................................................................... 7

V.   There is Only One Occurrence: Sandy Flooding .................................................................. 9

CONCLUSION ............................................................................................................................ 10

**TABLE OF AUTHORITIES**

Page(s)

CASES

*A. Gugliotta Dev., Inc. v. First Am. Title Ins. Co. of N.Y.*,
    112 A.D. 3d 559, 561, 976 N.Y.S.2d 172, 175 (2nd Dep't 2013) ............................................5

*Aetna Cas. & Sur. v. Yates*, 344 F.2d 939, 941 (5th Cir. 1965) ........................................................8

*Allcity Ins. Co. v. Borrello*,
    19 A.D. 3d 621, 623, 798 N.Y.S.2d 121, 123 (2d Dep't 2005) .................................................2

*Bamundo, Zwal & Schermerhorn, LLP v. Sentinel Ins. Co.*,
    No. 13-cv-6672 (RJS), 2015 WL 1408873 (S.D.N.Y. Mar. 26, 2015) .....................................4

*Great Lakes Int'l Trading, Inc. v. Travelers Prop. Cas. Co. of Am.*,
    No. 3:13-cv-01522 (JAM), 2014 WL 6686633, at *3 (D. Conn. Nov. 26, 2014) ......................6

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562, 569 (2002) .......................................................................................................4

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191, 210, 223 (5th Cir. 2007) ....................................................................................5

*Johnson Gallagher Magliery, LLC v. Charter Oak Fire Ins. Co.*,
    No. 13 Civ. 866 (DLC), 2014 WL 1041831, at *8 (S.D.N.Y. Mar. 18, 2014) .........................4

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102, 115 (2d Cir. 2010) ..............................................................................................6

*Narob Dev. Corp. v. Ins. Co. of N. Am.*, 631 N.Y.S.2d 155 (1st Dep't 1995) ...............................8

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
    563 F.3d 777, 786-87 (9th Cir. 2009) ...................................................................................3, 6

*Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*,
    472 F.3d 33, 48-49 (2d Cir. 2006) ........................................................................................7, 8

*Pinnacle Entm't, Inc. v. Allianz Global Risks U.S. Ins. Co.*,
    2:06-CV-00935-BES-PAL, 2008 U.S. Dist. LEXIS 108583 (D. Nev. Mar. 26, 2008).........3, 4

*Platek v. Town of Hamburg*,
    24 N.Y.3d 688, 694 (Feb. 19, 2015) ........................................................................................8

*Pub. Serv. Enter. Gr., Inc. v. ACE Am. Ins. Co.*,
    No. ESX-L-4951-13, 2015 N.J. Super Unpub. Lexis 620, at *4-6 (N.J. Law Div. Mar.
    23, 2015) ...................................................................................................................................3

*Rapid Park Indus. v. Great Northern Ins. Co.*,
  2010 WL 4456856, at *4 (S.D.N.Y. Oct. 15, 2010) (Rakoff, J.), *aff'd* 502 Fed.Appx.
  40 (2d Cir. 2012) .................................................................................................................7

*Roberts v. State Farm Fire & Cas. Co.*, 705 P.2d 1335, 1337 (Ariz. 1985) ...................................7

*RTG Furniture Corp. v. Indus. Risk Insurers*,
  616 F. Supp. 2d 1258 (S.D. Fla. 2008) .....................................................................................7

*Ruiz v. State Wide Insulation & Const. Corp.*,
  269 A.D.2d 518, 519, 703 N.Y.S.2d 257, 259 (2d Dep't 2000) ................................................2

*Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*,
  769 F.3d 807, 816 (2d Cir. 2014) ..............................................................................................4

*Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*,
  565 F.3d 948 (5th Cir. 2009) .....................................................................................................3

*Stern v. Cigna Grp. Ins.*,
  No. 07-0772-cv, 2008 WL 4950067, at *2 (2d Cir. Nov. 20, 2008) ..........................................2

*U.S. Fire Ins. Co. v. Gen. Reins. Corp.*,
  949 F.2d 569, 574 (2d Cir. 1991) ..............................................................................................2

