UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL RAILROAD PASSENGER
CORPORATION,

                                    Plaintiff,

            vs.                                                    Civ. Action No.:14-cv-7510 (JSR)

ARCH SPECIALTY INSURANCE COMPANY;
ASPEN SPECIALTY INSURANCE COMPANY;
COMMONWEALTH INSURANCE COMPANY;
FEDERAL INSURANCE COMPANY;
LEXINGTON INSURANCE COMPANY;
LIBERTY MUTUAL FIRE INSURANCE COMPANY;
CERTAIN UNDERWRITERS AT LLOYD'S OF
LONDON and CERTAIN LONDON MARKET
INSURANCE COMPANIES subscribing to Policy Nos.
507/N11NA08240, 507/N11NA08241, 507/N11NA08242,
507/N11NA08244, 507/N11NA08244, 507/N11NA08245
and GEP 2944;
MAIDEN SPECIALTY INSURANCE COMPANY;
MAXUM INDEMNITY COMPANY;
NAVIGATORS INSURANCE COMPANY;
PARTNER REINSURANCE EUROPE plc;
RSUI INDEMNITY COMPANY;
SCOR GLOBAL P&C SE;
STEADFAST INSURANCE COMPANY;
TORUS SPECIALTY INSURANCE COMPANY; and
WESTPORT INSURANCE CORPORATION,

                                    Defendants.

---

**PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT OF FACTS IN
OPPOSITION TO INSURERS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING REPLACEMENT OF BENCHWALLS AND TRACK BED**

---

        Pursuant to Rule 56.1(b) of the Local Civil Rules of the United States District Courts for

the Southern and Eastern Districts of New York, Plaintiff National Railroad Passenger

Corporation ("Amtrak") submits this Counterstatement of Facts in Opposition to Insurers'

Motion for Partial Summary Judgment Regarding Replacement of Benchwalls and Track Bed.

**AMTRAK'S RESPONSE TO INSURERS' LOCAL CIVIL RULE 56.1 STATEMENT**

*Amtrak's Allegations*

**<u>Statement Paragraph No. 1</u>** Amtrak sets forth the allegations regarding its claim in its Amended Complaint. (Suriano Decl., Ex. 1). Among these are allegations that on October 29, 2012, as a result of Superstorm Sandy (Suriano Decl., Ex. 1, ¶¶ 8 and 10):

> 8.  The East River Tunnel ("ERT"), which consists of four tubes, two ventilation shafts and other structures, was inundated at mid-river up to the crowns of two tubes. The tunnel under the Hudson River, known as the North River Tunnel ("NRT") consists of two tubes, a ventilation shaft, an egress shaft and other structures. Both NRT tubes were inundated at mid-river above the height of the bench walls.

> 10.  The bench walls, which are concrete and steel structures, are essential components of the tunnels. They run from portal-to-portal, providing emergency egress from trains if necessary, along with access to the full length of the tunnels. They also house duct banks that are packed with cables, wires and other equipment, used either for the operation of trains or for the transport of communications, power and other services from one side of the river to the other.

**<u>Response To Paragraph No. 1</u>**

Admits that the paragraphs excerpted above are contained in the Amended Complaint.

**<u>Statement Paragraph No. 2</u>** Amtrak also alleges (Suriano Decl., Ex. 1, ¶¶ 12-14):

> 12.  As the storm subsided, Amtrak commenced the complex process of dewatering each tunnel .... Ultimately, Amtrak pumped more than 15 million gallons of water out of both tunnels combined ....

> 13.  After the storm was over and the tunnels were dewatered, additional physical damage began to take place within each tunnel due to various forms of chemical attack. This damage was caused by highly reactive salts, principally chlorides and sulfates, that had thoroughly infiltrated essential components and were not removed by dewatering.

> 14.  When the water was pumped out, these remaining chlorides and sulfates were exposed to oxygen and moisture in the air. The exposure caused the chlorides to attack the steel reinforcement in the benchwalls and the iron rails of the track bed ....

2

**Response To Paragraph No. 2**

 Admits that the paragraphs excerpted above are contained in the Amended Complaint but

denies that paragraphs 12 and 14 have been reproduced in full and refers the Court to the

Amended Complaint for the actual text of those paragraphs.

**Statement Paragraph No. 3** Amtrak further alleges (Suriano Decl., Ex. 1, ¶¶ 78-81):

> 78.  Subsequent to the storm, Amtrak began to suffer losses from chloride attack and sulfate attack on essential components of the ERT, including the bench walls, the track structures and limited portions of the tunnel liner. These physical losses are continuing.

> 79.  The remedy for such damage includes the replacement of the bench walls and the track structure in their entirety.

> 80.  Subsequent to the storm, Amtrak also began to suffer losses from chloride attack and sulfate attack on essential components of the NRT.  Such chemical attack already has led to a bench wall incident that led to train delays and emergency repairs.

> 81.  The damage to the NRT is continuing. The remedy includes the replacement of the bench walls and the track structure, which will lead to further business interruption losses.  Temporary repairs in the interim are needed as well.

