UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NATIONAL RAILROAD PASSENGER : 
CORPORATION, :
 :
 :
                    Plaintiff, :
 :
 :
           v. :
 :
 :
ARCH SPECIALTY INSURANCE COMPANY; : 14 Civ. 7510 (JSR)
ASPEN SPECIALTY INSURANCE COMPANY; :
COMMONWEALTH INSURANCE COMPANY; :
FEDERAL INSURANCE COMPANY; LEXINGTON :
INSURANCE COMPANY; LIBERTY MUTUAL FIRE :
INSURANCE COMPANY; CERTAIN :
UNDERWRITERS AT LLOYD'S OF LONDON and :
CERTAIN LONDON MARKET COMPANIES :
Subscribing to Policy Nos. 507/N11NA08240, :
507/N11NA08241, 507/N11NA08242, :
507/N11NA08244, 507/N11NA08244, :
507/N11NA08245 and GEP 2944; MAIDEN :
SPECIALTY INSURANCE COMPANY; MAXUM :
INDEMNITY COMPANY; NAVIGATORS :
INSURANCE COMPANY; PARTNER :
REINSURANCE EUROPE plc; RSUI INDEMNITY :
COMPANY; STEADFAST INSURANCE COMPANY; :
TORUS SPECIALTY INSURANCE COMPANY; and :
WESTPORT INSURANCE CORPORATION, :
 :
                    Defendants. :
 :
 :
-----------------------------------------------------------------x

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
INSURERS' MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING REPLACEMENT OF BENCHWALLS AND TRACK BED**[1]

---

[1] All Insurer-Defendants join this motion, though Partner Re's participation in this brief is without waiver of its motion for summary judgment [ECF No. 162], seeking dismissal on the grounds that Partner Re reinsured Amtrak's captive insurer (non-party Passenger Railroad Insurance, Ltd.) and Amtrak has no right of direct action against Partner Re.

FILED UNDER SEAL PER NOVEMBER 29, 2014 PROTECTIVE ORDER

Pursuant to Rule 56.1(b) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Arch Specialty Insurance Company ("Arch"), Aspen Specialty Insurance Company ("Aspen"), Commonwealth Insurance Company ("Commonwealth"), Federal Insurance Company ("Federal"), Lexington Insurance Company ("Lexington"), Liberty Mutual Fire Insurance Company ("Liberty Mutual"), Certain Underwriters at Lloyd's of London, and Certain London Market Companies Subscribing to Policy Nos. 507/N11NA08240 ("Lloyd's '240 Policy"), 507/N11NA08241 ("Lloyd's '241 Policy"), 507/N11NA08242 ("Lloyd's '242 Policy"), 507/N11NA08244 ("Lloyd's '244 Policy"), 507/N11NA08244 ("London Companies '244 Policy"), 507/N11NA08245 ("Inter Hannover") and GEP 2944 ("GEP"), Maiden Specialty Insurance Company ("Maiden Specialty"), Maxum Indemnity Company ("Maxum"), Navigators Insurance Company ("Navigators"), Partner Reinsurance Europe plc ("Partner Re"), RSUI Indemnity Company ("RSUI"), Steadfast Insurance Company ("Steadfast"), Torus Specialty Company ("Torus"), and Westport Insurance Corporation ("Westport") (collectively, "Insurers") submit this Local Civil Rule 56.1 Statement of Undisputed Facts in Support of Insurers' motion for partial summary judgment regarding Plaintiff's claim for replacement of benchwalls and track bed in their entirety. The exhibits referred to in this Statement are attached to the March 9, 2015 Declaration of Costantino P. Suriano ("Suriano Decl.") and the March 9, 2015 Declaration of Bruce R. Kaliner ("Kaliner Decl.") and are referred to as "Ex. __."