*W.W.W. Assocs., Inc. v. Giancontieri*,
  77 N.Y.2d 157 (1990) ...............................................................................................................4

*Woodhams v. Allstate Fire & Cas. Co.*,
  748 F. Supp. 2d 211, 219 (S.D.N.Y. 2010), *aff'd*, 453 Fed. App'x. 108 (2d Cir. 2012) ...........6

**OTHER AUTHORITIES**

Lee R. Russ & Thomas F. Segalla, 2 *Couch on Insurance* § 21:21 (3d ed. 1995) ..........................2

As the Court noted when these issues were presented on Amtrak's motions: "I've been confronted with a flood of papers here and I need to separate out which are meaningful and which are merely wind driven." Mondell Reply Decl., Ex. M (Feb. 3, 2015 Hearing) at 40:8-10. At that time, Amtrak sought to forestall a summary judgment ruling against it through bluster about supposed industry standards, purportedly backed by discovery in this case. *Id.* at 38:4-15. This Court observed that an affirmative motion by Insurers would require Amtrak to identify any such evidence. *Id.* at 41:19-25. That motion has been made, Amtrak's Opposition identifies no record evidence that raises any genuine dispute of material fact, and the time is ripe to enter summary judgment in Insurers' favor.

The policies' flood provisions are unambiguous, and the case law is equally plain that "storm surge" is a type of "flood." Insurers' Mot. at 10-16. Against this ocean of authority, Amtrak clings to an unpublished New Jersey state court decision, *PSEG*, which is inapposite given the readily-distinguishable policy language at issue there and that court's reliance on a Nevada case abrogated by the Ninth Circuit. *Infra* Sec. II. Though Amtrak's brief overflows with arguments based on extrinsic evidence, (i) such arguments cannot be used to vary the plain language at issue, and (ii) a review of the actual evidence – as opposed to Amtrak's dubious characterizations – shows that the record Amtrak cites supports Insurers' position. *Infra* Sec. III.

Moreover, the saltwater flooding is the only cause of loss at issue, and Amtrak's alternative theories attempting to parse that single cause of loss fail. Controlling New York law holds that "ensuing loss" only occurs where it is caused by a peril that is "separate and independent" from the original cause of loss. *Infra* Sec. IV. Amtrak's three-occurrence theory is internally inconsistent and cannot be squared with the plain language of the Occurrence Endorsement or the undisputed facts. *Infra* Sec. V.

I.  **The Policies Are Unambiguous and Case Law is Equally Clear: "Storm Surge" is Part of "Flood"**

Amtrak essentially concedes that the flood definitions are unambiguous.[1]  It does not contest that, when there is a flood loss, a program sublimit of $125 million applies, excepting only "ensuing loss."  Amtrak's Opp. at 1-2.  It does not identify any basis in the record for its argument that this Court should ignore the plain language of the flood exclusions in certain of the excess policies.  *See* Insurers' 56.1 Reply Stmt. ¶¶16, 17 (the language "ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE EXCLUDING FLOOD..." is quoted from documents Amtrak admits are the operative contracts).[2]  The matter is thus ripe for a decision as a matter of law on the unambiguous contract language.

The facts are equally plain: the parties agree that the damage at issue – the inundation of Amtrak's property – was caused by storm surge.  Opp. at 15.

Courts consistently conclude under these circumstances that provisions addressing the scope of flood coverage apply to storm surge losses.  Mot. at 10-11.  In response to Insurers' citations to cases from New York and around the country – including multiple federal appellate courts – Amtrak's weak rebuttal is that in some of those cases, flood was defined in terms that

---

[1] Amtrak's earlier motion argued this affirmatively [ECF No. 100].  Here, Amtrak makes the point in passing that, if found to be ambiguous, the flood definitions should be construed in its favor.  However, *contra proferentem* (i) is strictly a "principle[] of last resort," *Stern v. Cigna Grp. Ins.*, No. 07-0772-cv, 2008 WL 4950067, at *2 (2d Cir. Nov. 20, 2008); and (ii) does not apply to a negotiated policy issued to a sophisticated insured represented by a broker.  *See*, *e.g.*, *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 574 (2d Cir. 1991).  That is especially true where, as here, the *insured* drafted the policy.  *See* Rule 56.1 Counter-Statement Responses 2, 3.