**Response To Paragraph No. 3**

 Admits that the paragraphs excerpted above are contained in the Amended Complaint but

denies that paragraph 79 has been reproduced in full and refers the Court to the Amended

Complaint for the actual text of paragraph 79.

***Amtrak's Benchwall Claim***

**Statement Paragraph No. 4** The benchwalls generally run alongside both sides of the track within each tunnel tube. (Suriano Decl., Ex. 11 at 2; Kaliner Decl., Ex. 4 at AMT00032175-76).

**Response To Paragraph No. 4**

 Admitted regarding the benchwalls generally but denied that Exhibit 4 to the Kaliner

Declaration is a complete copy of ICF Kaiser Report Deliverable D3 – Base Condition Report

Final (March 1998) and that the pages contained within Exhibit 4 constitute the "relevant

portions" of said document.

**Statement Paragraph No. 5** Amtrak admitted that it did not power wash any tubes within the ERT or NRT after dewatering from Sandy (Suriano Decl. Ex. 2 - Amtrak's Response to Defendants' First Request for Admissions ("Response"), Response Nos. 15-18 and 30-33). This was confirmed by Cathy Rawlings, Amtrak's Director of Risk Management and Chairwoman of Amtrak's Sandy Team. (Kaliner Decl., Ex. 3 - Deposition of Amtrak's Rule 30(b)(6) representative Cathy Rawlings ("Rawlings Dep.") at 148:21-149:15; 149:18-20).

**Response To Paragraph No. 5**

Admits that powerwashing did not occur after dewatering from Sandy but denies that this

is a material fact and further denies Defendants' characterization of the referenced exhibits.

Exhibit 2 to the Suriano Declaration references only inundated tubes while with regard to Exhibit

3 to the Kaliner Declaration, Ms. Rawlings' testimony was in reference to questioning regarding

"clean[ing]" wherein she stated that Amtrak had not cleaned ERT or NRT, at least in part,

because Amtrak needed insurance monies to do the work.  By way of a further response, Amtrak

did not want to introduce more water into the tunnels and wash the chlorides into other locations,

like the ballast, without first receiving advice from an engineering firm about the potential

consequences and developing a plan.  *See* Declaration of Marshall Gilinsky, dated March 30,

2015 ("Gilinsky Decl."), Ex. EE (Sullivan Tr.) at 254-273.

**Statement Paragraph No. 6** Amtrak alleges that salts were left behind in the dewatering process and that when the tunnel surfaces were exposed to oxygen and moisture, the salts "attack[ed] the steel reinforcement in the benchwalls" (Suriano Decl., Ex. 1 at in 12-14; Kaliner Decl. Ex. 3 - Rawlings Dep. at 132:14-133:9; 147:16-148:20).

**Response To Paragraph No. 6**

Admits that after the storm was over and the tunnels were dewatered, additional physical

damage began to take place within each tunnel due to various forms of chemical attack. *See*

Suriano Decl., Ex. 1 at ¶13.  Amtrak denies Defendants' characterization of the referenced

4

paragraph in the Amended Complaint as well as Exhibit 3 to the Kaliner Declaration as, in

Exhibit 3, Ms. Rawlings' testimony specifically referenced chlorides.

**Statement Paragraph No. 7** Amtrak also admitted that there are sections within each of the tunnel tubes that Sandy floodwater did not reach (Suriano Decl., Ex. 2 Response Nos. 12, 14, 27, 29, and 69-74).

**Response To Paragraph No. 7**

Denies Defendants' characterization of the referenced paragraphs in Exhibit 2 to the

Suriano Declaration.   By way of example, Response No. 12 in Exhibit 2, in pertinent part,

provides that "a portion of East River Tunnel (Track 1) at the Manhattan end of the tunnel tube

was not reached by storm surge with salinity estimated at 28 parts per thousand." *See* Suriano

Decl., Ex 2, Response No. 12.

**Statement Paragraph No. 8** The four ERT lines have lengths varying from approximately 11,900 feet to 12,900 feet portal to portal. The two NRT tubes are both approximately 13,400 ft long, portal to portal (Kaliner Decl., Ex. 4 - Kaiser Report Deliverable D3 - Base Condition Report Final (March 1998) at AMT00032174).

**Response To Paragraph No. 8**

Admitted.

**Statement Paragraph No. 9** An October 15, 2013 e-mail from Glenn Sullivan, Amtrak's Director of Facilities and corporate representative on engineering issues, to James Richter, Deputy Chief Engineer of Structures (Kaliner Decl., Ex. 5) stated that there was flooding: in the ERT (Line 1) for 4,206 ft.; in the ERT (Line 2) for 4,059 ft.; in the NRT (North tube) for 3,212 ft.; and in the NRT (South tube) for 2,307 ft.

**Response To Paragraph No. 9**

Denied.  In no part of Exhibit 5 to the Kaliner Declaration is there any use of the term

"flooding" nor is there a statement that "flooding" occurred for the number of feet described.