# INSURERS' LOCAL CIVIL RULE 56.1 STATEMENT

## Amtrak's Allegations

1. Amtrak sets forth the allegations regarding its claim in its Amended Complaint. (Suriano Decl., Ex. 1). Among these are allegations that on October 29, 2012, as a result of Superstorm Sandy (Suriano Decl., Ex. 1, ¶¶ 8 and 10):

> 8. The East River Tunnel ("ERT"), which consists of four tubes, two ventilation shafts and other structures, was inundated at mid-river up to the crowns of two tubes. The tunnel under the Hudson River, known as the North River Tunnel ("NRT") consists of two tubes, a ventilation shaft, an egress shaft and other structures. Both NRT tubes were inundated at mid-river above the height of the bench walls.
>
> 10. The bench walls, which are concrete and steel structures, are essential components of the tunnels. They run from portal-to-portal, providing emergency egress from trains if necessary, along with access to the full length of the tunnels. They also house duct banks that are packed with cables, wires and other equipment, used either for the operation of trains or for the transport of communications, power and other services from one side of the river to the other.

2. Amtrak also alleges (Suriano Decl., Ex. 1, ¶¶ 12-14):

> 12. As the storm subsided, Amtrak commenced the complex process of dewatering each tunnel .... Ultimately, Amtrak pumped more than 15 million gallons of water out of both tunnels combined ....
>
> 13. After the storm was over and the tunnels were dewatered, additional physical damage began to take place within each tunnel due to various forms of chemical attack. This damage was caused by highly reactive salts, principally chlorides and sulfates, that had thoroughly infiltrated essential components and were not removed by dewatering.
>
> 14. When the water was pumped out, these remaining chlorides and sulfates were exposed to oxygen and moisture in the air. The exposure caused the chlorides to attack the steel reinforcement in the benchwalls and the iron rails of the track bed ....

3. Amtrak further alleges (Suriano Decl., Ex. 1, ¶¶ 78-81):

> 78. Subsequent to the storm, Amtrak began to suffer losses from chloride attack and sulfate attack on essential components of the ERT, including

3

the bench walls, the track structures and limited portions of the tunnel liner. These physical losses are continuing.

79. The remedy for such damage includes the replacement of the bench walls and the track structure in their entirety ....

80. Subsequent to the storm, Amtrak also began to suffer losses from chloride attack and sulfate attack on essential components of the NRT. Such chemical attack already has led to a bench wall incident that led to train delays and emergency repairs.

81. The damage to the NRT is continuing. The remedy includes the replacement of the bench walls and the track structure, which will lead to further business interruption losses. Temporary repairs in the interim are needed as well.

**Amtrak's Benchwall Claim**

4. The benchwalls generally run alongside both sides of the track within each tunnel tube. (Suriano Decl., Ex. 11 at 2; Kaliner Decl., Ex. 4 at AMT00032175-76).

5. Amtrak admitted that it did not power wash any tubes within the ERT or NRT after dewatering from Sandy (Suriano Decl. Ex. 2 - Amtrak's Response to Defendants' First Request for Admissions ("Response"), Response Nos. 15-18 and 30-33). This was confirmed by Cathy Rawlings, Amtrak's Director of Risk Management and Chairwoman of Amtrak's Sandy Team. (Kaliner Decl., Ex. 3 - Deposition of Amtrak's Rule 30(b)(6) representative Cathy Rawlings ("Rawlings Dep.") at 148:21-149:15; 149:18-20).

6. Amtrak alleges that salts were left behind in the dewatering process and that when the tunnel surfaces were exposed to oxygen and moisture, the salts "attack[ed] the steel reinforcement in the benchwalls" (Suriano Decl., Ex. 1 at ¶¶ 12-14; Kaliner Decl. Ex. 3 - Rawlings Dep. at 132:14-133:9; 147:16-148:20).

7. Amtrak also admitted that there are sections within each of the tunnel tubes that Sandy floodwater did not reach (Suriano Decl., Ex. 2 Response Nos. 12, 14, 27, 29, and 69-74).

8. The four ERT lines have lengths varying from approximately 11,900 feet to 12,900 feet portal to portal. The two NRT tubes are both approximately 13,400 ft. long, portal to portal (Kaliner Decl., Ex. 4 - Kaiser Report Deliverable D3 - Base Condition Report Final (March 1998) at AMT00032174).