[2] Courts routinely hold that declarations are part of the operative policy terms and conditions. *See*, *e.g.*, *Ruiz v. State Wide Insulation & Const. Corp.*, 269 A.D.2d 518, 519, 703 N.Y.S.2d 257, 259 (2d Dep't 2000); *see also* Lee R. Russ & Thomas F. Segalla, 2 *Couch on Insurance* § 21:21 (3d ed. 1995).  Amtrak's citation to *Allcity Ins. Co. v. Borrello*, 19 A.D. 3d 621, 623, 798 N.Y.S.2d 121, 123 (2d Dep't 2005) is not to the contrary.  That case merely stands for the proposition that limitations (in that case, location limitations) must be stated "in the policy, or a rider . . . listed on the declaration page annexed as part of the policy. . . ."  *Id.*

included a phrase such as "whether or not driven by wind." Opp. at 8, n. 34. That same argument has been considered and rejected in a decision enforcing plain policy limitations on flood coverage as a matter of law. *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 563 F.3d 777 (9th Cir. 2009).

## II. The Two Unpublished Cases Amtrak Relies Upon Are Inapposite

Amtrak's reliance on the unpublished *PSEG*[3] and *Pinnacle*[4] opinions is misplaced. The dispute in *PSEG* was whether losses resulted from "flood," and thus fell under the applicable sublimits, or from a "named windstorm" – a defined term in the *PSEG* policies. *PSEG*, 2015 N.J. Super. Unpub. Lexis 620, at *4. Because the named windstorm definition *expressly* included "storm surge" and the flood definition did not, the court held that storm surge losses were more logically classified as "named windstorm," and implicitly (albeit incorrectly[5]) held that they could not be classified as both "flood" and "named windstorm." *Id*. at *4-5. The Policies here are not comparable; the broad flood definitions plainly evidence the intent to encompass storm surge and there is no express reference to "storm surge" elsewhere that could be read to evince a different intent, even under the *PSEG* court's flawed analysis.

Amtrak's (and the *PSEG* court's) reliance on *Pinnacle* is equally flawed: *Pinnacle* is no longer good law following the Ninth Circuit's decision in *Northrop Grumman. See* 563 F.3d at

---

[3] *Pub. Serv. Enter. Gr., Inc. v. ACE Am. Ins. Co.*, No. ESX-L-4951-13, 2015 N.J. Super. Unpub. Lexis 620 (N.J. Law Div. Mar. 23, 2015) ("PSEG").

[4] *Pinnacle Entm't, Inc. v. Allianz Global Risks U.S. Ins. Co.*, 2:06-CV-00935-BES-PAL, 2008 U.S. Dist. LEXIS 108583 (D. Nev. Mar. 26, 2008).

[5] *See, e.g.*, *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948 (5th Cir. 2009) (enforcing flood sublimit to claim which also fell within definition of "Weather Cat Occurrence"). *PSEG* is also distinguishable in that, relying on New Jersey law, the court considered extrinsic evidence *in order* to determine that the policy language was ambiguous. 2015 N.J. Super. Unpub. Lexis 620, at *5-6. In New York, by contrast, extrinsic evidence may not be used to interpret policy language unless the court has independently determined that the language at issue is ambiguous. *See infra* at p. 4 (citing cases).

787 n. 8 (*Pinnacle* "is an unpublished memorandum out of the District of Nevada, and its holding was based on the district court's reasoning in this case, which we disagree with here.").[6]

Recent New York authority supports Insurers' position that limitations on flood coverage apply to claims based on Sandy's flooding of Lower Manhattan. *Bamundo, Zwal & Schermerhorn, LLP v. Sentinel Ins. Co.*, No. 13-cv-6672 (RJS), 2015 WL 1408873 (S.D.N.Y. Mar. 26, 2015) (enforcing exclusion of flood in "Covered Cause of Loss" definition as applied to claim for "civil authority" coverage; the cause of civil authority evacuation orders issued during Sandy was flooding); *see also Johnson Gallagher Magliery, LLC v. Charter Oak Fire Ins. Co.*, No. 13 Civ. 866 (DLC), 2014 WL 1041831 at *8 (S.D.N.Y. Mar. 18, 2014) (policy's water damage exclusion, which encompassed exclusion for "flood waters and overflows from any body of water," excluded loss of business income due to power shutdown caused by Sandy).