Rather, the document references the distances for "submerged water above the top of the rail"

which is not to say that inundation did not occur elsewhere in the tunnels, including up to lower

heights.  *See* Kaliner Decl., Ex. 5, page 4 of 5.

**Statement Paragraph No. 10**          An October 15, 2013 e-mail from Amtrak's James Richter to Bruce Pohlot, Amtrak's Chief Engineer (Kaliner Decl., Ex. 6), considered three tunnel repair options:  1) Repairs with end to end tunnel cleaning; 2) Repairs that include replacement of benchwalls within flooded area; 3) Repairs with partial tunnel cleaning (and no benchwall replacement). Option 3 was considered Amtrak's "bottom line number."

**Response To Paragraph No. 10**

Denied.  The term "considered" does not appear in Exhibit 6.  Moreover, Amtrak denies

that Mr. Pohlot's repair estimates constitute a material fact.

**Statement Paragraph No. 11**          Notably, Sullivan confirmed that Amtrak's tunnel tubes (which include the benchwalls and track bed) were not in a state of good repair before Sandy, and that if water from Sandy **did not** touch a part of the tunnels, then any damage that might exist in that part of the tunnels could not be the result of Sandy (Kaliner Decl., Ex. 7 - Deposition of Amtrak's Rule 30(b)(6) representative Glenn Sullivan ("Sullivan Dep.") at 414:7-15; 646:21-647:10).

> Q.  Okay.  Well, would you agree with me, sir, that if water from Sandy did not touch a part of the tunnel, then any damage that might exist in that part of the tunnel is not the result of Sandy?
>
> *          *          *
>
> A.  If water from Sandy did not --
>
> Q.  -- touch a part of the tunnel, do you agree that the part of the tunnel that it did not touch could not be damaged by Sandy?
>
> *
>
> A.  I would agree with that.

**Response To Paragraph No. 11**

Denied.  Defendants' mischaracterize Mr. Sullivan's testimony by selectively quoting

from his transcript and failing to excerpt the first referenced section at all.   Mr. Sullivan testified

that NRT and ERT were not in a state of good repair in the context of the 2009 Engineering State

of Good Repair Report and prefaced by the notion that the concept "state of good repair" is

complex and that what is meant might be something different from how it was defined in the

Report.  *See* Gilinsky Decl., Ex. FF (Sullivan Tr.) at 409-414.  Moreover, the excerpted section

reveals that Mr. Sullivan was attempting to answer the question that if Sandy did not touch a part

of the tunnel then any damage that might exist in that part of the tunnel is not the result of Sandy,

when he was interrupted mid-sentence by a questioner who altered the question mid answer so

that it asked if the part of the tunnel it did not touch could not be damaged by Sandy.

**Statement Paragraph No. 12**        Dr. Michael Thomas of C&CS Atlantic Inc., Amtrak's
expert on the impact of chlorides and sulfates on the concrete in Amtrak's tunnels, prepared a
January 12, 2015 report entitled: "Impact of Superstorm Sandy on the Condition of the Concrete
in the Amtrak River Tunnels in New York City" (Kaliner Decl., Ex. 8), and acknowledged that
his report stated:

> The only remedy for abating this damage is the complete removal
> and replacement of all of the concrete infused by chlorides,
> especially in the vicinity of embedded steel components, and the
> replacement of all severely corroded steel members. In my
> opinion, this would require the complete reconstruction of the
> refuge niches and splicing vaults **in the areas of the tunnels that
> were inundated**.

(Kaliner Decl., Ex. 8 at 6 (emphasis added).

**Response To Paragraph No. 12**

Admits that the paragraph excerpted above is contained on page 6 of Exhibit 8 to the

Kaliner Declaration but denies Defendants' characterization of same.  Amtrak objects to the

characterization of Dr. Michael Thomas as he is a Professor of Civil Engineering as well as the

Chair of the Civil Engineering Department at the University of New Brunswick.  *See* Declaration

of Michael Thomas, dated March 30, 2015 ("Thomas Decl.") at ¶ 1.

*HNTB's Assessment of Amtrak's Benchwalls*

**Statement Paragraph No. 13**        HNTB prepared a report issued on or about September 18,
2014 which set forth its positions regarding Amtrak's tunnels. (Suriano Decl., Ex. 11).

7

**Response To Paragraph No. 13**

Admits that HNTB issued a report dated September 18, 2014 that set forth the results of

its analysis and its recommendations regarding the damage suffered by Amtrak's inundated

tunnels.

**Statement Paragraph No. 14**        The HNTB report, which "addresses the damage that was
caused to the structural components of the tunnels and presents recommendations to remedy this
damage to meet the current state of practice for rail tunnels," provides (Suriano Decl., Ex. 11 at
2):

> The most serious damage in the tunnels was found in the concrete
> bench walls. These bench walls, which run portal to portal, are an
> essential component of the tunnels. The structures provide
> emergency egress form trains when necessary as well as access to
> trains and track for emergency and other personnel. The interiors
> house ducts that contain electrical wiring, equipment, cables, and
> other essential equipment.