9. An October 15, 2013 e-mail from Glenn Sullivan, Amtrak's Director of Facilities and corporate representative on engineering issues, to James Richter, Deputy Chief Engineer of Structures (Kaliner Decl., Ex. 5) stated that there was flooding: in the ERT (Line 1) for 4,206 ft.; in the ERT (Line 2) for 4,059 ft.; in the NRT (North tube) for 3,212 ft.; and in the NRT (South tube) for 2,307 ft.

10. An October 15, 2013 e-mail from Amtrak's James Richter to Bruce Pohlot, Amtrak's Chief Engineer (Kaliner Decl., Ex. 6), considered three tunnel repair options: 1) Repairs with end to end tunnel cleaning; 2) Repairs that include replacement of benchwalls within flooded area; 3) Repairs with partial tunnel cleaning (and no benchwall replacement). Option 3 was considered Amtrak's "bottom line number."

11. Notably, Sullivan confirmed that Amtrak's tunnel tubes (which include the benchwalls and track bed) were not in a state of good repair before Sandy, and that if water from Sandy **did not** touch a part of the tunnels, then any damage that might exist in that part of the tunnels could not be the result of Sandy (Kaliner Decl., Ex. 7 - Deposition of Amtrak's Rule 30(b)(6) representative Glenn Sullivan ("Sullivan Dep.") at 414:7-15; 646:21-647:10).

> Q. Okay. Well, would you agree with me, sir, that if water from Sandy did not touch a part of the tunnel, then any damage that might exist in that part of the tunnel is not the result of Sandy?
>
>   \*  \*  \*
>
> A. If water from Sandy did not --
>
> Q. -- touch a part of the tunnel, do you agree that the part of the tunnel that it

did not touch could not be damaged by Sandy?

       \*     \*     \*

A. I would agree with that.

12. Dr. Michael Thomas of C&CS Atlantic Inc., Amtrak's expert on the impact of chlorides and sulfates on the concrete in Amtrak's tunnels, prepared a January 12, 2015 report entitled: "Impact of Superstorm Sandy on the Condition of the Concrete in the Amtrak River Tunnels in New York City" (Kaliner Decl., Ex. 8), and acknowledged that his report stated:

> The only remedy for abating this damage is the complete removal and replacement of all of the concrete infused by chlorides, especially in the vicinity of embedded steel components, and the replacement of all severely corroded steel members. In my opinion, this would require the complete reconstruction of the refuge niches and splicing vaults **in the areas of the tunnels that were inundated.**

(Kaliner Decl., Ex. 8 at 6 (emphasis added)

**HNTB's Assessment of Amtrak's Benchwalls**

13. HNTB prepared a report issued on or about September 18, 2014 which set forth its positions regarding Amtrak's tunnels. (Suriano Decl., Ex. 11).

14. The HNTB report, which "addresses the damage that was caused to the structural components of the tunnels and presents recommendations to remedy this damage to meet the current state of practice for rail tunnels," provides (Suriano Decl., Ex. 11 at 2):

> The most serious damage in the tunnels was found in the concrete bench walls. These bench walls, which run portal to portal, are an essential component of the tunnels. The structures provide emergency egress form trains when necessary as well as access to trains and track for emergency and other personnel. The interiors house ducts that contain electrical wiring, equipment, cables, and other essential equipment.

15. HNTB found cracks, spalls, and corrosion in certain areas of the benchwalls, and HNTB concluded that because chlorides and sulfates had infiltrated the benchwall surfaces and

ducts, these substances could not be reliably removed. Specifically, HNTB found (Suriano Decl., Ex. 11 at 2 and 51):

> Inspection has shown that the bench walls have significant damage, consistent with that of a century old tunnel. The damage consists of corrosion of embedded steel elements, most commonly at the splicing chambers, horizontal cracking within the bench walls, and erosion along the base of the bench walls ....

16. Thus, HNTB concluded (Suriano Decl., Ex. 11 at 2-3):

It is accordingly recommended that the bench walls be replaced with new bench walls, constructed at the proper height to meet current fire-life safety standards (National Fire Protection Association (NFPA) 130). As it is neither practical nor advisable from safety or other perspectives to construct the middle portion of a bench wall at different height than the two ends, it is recommended that the replacement be portal to portal.