### III.  Amtrak's Extrinsic Evidence Does Not Change the Result

"Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002); *see also Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990)) ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."). Here, there is no ambiguity in the flood definitions or in their application to the facts of Amtrak's Sandy flooding claim, and the Court need not reach Amtrak's arguments based on extrinsic evidence regarding: (i) premium calculations and loss modeling, Opp. at 11-12; (ii) other language negotiated by other insureds in

---

[6] Perhaps because of this, Amtrak did not cite *Pinnacle* in its motion for summary judgment or reply, [ECF Nos. 100, 141], even though Insurers noted it, together with the Ninth Circuit's repudiation, in their earlier briefing. Insurers' Opp. Br. at 18 n. 21 [ECF No. 132].

other policies, Opp. at 13; or (iii) Amtrak's own self-serving statements in litigation, Opp. at 14. In any event, those arguments do not create a genuine issue of material fact.

*First*, as respects premium calculations and loss modeling, Amtrak fails to provide record support for its (incorrect) statement that, with respect to storm surge and flood, "underwriters examine these risks of loss separately." Opp. at 12. Indeed, to the extent Amtrak provides citations elsewhere, the testimony establishes the opposite of what Amtrak argues. Underwriters considered various perils and did ***not*** separate flood from storm surge. *See, e.g.*, Gilinsky Decl., Ex. A (Ash-Noble Tr.) at 41:8-11 ("there are often areas where perils can overlap. . . . For example, flood and windstorm."); Gilinsky Decl., Ex. B (Bollier Tr.) at 41:7-12 (Q: How do you price the risk associated with storm surge using FLEXA? [objection] A: As I mentioned before, it's basically pricing flood."); Insurers' 56.1 Reply Stmt. ¶¶48-50 (cataloging Amtrak's misstatements regarding the evidence). Similarly, Amtrak has failed to identify any evidence suggesting that, to the extent modeling was used, it was tied to underwriters' interpretation of the policy wording. *E.g.*, Gilinsky Decl., Ex. C (Goodson Tr.) at 74:3-15 (engineers performing modeling did so without knowledge of policy provisions); *see* Insurers' 56.1 Reply Stmt. ¶50.

*Second*, Amtrak's argument that flood could have been defined differently is simply irrelevant. Even where "relevant provisions of the policy could have theoretically been more precise . . . , such lack of specificity does not render the policy provisions ambiguous." *A. Gugliotta Dev., Inc. v. First Am. Title Ins. Co. of N.Y.*, 112 A.D. 3d 559, 561, 976 N.Y.S.2d 172, 175 (2nd Dep't 2013) (internal citations omitted); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 210, 223 (5th Cir. 2007) ("that other policies have more explicitly defined the scope of similar exclusions" did not make policy at issue ambiguous; an insured may not avoid a limitation "merely by affixing an additional label or separate characterization to the act or event

5

causing the loss") (internal quotation marks omitted).[7] This is particularly true in the flood context, given that every flood is caused by something, be it rain, snowmelt, a defective levee, or a windstorm. *See Great Lakes Int'l Trading, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 3:13-cv-01522 (JAM), 2014 WL 6686633, at *3 (D. Conn. Nov. 26, 2014) ("Floods are not spontaneous and might always be ascribed to underlying causes."); *see also* Gilinksy Decl., Ex. J (Branscome Tr.) at 26:2-27:20 (testifying that "storm surge is – is one cause of flooding or of floods" and that others include tsunami, rainfall, snowmelt, and failure of man-made structures).