**Response To Paragraph No. 14**

Admits that the paragraph excerpted above (other than a spelling mistake in Defendants'

reproduction) and the quote in paragraph 14 can be found on page 2 of Exhibit 11 to the Suriano

Declaration but denies Defendants' characterization of same.

**Statement Paragraph No. 15**        HNTB found cracks, spalls, and corrosion in certain areas
of the benchwalls, and HNTB concluded that because chlorides and sulfates had infiltrated the
benchwall surfaces and ducts, these substances could not be reliably removed. Specifically,
HNTB found (Suriano Decl., Ex. 11 at 2 and 51):

> Inspection has shown that the bench walls have significant
> damage, consistent with that of a century old tunnel. The damage
> consists of corrosion of embedded steel elements, most commonly
> at the splicing chambers, horizontal cracking within the bench
> walls, and erosion along the base of the bench walls ....

**Response To Paragraph No. 15**

Admits that the paragraph excerpted above is contained on page 51 of Exhibit 11 to the

Suriano Declaration but denies Defendants' characterization of HNTB's findings.  By way of the

further response, Defendants' characterization of HNTB's findings ignores the role of Sandy

which featured prominently in HNTB's findings.  *See* Suriano Decl., Ex. 11 at 51 ("Even though

the water has been removed, the chlorides and sulfates have damaged and continue to damage

the bench walls.").

**Statement Paragraph No. 16**          Thus, HNTB concluded (Suriano Decl., Ex. 11 at 2-3):

> It is accordingly recommended that the bench walls be replaced
> with new bench walls, constructed at the proper height to meet
> current fire-life safety standards (National Fire Protection
> Association (NFPA) 130). As it is neither practical nor advisable
> from safety or other perspectives to construct the middle portion of
> a bench wall at different height than the two ends, it is
> recommended that the replacement be portal to portal.

**Response To Paragraph No. 16**

Admits that the paragraph excerpted above is contained on pages 2-3 of Exhibit 11 to the

Suriano Declaration but denies Defendants' characterization of same.

**Statement Paragraph No. 17**          HNTB provided these recommendations to Amtrak
(Suriano Decl., Ex. 11 at 52):

> Recommendations
>
> Based on our investigations and professional opinion, we
> recommend that the following actions be undertaken in the
> damaged tubes:
>
> *
>
> Perform the following work as soon as possible and as tunnel
> access allows:
>
> 7.  Remove the bench walls and replace with new bench walls,
> sized to conform to the requirements of NFPA 130 for the entire
> length of the tunnels (portal to portal).

**Response To Paragraph No. 17**

Admits that the paragraph excerpted above is contained on page 52 of Exhibit 11 to the

Suriano Declaration but denies that the above excerpted portion contains all of the

9

recommendations set forth in HNTB's report.  By way of further response, Amtrak takes issue

with Defendants' observation, as set forth in footnote 2 to Defendants' Rule 56.1 Statement, as it

presents no material fact for this Court's consideration.

**Statement Paragraph No. 18**        The HNTB Report estimates the total amount for benchwall
replacement (for the ERT and NRT tubes combined) at $479.4 million (Suriano Decl., Ex. 11 at
53).

**Response To Paragraph No. 18**

Admits that HNTB's report contains a cost estimate in 2014 dollars for the actions

recommendation by HNTB and the estimate for bench wall replacement (without pressure

washing or addressing cracks and delaminations, or direct fixation of track) was presented as

$479.4 million.

***Amtrak's Track Bed Claim***

**Statement Paragraph No. 19**        Amtrak alleges that salts were left behind in the dewatering
process and that when the tunnel surfaces were exposed to oxygen and moisture, the salts
"attack[ed] the steel reinforcement in the ... iron rails of the track bed" (Suriano Decl., Ex. 1 at
¶¶ 12-14; Kaliner Ex. 3 - Rawlings Dep. at 132:14-133:9; 147:16-148:20).

**Response To Paragraph No. 19**

Admits that after the storm was over and the tunnels were dewatered, additional physical

damage began to take place within each tunnel due to various forms of chemical attack. See

Suriano Decl., Ex. 1 at ¶13.  Amtrak denies Defendants' characterization of the referenced

paragraphs in the Amended Complaint as well as Exhibit 3 to the Kaliner Declaration as, in

Exhibit 3, Ms. Rawlings' testimony specifically referenced chlorides.

**Statement Paragraph No. 20**        Only a portion of the track bed was in an inundated portion
of the tunnels *(See* Kaliner Decl., Ex. 10).

**Response To Paragraph No. 20**

Denies that the statement in paragraph 20 is true, material, or supported by any citation to

evidence.   Moreover, the document described in Exhibit 10 to the Kaliner Declaration is a more

extensive and comprehensive document of over thirty-five hundred pages, of which only twenty-nine pages are attached to that Declaration.