17. HNTB provided these recommendations to Amtrak (Suriano Decl., Ex. 11 at 52):

Recommendations

Based on our investigations and professional opinion, we recommend that the following actions be undertaken in the damaged tubes:

\*         \*         \*

Perform the following work as soon as possible and as tunnel access allows:

> 7. Remove the bench walls and replace with new bench walls, sized to conform to the requirements of NFPA 130 for the entire length of the tunnels (portal to portal).[2]

18. The HNTB Report estimates the total amount for benchwall replacement (for the ERT and NRT tubes combined) at $479.4 million (Suriano Decl., Ex. 11 at 53).

**Amtrak's Track Bed Claim**

19. Amtrak alleges that salts were left behind in the dewatering process and that when the tunnel surfaces were exposed to oxygen and moisture, the salts "attack[ed] the steel

---

[2] The HNTB Report refers neither to a specific provision of NFPA 130, nor to a specific edition of NFPA 130.

7

reinforcement in the ... iron rails of the track bed" (Suriano Decl., Ex. 1 at ¶¶ 12-14; Kaliner Ex. 3 - Rawlings Dep. at 132:14-133:9; 147:16-148:20).

20. Only a portion of the track bed was in an inundated portion of the tunnels (*See* Kaliner Decl., Ex. 10).

21. On January 21, 2014, Amtrak made a claim submission to the Insurers with schedules prepared by Continental Machinery Company ("CMC"), which was described to the Insurers' adjustment team as Amtrak's MEP (mechanical, electrical, and plumbing) consultant (Kaliner Decl., Ex. 10). The CMC schedules for the ERT and NRT tubes included line items for replacement of the third (electrified) rail and the rest of the track bed (ballast, ties, and running rails) in the ERT and NRT tubes that experienced flooding along some portion of their lengths.

22. The CMC schedules did not provide any information from which it could be determined what portion of the track bed CMC was proposing to replace, its rationale for replacement as opposed to repair, or how CMC had derived the claimed amounts, which totaled $77,170,675 before the addition of "loads" of 16.26 percent for a share of Amtrak's corporate overhead, engineering, and project management, and a 20 percent "contingency" for a total of $105,152,762 (Kaliner Decl., Ex. 10). For ease of reference, Insurers have highlighted in yellow the relevant lines of the CMC schedules.

23. Amtrak retained an engineering firm (HNTB) to provide a structural assessment of the ERT and the NRT (Suriano Decl., Ex. 1, ¶ 92). When HNTB, Amtrak's retained engineering consultant and designated expert, issued its September 18, 2014 report entitled "Structural Assessment of the Amtrak Under River Tunnels in NYC Inundated by Super Storm Sandy" (the "HNTB report"), it asserted that the entire track bed needed to be replaced portal to

portal and increased the amount of that claim from $105,152,762 million to $192.3 million on the following basis (Suriano Decl., Ex. 11 at 51) (emphasis added):

> The rail system used in both tunnels consists of rock ballast, treated timber ties, tie plates and clips, running rail and third rail. These components are now coated with chlorides. **Full removal of chlorides from the ballast, including from the inaccessible surfaces, is not possible; therefore the ballast should be removed in its entirety. The tie and rail systems have to be removed in order to remove the ballast. It should be replaced with direct fixation rail system, which is the state of practice for rail tunnels. The direct fixation system should be installed for the entire length of the tunnels, e.g. portal to portal.** This will provide Amtrak with a uniform track support system throughout each tunnel. In addition, this work should be accomplished in coordination with the bench wall replacement to minimize service interruptions.

24. HNTB also calculated the costs to replace only the inundated sections of the tunnel (Kaliner Decl., Ex. 12).

25. In an October 3, 2013 report entitled "Ballast Test Results from East River and North River Tunnels" Amtrak personnel concluded, after sampling the ballast from ten locations in the flooded zone and from five locations in the unflooded zone of each tunnel (Kaliner Decl., Ex. 13):

> [b]ased on the above findings there does not appear to be any detrimental effects from the Hurricane Sandy floodwaters relating to increased conductivity of the ballast or to increased capability to induce corrosion in the surrounding environment.