*Third*, in the wide swath of extrinsic evidence that Amtrak cites, and despite its acknowledgment that it is the reasonable expectations "at the time of the contract" that control, Opp. at 14 & n. 64, Amtrak points to nothing evidencing an intent expressed at the time of contracting for storm surge to be treated separately from flood. Instead, Amtrak's "intent" evidence comprises: (i) a post-dispute April 1, 2014 e-mail exchange between Amtrak and its broker that vaguely discusses the evolution of the language used in Amtrak's policies; and (ii) the deposition testimony of its risk manager adopting Amtrak's litigation theory in her current reading of the policy. Opp. at 14, n. 63. To the extent such evidence is given any consideration whatsoever, it is overwhelmed by the extensive record of Amtrak's conduct before the dispute crystallized into a lawsuit, which is entitled to greater weight. Mot. at 16-18; *see also N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (summary judgment appropriate where "the extrinsic evidence . . . is so one-sided that no reasonable person could decide to the contrary") (internal quotation marks omitted).

---

[7] This holds true even when such theoretically-more-precise language has been used by the same insurer in other policies. *Woodhams v. Allstate Fire & Cas. Co.*, 748 F. Supp. 2d 211, 219 (S.D.N.Y. 2010), *aff'd*, 453 Fed. App'x. 108 (2d Cir. 2012) (insurer's use of "different language in provisions in different [policies] does not create an ambiguity[]"); *Northrop Grumman*, 563 F.3d at 786 (rejecting argument premised on insurer's use of "whether driven by wind or not" to define flood in "earlier policies issued to [insured]" (internal quotation marks omitted)).

## IV. There Is No "Ensuing Loss" Here

Amtrak's argument that damage caused by chlorides brought into its tunnels by Sandy floodwaters constitutes "ensuing loss" is also misguided. It is well-settled that an ensuing loss exception applies only where damage is caused by a separate and independent peril. Mot. at 19-20.[8] The cases Amtrak relies on fail to apply or misapply this clear doctrine. In *Roberts v. State Farm Fire & Cas. Co.*, 705 P.2d 1335 (Ariz. 1985), an Arizona case decided three decades ago, the court did not follow the analysis mandated by New York law – *i.e.*, an analysis of whether honey damage constituted a separate and independent peril from the presence of a beehive. Instead, the court relied on a dictionary definition of "ensuing" to reach a result that would arguably cause any "ensuing loss" exception to an exclusion to swallow the exclusion whole. *Id.* at 1337 (citing dictionary definition: "to take place afterward . . . to follow as a chance, likely, or necessary consequence: RESULT") (internal quotation marks omitted).[9]

Amtrak's reliance on *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33 (2d Cir. 2006), is similarly misplaced. First, that case involved an efficient cause analysis; it did not address ensuing loss. *Id.* at 48-49. Second, to the extent such reasoning applies in this context, Amtrak misapplies it. In *Parks Real Estate*, the collapse of the World Trade Center was not the efficient cause of damage to the insured property (located blocks

---

[8] To the extent Amtrak seeks to argue that the sole test is whether damage is "collateral or subsequent" to the initial loss, Opp. at 17, rather than caused by a "separate and independent peril," that is a misstatement of the opinion it purports to rely upon, as well as New York law. "In order for the ensuing loss exception to apply, there must be a distinct, new, covered peril." *Rapid Park Indus. v. Great Northern Ins. Co.*, 2010 WL 4456856, at *4 (S.D.N.Y. Oct. 15, 2010) (citation omitted) (Rakoff, J.), *aff'd* 502 Fed.Appx. 40 (2d Cir. 2012).

[9] Amtrak's characterization of *RTG Furniture Corp. v. Indus. Risk Insurers*, 616 F. Supp. 2d 1258 (S.D. Fla. 2008), is inaccurate. Amtrak states the court "acknowledged the merit of the . . . argument that a broader construction of 'ensuing loss' should apply" where a deductible, not an exclusion, is at issue. Opp. at 19. But rather than endorse either party's argument, the court simply outlined the arguments made, determined the deductible was ambiguous, and denied the cross-motions for summary judgment. *RTG Furniture*, 616 F. Supp. 2d at 1266.