**Statement Paragraph No. 21**        On January 21, 2014, Amtrak made a claim submission to the Insurers with schedules prepared by Continental Machinery Company ("CMC"), which was described to the Insurers' adjustment team as Amtrak's MEP (mechanical, electrical, and plumbing) consultant (Kaliner Decl., Ex. 10). The CMC schedules for the ERT and NRT tubes included line items for replacement of the third (electrified) rail and the rest of the track bed (ballast, ties, and running rails) in the ERT and NRT tubes that experienced flooding along some portion of their lengths.

**Response To Paragraph No. 21**

Denies Defendants' characterization of the materials provided by CMC on January 21, 2014 and the manner in which CMC was "described" to the "Insurers' adjustment team" for which no citation to evidence is provided.  Moreover, the document described in Exhibit 10 to the Kaliner Declaration is a more extensive and comprehensive document of over thirty-five hundred pages, of which only twenty-nine pages are attached to that Declaration.

**Statement Paragraph No. 22**        The CMC schedules did not provide any information from which it could be determined what portion of the track bed CMC was proposing to replace, its rationale for replacement as opposed to repair, or how CMC had derived the claimed amounts, which totaled $77,170,675 before the addition of "loads" of 16.26 percent for a share of Amtrak's corporate overhead, engineering, and project management, and a 20 percent "contingency" for a total of $105,152,762 (Kaliner Decl., Ex. 10). For ease of reference, Insurers have highlighted in yellow the relevant lines of the CMC schedules.

**Response To Paragraph No. 22**

Denied.  Moreover, and incorporating the limitations described in response to Paragraphs 20 and 21 above, Exhibit 10 to the Kaliner Declaration does not contain any highlighting.

**Statement Paragraph No. 23**        Amtrak retained an engineering firm (HNTB) to provide a structural assessment of the ERT and the NRT (Suriano Decl., Ex. 1, ¶ 92). When HNTB, Amtrak's retained engineering consultant and designated expert, issued its September 18, 2014 report entitled "Structural Assessment of the Amtrak Under River Tunnels in NYC Inundated by Super Storm Sandy" (the "HNTB report"), it asserted that the entire track bed needed to be replaced portal to portal and increased the amount of that claim from $105,152,762 million to $192.3 million on the following basis (Suriano Decl., Ex. 11 at 51) (emphasis added):

The rail system used in both tunnels consists of rock ballast, treated timber ties, tie plates and clips, running rail and third rail. These components are now coated with chlorides. **Full removal of chlorides from the ballast, including from the inaccessible surfaces, is not possible; therefore the ballast should be removed in its entirety. The tie and rail systems have to be removed in order to remove the ballast. It should be replaced with direct fixation rail system, which is the state of practice for rail tunnels. The direct fixation system should be installed for the entire length of the tunnels, e.g. portal to portal.** This will provide Amtrak with a uniform track support system throughout each tunnel. In addition, this work should be accomplished in coordination with the bench wall replacement to minimize service interruptions.

**Response To Paragraph No. 23**

Admit that Amtrak retained HNTB to provide a structural assessment of the ERT and NRT but deny Defendants' characterization of HNTB's report.

**Statement Paragraph No. 24**    HNTB also calculated the costs to replace only the inundated sections of the tunnel (Kaliner Decl., Ex. 12).

**Response To Paragraph No. 24**

Denies that the statement in paragraph 24 is true, material, or supported by any citation to evidence.

**Statement Paragraph No. 25**    In an October 3, 2013 report entitled "Ballast Test Results from East River and North River Tunnels" Amtrak personnel concluded, after sampling the ballast from ten locations in the flooded zone and from five locations in the unflooded zone of each tunnel (Kaliner Decl., Ex. 13):

> [b]ased on the above findings there does not appear to be any detrimental effects from the Hurricane Sandy floodwaters relating to increased conductivity of the ballast or to increased capability to induce corrosion in the surrounding environment.

**Response To Paragraph No. 25**

Denied.  *See* Declaration of Alfred Cloutier dated March 30, 2015.

**Statement Paragraph No. 26**    In an undated note written sometime in or about November 2013, Ms. Rawlings stated (Kaliner Decl., Ex. 14).

12

Ballast report says no damage to ballast from flooding. It can
conduct electricity, but must remove ballast to replace rail and ties.
Ballast is just rock.

**Response To Paragraph No. 26**

Denied.

**Statement Paragraph No. 27**         Nasri Munfah, Amtrak's retained engineering expert and
author of the HNTB report, testified at his deposition that HNTB did not make any inspections or
conduct any testing of any of the ballast in any area of the track bed (Kaliner Decl., Ex. 15 —
Deposition Transcript of Nasri Munfah ("Munfah Dep.") at 105:23-106:7).

**Response To Paragraph No. 27**

Admits that HNTB did not test or inspect ballast but denies that this is material.

**Statement Paragraph No. 28**         Munfah also testified at his deposition that Amtrak did not
disclose to HNTB the fact that its own ballast tests demonstrated no damage or contamination of
the ballast as a result of Sandy floodwaters (Kaliner Decl., Ex. 15 - Munfah Dep. at 108:4-11;
111:22-112:5).