26. In an undated note written sometime in or about November 2013, Ms. Rawlings stated (Kaliner Decl., Ex. 14).

> Ballast report says no damage to ballast from flooding. It can conduct electricity, but must remove ballast to replace rail and ties. Ballast is just rock.

27. Nasri Munfah, Amtrak's retained engineering expert and author of the HNTB report, testified at his deposition that HNTB did not make any inspections or conduct any testing

of any of the ballast in any area of the track bed (Kaliner Decl., Ex. 15 – Deposition Transcript of Nasri Munfah ("Munfah Dep.") at 105:23-106:7).

28. Munfah also testified at his deposition that Amtrak did not disclose to HNTB the fact that its own ballast tests demonstrated no damage or contamination of the ballast as a result of Sandy floodwaters (Kaliner Decl., Ex. 15 - Munfah Dep. at 108:4-11; 111:22-112:5).

29. Richard Bernaski, Amtrak's Division Engineer-New York Division, testified at deposition that Amtrak has access to a piece of equipment known as a "Vac Train," which allows Amtrak to remove the ballast from its track bed without removing the ties and the rails (Kaliner Decl., Ex. 16 – Deposition transcript of Richard Bernaski ("Bernaski Dep.") at 230:6-15).

30. Amtrak's corporate representative on engineering topics testified that the HNTB report offers no reason why Amtrak's track bed should be replaced with a direct fixation system. *See* Kaliner Decl., Ex. 7 - Sullivan Dep. at 443:13-444:23 ("And it [the HNTB Report] offers no reason. It – it offers the reason why the ballast has to be removed. It does not offer any reason why direct fixation should be replaced back in. It gives no opinion for that ... [i]t makes a suggestion with no reason.").

**The Policies**

31. Amtrak purchased a set of property insurance policies for the 2011-12 policy year, which were in effect on October 29, 2012, and which insured Amtrak's property, including the benchwalls in the ERT and NRT, subject to the full terms, conditions, limitations, exclusions, and endorsements of those policies (the "Policies") (Suriano Decl., Ex. 1, ¶¶ 57, 71).

32. Amtrak and its broker-representatives prepared manuscript wording that they sent to each of the Insurers in the fall of 2011 (the "Manuscript Wording"). (Kaliner Decl., Ex. 3 - Rawlings Dep. at 57:08-58:12; 70:3-16). For the purpose of this motion, with the exception of

10

Partner Re, the Manuscript Wording was incorporated in each of the Policies attached as exhibits to the Amended Complaint, subject to the terms, conditions, limitations, and endorsements of the Policies, as added by each insurer through its respective policy documentation. Responding further, solely for the purposes of this motion, the operative contracts as to all Insurers' other than Partner Re (the "Policies") are attached to Amtrak's Amended Complaint as Exhibits 1-18, 20-24. The operative contract as to Partner Re, inclusive of all endorsements issued by Partner Re, is attached to the Suriano Decl. as Ex. 9. For all purposes other than this motion, Insurers reserve and do not waive any disputes with Amtrak regarding the true and complete copies of their policies, which are pled in Insurers' respective Answers, and relate principally to the omission of endorsements not material here.

33. Amtrak alleges that the Policies obligate the Insurers "to provide coverage for ... increased cost of construction ..." (Suriano Decl., Ex. 1, ¶62).

34. The Policies' Demolition and Increased Cost of Construction Coverage Extension ("DICC") is sublimited to $125 million per occurrence and further provides (Suriano Decl., Ex. 17):

> 8. COVERAGE EXTENSIONS
>
> A. Demolition and Increased Cost of Construction
>
> In the event of loss or damage under this policy that causes the enforcement of any law, ordinance, governmental directive or standard regulating the construction, repair, use, or occupancy of property, this Company shall be liable for:
>
> (1) the cost of demolishing the undamaged property including the cost of clearing the site;
>
> (2) the proportion that the value of the undamaged part of the property bore to the value of the entire property prior to loss;

11

(3) increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site. However, this Company shall not be liable for any increased cost of construction loss unless the damaged property is actually rebuilt or replaced;

(4) any increase in the Time Element loss arising out of the additional time required to comply with said law or ordinance.