7

away); the damage at issue was caused by a *particulate cloud* that was caused by the collapse. *Id*. Amtrak's allegations that certain salts (*i.e.*, chlorides) remained after saltwater was pumped out of its tunnels and continued to cause damage do not turn the salts into a peril separate and independent from the saltwater that brought them into the tunnels.

Amtrak's ensuing loss example, Opp. at 18-19, borrowed from dicta offered by Judge Friendly in *Aetna Cas. & Sur. v. Yate*s, 344 F.2d 939 (5th Cir. 1965), reveals the fundamental flaw in its theory. The "separate and independent peril" standard ensures that an ensuing loss flows not from an automatic consequence of the original peril but, rather, from an entirely separate peril. Judge Friendly underscored this in rejecting the insured's argument that its claim should be deemed a form of ensuing loss. *Id.* at 941 ("We do not think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified" as a form of ensuing water damage). Similarly, there is no separate, independent peril here merely because Amtrak seeks to apply a label other than saltwater flooding. *See* Insurers' 56.1 Stmt. ¶45 (testimony of Amtrak's corporate representative that the chlorides were introduced into the tunnels by Sandy's "wind-driven water"); Cloutier Decl., ¶¶4, 9 ("corrosion initiated by Superstorm Sandy").

If the interaction of chlorides and oxygen (both of which were already present in the floodwaters) was sufficient to give rise to a separate and independent peril, sublimits such as those at issue here would become effectively meaningless, a result that New York law guards against. *Platek v. Town of Hamburg*, 24 N.Y.3d 688, 694 (Feb. 19, 2015) (quoting *Narob Dev. Corp. v. Ins. Co. of N. Am.,* 631 N.Y.S.2d 155 (1st Dep't 1995)) ("[C]ourts have sought to assure that the [ensuing loss] exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk."). *See also Yates*, 344 F.2d at 941.

8

## V. There is Only One Occurrence: Sandy Flooding

In its briefing, Opp. at 20-23, Amtrak returns to its efforts to create a theoretical ambiguity regarding the interpretation of the Occurrence Endorsement by relying on arguments proffered in its earlier summary judgment motion, [ECF No. 103], which this Court denied. As Insurers' briefing in connection with that earlier motion explained [ECF No. 135], Amtrak's reading of the Occurrence Endorsement is unreasonable because it renders the second and third sentences superfluous.[10] The Occurrence Endorsement's plain language – which aggregates losses that are: (i) directly attributable to Sandy flooding; or (ii) "attributable to several causes in an unbroken chain of causation" triggered by the "common cause, event or catastrophe" of Sandy flooding – requires a finding of a single occurrence when applied to the facts of this claim.

Amtrak shies away from applying the Occurrence Endorsement to the facts of its claim because such analysis shows the internal inconsistencies in Amtrak's three-occurrence position. Insurers' Motion posed the question: if, as Amtrak asserts, it is time and location that separate its claimed losses, why would three occurrences be the right answer? Mot. at 24. Amtrak's Opposition does not answer that question and serves only to underscore the internal inconsistencies in its position. For example, Amtrak submits a sworn declaration asserting that Amtrak dewatered the *south tube* of the North River Tunnel on November 1st, but the *north tube* on November 4th, three days later, through an independent dewatering process. Sullivan Decl., ¶11. Yet Amtrak treats the two tubes of the North River Tunnel as a single occurrence. *See* Insurers' 56.1 Stmt. ¶¶40, 43. At the same time, even though the North River Tunnel north

---

[10] In its reply to its Occurrence motion, Amtrak acknowledged that the second sentence of the Occurrence Endorsement aggregated losses when several causes operated in an unbroken chain of causation, Occ. Reply Br. at 3, 6 [ECF No. 140], but now appears to retreat from that position. Amtrak instead repeats its mantra that the alleged saltwater corrosion was an indirect result of the flooding because it allegedly began after the water was removed. Amtrak does not explain how or why that would have broken the chain of causation initiated by the Sandy flooding.