**Response To Paragraph No. 28**

Denies Defendants' characterization of Mr. Munfah's testimony, Amtrak's "own ballast

tests," the results of said "tests," and that this statement is in any way material.

**Statement Paragraph No. 29**         Richard Bernaski, Amtrak's Division Engineer-New York
Division, testified at deposition that Amtrak has access to a piece of equipment known as a "Vac
Train," which allows Amtrak to remove the ballast from its track bed without removing the ties
and the rails (Kaliner Decl., Ex, 16 — Deposition transcript of Richard Bernaski ("Bernaski
Dep.") at 230:6-15).

**Response To Paragraph No. 29**

Denies Defendants' characterization of Mr. Bernaski's testimony and the materiality of

the statement.

**Statement Paragraph No. 30**         Amtrak's corporate representative on engineering topics
testified that the HNTB report offers no reason why Amtrak's track bed should be replaced with
a direct fixation system. *See* Kaliner Decl., Ex. 7 - Sullivan Dep. at 443:13-444:23 ("And it [the
HNTB Report] offers no reason. It — it offers the reason why the ballast has to be removed. It
does not offer any reason why direct fixation should be replaced back in. It gives no opinion for
that ... [i]t makes a suggestion with no reason.").

**Response To Paragraph No. 30**

Denied.  Defendants' mischaracterize Mr. Sullivan's testimony by selectively quoting from his transcript, and by quoting part of the answer outside of the context of the extremely narrowly worded question.  The question, beginning at 443:13, is as follows:  If you – if I direct your attention, sir, to the "Rail and Ballast System" paragraph on page 51 of the HNTB report, would you agree with me, sir, that the reason and only reason provided there for the claim that direct fixation is required as a result of Sandy, is the claim that the ballast in the NRT and ERT 1 and 2 was contaminated with chloride because of Sandy?"  *See* Kaliner Decl., Ex. 7, at 443:13-21 (emphasis added).  Thus Mr. Sullivan's response was in response to a specific paragraph on a specific page. Amtrak therefore objects to the insertion of the parenthetical "[the HNTB Report]" which is wrong and deliberately misleading, given the questioner's reference to a specific, single, page of the report.  By way of a further response, and per Mr. Healy's objection to the question beginning on 443:13, the document speaks for itself.

*The Policies*

**Statement Paragraph No. 31**        Amtrak purchased a set of property insurance policies for the 2011-12 policy year, which were in effect on October 29, 2012, and which insured Amtrak's property, including the benchwalls in the ERT and NRT, subject to the full terms, conditions, limitations, exclusions, and endorsements of those policies (the "Policies") (Suriano Decl., Ex. 1, ¶¶ 57, 71).

**Response To Paragraph No. 31**

Admitted except with respect to the word "full," which is ambiguous.

**Statement Paragraph No. 32**        Amtrak and its broker-representatives prepared manuscript wording that they sent to each of the Insurers in the fall of 2011 (the "Manuscript Wording"). (Kaliner Decl., Ex. 3 - Rawlings Dep. at 57:08-58:12; 70:3-16). For the purpose of this motion, with the exception of Partner Re, the Manuscript Wording was incorporated in each of the Policies attached as exhibits to the Amended Complaint, subject to the terms, conditions, limitations, and endorsements of the Policies, as added by each insurer through its respective policy documentation. Responding further, solely for the purposes of this motion, the operative contracts as to all Insurers' other than Partner Re (the "Policies") are attached to Amtrak's Amended Complaint as Exhibits 1-18, 20-24. The operative contract as to Partner Re, inclusive

of all endorsements issued by Partner Re, is attached to the Suriano Decl. as Ex. 9. For all purposes other than this motion, Insurers reserve and do not waive any disputes with Amtrak regarding the true and complete copies of their policies, which are pled in Insurers' respective Answers, and relate principally to the omission of endorsements not material here.

**Response To Paragraph No. 32**

Denied.  Defendants' characterization of the sale of the policy is misleading.  In the first instance, the language in the submissions was presented to the insurance companies and the insurance companies negotiated for the inclusion of different terms than those presented in the submissions.  Moreover, and illustrating the point, the insurance companies then sold Amtrak insurance policies containing various endorsements, such as changes to the definition of "Flood" or the deletion of the "Policy Authors" provision.  *See*, *e.g.*, Exs. 6 and 24 to the Am. Compl. Amtrak further denies that Amtrak or its broker prepared or presented "Manuscript Wording." This assertion is deliberately misleading.  Among other things, it ignores that the broker merely offered draft language to the insurance companies for consideration, expressly as a "Proposed" form. *See* Orin Decl., Ex. 4 at 40.  It also leaves out that each insurance company reviewed the proposed language and decided whether to alter it or accept it. *See* Orin Decl., Ex. 5 at 48-49. Even the claim that Amtrak or its broker "prepared" the proposed language is wrong.  Amtrak's broker, Sharon Walker, expressly testified that – while Marsh proposed the form based on what the insurance companies had found acceptable in prior years – the language in the form was not "prepared or "created" by either Marsh or Amtrak. See Orin Decl., Ex. 6 at 68-69.   By way of a further response, the differences among Amtrak's policies, as expressed in their endorsements, speak for themselves.