## NFPA 130

35. The National Fire Protection Association ("NFPA") is an international non-profit private organization that maintains copyrighted standards for usage and adoption by local governments. NFPA 130 (Suriano Decl., Ex. 18) is a copyrighted document, prepared by the NFPA Technical Committee on Fixed Guideway Transit and Passenger Rail Systems, which is made up of representatives of engineering firms, railroad authorities, fire departments, and various other industry professionals.

36. NFPA 130 (Suriano Decl., Ex. 18) provides in part:

IMPORTANT NOTICES AND DISCLAIMERS CONCERNING NFPA DOCUMENTS
NOTICE AND DISCLAIMER OF LIABILITY CONCERNING THE USE OF NFPA DOCUMENTS

NFPA codes, standards, recommended practices, and guides ("NFPA Documents") of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on fire and other safety issues. While the NFPA administers the process and establishes rules to promote fairness in the development of consensus, **it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in NFPA Documents.**

\*       \*       \*

**The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of NFPA Documents.**

37. Nasri Munfah of HNTB, Amtrak's retained engineering expert, testified at his deposition that NFPA 130 "are standards and they are best practices, and I did not say that NFPA 130 would prevent [Amtrak] from doing what they want to do." (Kaliner Decl., Ex. 15 at 282:15-283:12)

38. Amtrak Engineering Stations Standard Design Practices (SDP) originally issued on May 27, 2010 and revised on June 14, 2012 (Suriano Decl., Ex. 19 at 10) provides that Amtrak is exempt from state and local building and zoning laws.

MOUND COTTON WOLLAN & GREENGRASS

*Costantino P. Suriano*
Costantino P. Suriano
(csuriano@moundcotton.com)
Bruce R. Kaliner
(bkaliner@moundcotton.com)
One New York Plaza, 44th Floor
New York, New York 10004
Telephone: (212) 804-4200

*Attorneys for Defendants International Insurance Company of Hannover SE, one of Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy No. 507/N11NA08245, Commonwealth Insurance Company, now known as Northbridge General Insurance Corporation, Lexington Insurance Company, Maiden Specialty Insurance Company, and Steadfast Insurance Company*

Dated: New York, New York
March 9, 2015

ROPES & GRAY LLP

                                  /s/
Catherine A. Mondell (*pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Phone: (617) 951-7000
Fax: (617) 951-7050
Catherine.Mondell@ropesgray.com

Evan Lestelle
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Evan.Lestelle@ropesgray.com

*Attorneys for Defendants Partner Reinsurance Europe plc, Torus Specialty Insurance Company, Westport Insurance Corporation, and Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. GEP 2944, 507/N11NA08242, 507/N11NA08244 and 507/N11NA08244*

Dated: New York, New York
        March 9, 2015

FINAZZO COSSOLINI O'LEARY MEOLA &
HAGER, LLC

_____/s/_____
Christopher S. Finazzo
(christopher.finazzo.@finazzolaw.com)
5 Penn Plaza, 23rd Floor
New York, NY 10001
Tel : (646) 378-2033

*Attorney for Defendant Liberty Mutual Fire Insurance Company*

Dated: New York, New York
  March 9, 2015

BRUCKMANN & VICTORY, L.L.P.

_____/s/_____
Arjang Victory (victory@bvlaw.net)
Timothy G. Church (church@bvlaw.net)
420 Lexington Avenue, Suite 1621
New York, NY 10170
Tel : (212) 850-8500

*Attorneys for Defendants Arch Specialty Insurance Company, Aspen Specialty Insurance Company, Federal Insurance Company, Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies subscribing to Policy Nos. 507/N11NA08240 and 507/N11NA08241, Maxum Indemnity Company, Navigators Insurance Company, and RSUI Indemnity Company*

Dated: New York, New York
March 9, 2015

579610.1