9

tube was dewatered on the same day as the two East River Tunnel tubes, Sullivan Decl., ¶11, Amtrak combines the two East River tunnel tubes as one occurrence, but separates that from the North River Tunnel north tube. *See* Insurers' 56.1 Stmt. ¶40, 43. And Amtrak offers no explanation for why, under its theory, it treats those sections of the tubes dewatered on November 2nd as part of the same occurrence with those sections dewatered on the 3rd. Nor is there any principled basis for treating everything else that Amtrak is claiming outside the tunnels (including claimed saltwater corrosion at other locations) as a separate, single occurrence. Amtrak's inability to articulate a limiting principle – or any principle at all – for its three-occurrence theory reveals it is just an arbitrary mechanism through which Amtrak seeks a potential litigation windfall by attempting to call water damage something else.

In contrast, treating the claimed losses as a single occurrence is the logical result dictated by the plain policy language. Tellingly, it is the only way in which Amtrak had presented its claim until after this lawsuit was filed. Insurers' 56.1 Stmt. ¶38. Moreover, it is backed by the evidence Amtrak seeks to rely upon here. For example, Amtrak submits a declaration purporting to speak to "electro-chemical corrosion" which expressly acknowledges (twice!) that it was "corrosion initiated by Superstorm Sandy." Cloutier Decl., ¶¶4, 9. Such sworn statements confirm that the claimed losses are: (i) directly attributable to Sandy flooding; or (ii) "attributable to several causes in an unbroken chain of causation" triggered by the "common cause, event or catastrophe" of Sandy flooding; either way, all of the claimed losses are one occurrence.

## CONCLUSION

For the foregoing reasons, this Court should grant Insurers' motion for summary judgment, ruling as a matter of law on the unambiguous contract language to enforce the flood provisions and Occurrence Endorsement, which would limit Amtrak's maximum total insurance recovery to $125 million, substantially narrowing the issues to be tried and the parties involved.

Dated: New York, New York
April 6, 2015

                ROPES & GRAY LLP

                By:  /s/ Catherine A. Mondell_____
                Catherine A. Mondell
                (catherine.mondell@ropesgray.com)
                800 Boylston Street
                Boston, MA  02199
                Telephone: (617) 951-7000

                Evan P. Lestelle
                (evan.lestelle@ropesgray.com)
                1211 Avenue of the Americas
                New York, NY 10036
                Telephone: (212) 596-9000

*Attorneys for Defendants Partner Reinsurance Europe plc, Torus Specialty Insurance Company, Westport Insurance Corporation, and Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. GEP 2944, 507/N11NA08242, 507/N11NA08244, and 507/N11NA08244.*
All other signatories listed, and on whose behalf this filing is submitted, consent to its filing.

MOUND COTTON WOLLAN & GREENGRASS

By:  /s/ Costantino P. Suriano
Costantino P. Suriano
(csuriano@moundcotton.com)
Bruce R. Kaliner
(bkaliner@moundcotton.com)
One New York Plaza
New York, New York 10004
Telephone: (212) 804-4200

*Attorneys for Defendants Commonwealth Insurance Company, Lexington Insurance Company, Maiden Specialty Insurance Company, Steadfast Insurance Company, and International Insurance Company of Hannover SE.*

BRUCKMANN & VICTORY, L.L.P

By: /s/ Arjang Victory
Arjang Victory (victory@bvlaw.net)
Timothy G. Church (church@bvlaw.net)
420 Lexington Avenue, Suite 1621
New York, NY 10170
Tel: (212) 850-8500

*Attorneys for Defendants Arch Specialty Insurance Company, Aspen Specialty Insurance Company, Federal Insurance Company, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. 507/Nl1NA08240 and 507/N11NA08241, Maxum Indemnity Company, Navigators Insurance Company, and RSUI Indemnity Company.*

FINAZZO COSSOLINI O'LEARY MEOLA & HAGER, LLC

By: /s/ Christopher S. Finazzo

Christopher S. Finazzo
(christopher.finazzo@finazzolaw.com)
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel: (646) 378-2033

*Attorney for Defendant Liberty Mutual Fire Insurance Company.*