**Statement Paragraph No. 33**        Amtrak alleges that the Policies obligate the Insurers "to provide coverage for … increased cost of construction..."  (Suriano Decl., Ex. 1, ¶62).

**Response To Paragraph No. 33**

Admits that the words above are parts of those contained in paragraph 62 of the Amended

Complaint but denies Defendants' characterization of paragraph 62, and refers the Court to the

Amended Complaint for the actual text of paragraph 62.

**Statement Paragraph No. 34**          The Policies' Demolition and Increased Cost of Construction Coverage Extension ("DICC") is sublimited to $125 million per occurrence and further provides (Suriano Decl., Ex. 17):

> 8.  COVERAGE EXTENSIONS
>
> A.  Demolition and Increased Cost of Construction
>
> In the event of loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of property, this Company shall be liable for:
>
> (1)  the cost of demolishing the undamaged property including the cost of clearing the site;
>
> (2)  the proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;
>
> (3)  increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site. However, this Company shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;
>
> (4)  any increase in the Time Element loss arising out of the additional time required to comply with said law or ordinance.

**Response To Paragraph No. 34**

Denied.   Moreover, Exhibit 17 to the Suriano Declaration appears to contain incomplete

copies of the policies referenced in paragraph 6 of the declaration.  By way of a further response,

Amtrak refers the Court to the Amended Complaint for full copies of the referenced policies.

nydocs1-1047326.1

*NFPA 130*

**Statement Paragraph No. 35**        The National Fire Protection Association ("NFPA") is an international non-profit private organization that maintains copyrighted standards for usage and adoption by local governments. NFPA 130 (Suriano Decl., Ex. 18) is a copyrighted document, prepared by the NFPA Technical Committee on Fixed Guideway Transit and Passenger Rail Systems, which is made up of representatives of engineering firms, railroad authorities, fire departments, and various other industry professionals.

**Response To Paragraph No. 35**

Denies Defendants' characterization of the NFPA and refers the Court to the document

for its terms.

**Statement Paragraph No. 36**        NFPA 130 (Suriano Decl., Ex. 18) provides in part:

> IMPORTANT NOTICES AND DISCLAIMERS CONCERNING NFPA DOCUMENTS
>
> NOTICE AND DISCLAIMER OF LIABILITY CONCERNING THE USE OF NFPA DOCUMENTS
>
> NFPA codes, standards, recommended practices, and guides ("NFPA Documents") of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on fire and other safety issues. While the NFPA administers the process and establishes rules to promote fairness in the development of consensus, **it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in NFPA Documents.**
>
> \*        \*        \*
>
> **The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of NFPA Documents.**

**Response To Paragraph No. 36**

Denies that the text referenced in paragraph 36 appears in the manner that it is presented

by Defendants and refers the Court to the document for its terms.

**Statement Paragraph No. 37**        Nasri Munfah of HNTB, Amtrak's retained engineering expert, testified at his deposition that NFPA 130 "are standards and they are best practices, and I

17

did not say that NFPA 130 would prevent [Amtrak] from doing what they want to do." (Kaliner Decl., Ex. 15 at 282:15-283:12)

**Response To Paragraph No. 37**

Defendants' mischaracterize Mr. Munfah's testimony by omitting the question asked and selectively quoting from his transcript by, in this instance, only quoting part of his answer. Defendants' omitted, among other things, this part of Mr. Munfah's answer, "Our recommendation as an engineer is to do the best thing in terms of fire life safety." *See* Kaliner Decl., Ex. 15 at Tr. at 283:5-7.

**Statement Paragraph No. 38**        Amtrak Engineering Stations Standard Design Practices (SDP) originally issued on May 27, 2010 and revised on June 14, 2012 (Suriano Decl., Ex. 19 at 10) provides that Amtrak is exempt from state and local building and zoning laws.

**Response To Paragraph No. 38**

Denies that page 10 of Exhibit 19 to the Suriano Declaration contains any reference to an exemption to state and local building and zoning laws.

## PLAINTIFF'S LOCAL CIVIL RULE 56.1 COUNTERSTATEMENT
## OF ADDITIONAL MATERIAL FACTS

39.   During Superstorm Sandy, storm surge inundated Amtrak's tunnels under the East River and the Hudson River for the first time in their more than one hundred year history. See Declaration of Glenn Sullivan, dated March 30, 2015 ("Sullivan Decl.") at ¶ 5.  Both tubes under the Hudson River, known as the North River Tunnel ("NRT"), and two of the four tubes under the East River, known as the East River Tunnel ("ERT"), were inundated with saltwater. *See id*. Lines 1 and 2 of the ERT were inundated at mid-river up to their crowns and the NRT was inundated at mid-river above the benchwalls.  *See id*. at ¶ 6.

40.   As the storm subsided, Amtrak commenced the complex process of pumping millions of gallons of saltwater out of the tunnels.  *See id*.  After a number of days (different for

18

each tunnel), the tunnels were dewatered and full service eventually was restored.  *See* Sullivan Decl. at ¶ ¶ 10-11.  At that point, including through the re-electrification of third rail in all four of the inundated tubes, physical damage to the benchwalls and track bed commenced due to various forms of chemical attack.  *See* Declaration of Michael Thomas, dated March 30, 2015 ("Thomas Decl.") at ¶ 7.  Orin Decl., Ex. 10 at 251-55; Orin Decl., Ex. 11 at pp. 225-26; Cloutier Decl. at ¶ 4.

41.  The steel running rails were damaged by chlorides as a result of Sandy, and Amtrak employees familiar with the tunnels have seen accelerated deterioration since the storm.  Cloutier Decl. at ¶ 11.

42.  Similarly, the benchwalls have been and are being damaged by corrosive chlorides that have infiltrated the structure and cannot be removed.  *See* Thomas Decl. at ¶¶ 9-10, 12-13; Orin Decl., Ex. 10, at 251-255.  Also, Amtrak employees familiar with the tunnels before Sandy have seen accelerated deterioration since the storm.  Declaration of Stephen B. Wilchek, dated March 27, 2015 ("Wilchek Decl.") at ¶ 7.

43.  Defendants' agree that chlorides damage metals. *See* Orin Decl., Ex. 1 at § 4.01 and Ex. 4 (referencing the NEMA Guidelines which state, in pertinent part, that "Electrical equipment exposed to water can be extremely dangerous if reenergized without proper reconditioning or replacement."); Orin Decl. Exs. 15 – 20.

44.  In response to Sandy, Amtrak is undertaking to replace the benchwalls and the track bed in the four inundated tubes.  Based on the recommendations of HNTB, Amtrak will seek to do so portal-to-portal.  See Orin Decl., Ex. 10 at 263:9-265:22.

45.  In replacing any portion of the benchwalls – a massive project that necessarily will involve disruptive tunnel closures – Amtrak expects to be required to rebuild the benchwalls to

19

conform to the floor level of the trains, in accordance with NFPA 130 and the accessibility guidelines applicable to the Americans with Disabilities Act.  *See* Wilchek Decl. at ¶¶ 9-11; Sullivan Decl. at ¶¶ 12-13, 15; Declaration of Joe Rago ("Rago Decl."), dated March 30, 2015, at ¶ 3.

46.  Further, because the benchwalls are continuous structures that extend from one end of the tunnels to the other, Amtrak expects that portal-to-portal reconstruction will be needed to achieve among other things, a uniform walking surface compliant with both the NFPA and the enforcement of the ADA by the FRA.  *See* Wilchek Decl. at ¶ 11; Sullivan Decl. at ¶¶ 13, 15; Rago Decl. at ¶ 8.  That walking surface may be needed for passengers to make their way to safety, as well as for fire and rescue personnel. *See* Wilchek Decl. at ¶ 11; Rago Decl. at ¶¶ 6-8. *See also* Declaration of Catherine A. Mondell (Docket No. 180), Ex. V at 35-36 (providing that Amtrak has performed work "necessary to ensure compliance with the requirements of the ADA and that Amtrak undertook them knowing that "FRA review and approval will be required for platform designs" relating to boarding and walking surfaces").

47. With regard to the track bed, HNTB's recommendation was to install portal-to-portal direct fixation rail system, instead of the existing track-and-ballast structure, in line with the state of practice for rail tunnels and the requirements of both NFPA and the ADA. *See* Orin Decl., at Ex. 10 263:9-265:22.  In addition to correcting the damage in the track bed, this recommendation reflects the fact that the entire track bed will necessarily need to be removed to replace the benchwalls.  *See id*.

48.  Replacing the uneven ties and ballast of the existing track bed with a continuous concrete surface would comply with Amtrak's obligations under the ADA to achieve accessibility and safety for disabled passengers to the" maximum extent feasible." *See* Rago

20

Decl. at ¶¶ 5, 8.  A flat, wide concrete surface would improve the ability of disabled passengers to make their way to safety, as well as the ability of others to assist them.  *See* Rago Decl. at ¶ 8.



Dated:    March 30, 2015

By:   ___/s/_____

Rhonda D. Orin, Esq. (RO-0359)
rorin@andersonkill.com
Daniel J. Healy, Esq. (DH-7396)
dhealy@andersonkill.com
Marshall Gilinsky, Esq. (MG-8398)
mgilinsky@andersonkill.com
**ANDERSON KILL, L.L.P.**
1717 Pennsylvania Avenue, N.W.
Washington, DC  20006
Telephone:  202-416-6500

Finley T. Harckham, Esq. (FH-8219)
fharckham@andersonkill.com
Peter A. Halprin, Esq. (PH-2514)
phalprin@andersonkill.com
**ANDERSON KILL, P.C.**
1251 Avenue of the Americas
New York, NY  10020
Telephone:  212-278-1000

*Attorneys for Plaintiff*