UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>         Plaintiff,<br><br>   v.<br><br>ARCH  SPECIALTY INSURANCE COMPANY;<br>ASPEN SPECIALTY INSURANCE COMPANY;<br>COMMONWEALTH INSURANCE COMPANY;<br>FEDERAL INSURANCE COMPANY;<br>LEXINGTON INSURANCE COMPANY;<br>LIBERTY MUTUAL FIRE INSURANCE COMPANY;<br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON<br>and CERTAIN LONDON MARKET INSURANCE<br>COMPANIES subscribing to Policy Nos. 507/N11NA08240,<br>507/N11NA08241, 507/N11NA08242, 507/N11NA08244,<br>507/N11NA08244, 507/N11NA08245 and GEP 2944;<br>MAIDEN SPECIALTY INSURANCE COMPANY;<br>MAXUM INDEMNITY COMPANY;<br>NAVIGATORS INSURANCE COMPANY;<br>PARTNER REINSURANCE EUROPE plc;<br>RSUI INDEMNITY COMPANY;<br>SCOR GLOBAL P&C SE;<br>STEADFAST INSURANCE COMPANY;<br>TORUS SPECIALTY INSURANCE COMPANY; and<br>WESTPORT INSURANCE CORPORATION,<br><br>         *Defendants.* | Civ. Action No.:14-cv-7510 (JSR) |

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT-INSURERS'
MOTION TO STRIKE THE ROBLES HERNANDEZ AND HAX REBUTTAL REPORTS
PURSUANT TO THIS COURT'S ORDER DATED FEBRUARY 13, 2015**

---

nydocs1-1049959.5

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ..............................................................................................1

FACTUAL BACKGROUND ....................................................................................................4

1. Defendants Did Not Timely Disclose Their Position on Rail Damage. ............................4

2. Defendants Intend To Offer Expert Testimony As to the Absence of Rail Damage...........9

ARGUMENT ............................................................................................................................10

I.  NO PART OF EITHER REBUTTAL REPORT SHOULD BE STRICKEN. ...................10

II. THE HAX REPORT ADDRESSES ISSUES IN DEFENDANTS' EXPERT REPORTS THAT COULD NOT REASONABLY HAVE BEEN ANTICIPATED BY AMTRAK AND WERE NOT RESPONSIVE TO ISSUES RAISED BY AMTRAK'S EXPERTS. .........................................................................11

III. THE HERNANDEZ REPORT ALSO ADDRESSES ISSUES IN DEFENDANTS' EXPERT REPORTS THAT COULD NOT REASONABLY HAVE BEEN ANTICIPATED BY AMTRAK AND WERE NOT RESPONSIVE TO ISSUES RAISED BY AMTRAK'S EXPERTS.......................................................14

CONCLUSION...........................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Grp., Inc.*,
    Civ. No. 3:11CV715, 2013 U.S. Dist. LEXIS 152775 (D. Conn. Oct. 24, 2013) ....................11

*Long Term Capital Holdings v. United States*,
    No. 01 CV 1290, 2003 U.S. Dist. LEXIS 13256 (D. Conn. May, 15, 2003) ..........................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ....................................................................................................................11

Plaintiff National Railroad Passenger Corporation ("Amtrak") submits this Memorandum of Law in Opposition to the Defendant-Insurers' Motion to Strike the Robles Hernandez and Hax Rebuttal Reports Pursuant to this Court's Order dated February 13, 2015 ("Opposition"). As set forth below, Amtrak respectfully requests that the Court deny Defendants' Motion.

## PRELIMINARY STATEMENT

On February 12, 2015, this Court granted permission to Amtrak to name Francisco Robles Hernandez and Christopher Hax as rebuttal expert witnesses, on the condition that Amtrak provide rebuttal expert reports to Defendants within six days and make those witnesses available for deposition on an expedited basis. This Court reached this decision after hearing argument from both sides about whether rebuttal experts should be allowed. Defendants' Motion now seeks the preclusion of the rebuttal expert reports that Amtrak timely submitted in accordance with this Court's order.[1] This Motion does nothing more than re-argue the Court's decision, without adding anything new to the arguments that Defendants made on February 12.

In seeking to preclude the admission at trial of the rebuttal expert reports, this Motion is entirely premature. The time for the Court to evaluate the admissibility of these rebuttal expert reports will be if and when Amtrak offers them into evidence at trial, because they are rebuttal reports. Their admissibility will be evaluated in light of the testimony and evidence that has been admitted by then in Amtrak's direct case as well as Defendants' case in response. There is no reason for the Court to make a decision now about these rebuttal reports, as the Court has not yet heard the testimony of the Defendants' experts who Mr. Hax and Mr. Hernandez will rebut.

There is no merit to Defendants' contentions that the two rebuttal reports are not responsive to positions taken by Defendants' experts. The Hax Report responds directly to a

---

[1] *See* February 13, 2015 Order (ECF No. 158, filed February 17, 2015).

1

report submitted by Christopher Sheridan and Michael Pagano of the engineering firm of Thornton Tomasetti, as supplemented by their respective deposition testimony.  Mr. Pagano and Mr. Sheridan were named by Defendants as experts about what mechanical, electrical and plumbing ("MEP") property has been damaged and how the damage should be addressed.  The Hax Report points out inconsistencies in their opinions, such as the recommendations that submerged metal substances and electrical equipment be replaced, but <u>not</u> the submerged metal rail or the third rail which carries DC electrical current.  In this context, by affirmatively leaving rail damage out of the definitive report on mechanical, electrical and plumbing damage, Defendants were finally taking the position that there was no damage to the rail or trackbed.  Their report was in fact treated as an opinion of no damage by Defendants' other experts, such as the pricing expert who accordingly assessed no costs for the replacement of rail in Defendants' final report on costs.  The report of Francisco Robles Hernandez also responds to Defendants' position that rail has not been damaged, including by challenging the adequacy of certain test results that Defendants and their experts rely upon to establish the absence of rail damage.  The test results at issue are expressly relied upon, and attached as exhibits to, the report of Defendants' expert witness Paul Kelley.

   There is no merit to Defendants' claim that the two rebuttal reports merely compensate for the inability of Amtrak expert witness Nasri Munfah to prove the existence of rail damage.  Although Mr. Munfah's report states that rail has been and continues to be damaged, Mr. Munfah did not undertake the full burden of proving rail damage in his report.  Mr. Munfah had no reason to do so because, at the time of Amtrak's deadline for expert witnesses, the insurance companies were not disputing the existence of such damage.  Defendants had not advised Amtrak by that time that they were denying coverage for that part of Amtrak's claim.  Amtrak

2

did not expect Defendants to do so, as this position defies common sense. It is beyond dispute that four tubes had been immersed for days in salt water, that chlorides have corrosive qualities that damage steel substances, and that the immersed tubes contain steel rails. For the same reason that Defendants' experts Messrs. Sheridan and Pagano found that chlorides had damaged metal surfaces and electrical systems in the tunnels, they should have also found the chlorides had damaged the rails, which are steel substances and which carry the electrical return from the third rail as part of an electrical circuit.

      Amtrak did not reasonably anticipate Defendants' position on rail damage before its January 12, 2015 deadline for naming expert witnesses because Defendants had gone to great lengths to obfuscate their position by that date. Defendants had not denied coverage for rail damage or been forthcoming with Amtrak about their damage assessments, as discussed above. But the list of actions goes much further, such as withholding copies of Defendants' consultants' reports about rail damage until the evening of Friday, January 9, 2015 – just a weekend before Amtrak's Monday deadline for naming experts. Defendants took this action even though they had received the test results from those consultants in or before August 2014 and could easily have disclosed them to Amtrak at that time. Discovery suggests that the consultants' reports about those test results were in circulation among Defendants well before January, but were not disclosed to Amtrak despite Amtrak's repeated and urgent requests. As a result, it was not until Defendants filed their own expert reports on February 2, 2015 that Amtrak appreciated the need to be prepared at trial to prove what had seemed to be the accepted and indisputable fact of rail damage. At that point, Amtrak identified Messrs. Hax and Hernandez as rebuttal expert witnesses on that topic and obtained permission from this Court to file the rebuttal expert reports now at issue.

3

Rail damage is an important issue, with serious consequences for passenger safety. Because rail was damaged by Sandy and needs to be replaced, the determination of Defendants' coverage obligations must be based upon a complete record. If, at trial, Defendants present expert testimony to show that rail has not been damaged and does not need to be replaced, then Amtrak should be allowed to present expert testimony to rebut this position. There is no place for gamesmanship in resolving this important issue of public safety. Defendants' Motion accordingly should be denied.

## FACTUAL BACKGROUND

**1.  Defendants Did Not Timely Disclose Their Position on Rail Damage.**

Though the story really begins earlier, the parties' actions in the past year reveals that Defendants repeatedly failed to advise Amtrak that they intended to deny that there has been damage to the submerged rail in Amtrak's tunnels.

On January 21, 2014, Amtrak made its second preliminary and interim submission.[2] The submission included tabulations of damages by location.[3] For both tunnels, the tabulated damages included running rail and third rail.[4]

Instead of responding to this submission with an open exchange of information, Defendants barraged Amtrak with information requests without revealing their own assessments of Amtrak's damage. For example, on February 17, 2014, Robert Steller, Defendants' adjuster, advised Defendants that their adjustment team would engage consultants to perform a variety of

---

[2]  *See* Letter from Mr. Goodman to Mr. Steller, dated January 21, 2014, annexed as Ex. A to the Declaration of Rhonda Orin, dated May 28, 2015 ("Orin Decl.").

[3]  *See* Amtrak's January 21, 2014 submission to the insurance companies, annexed as Ex. B to the Orin Decl.

[4]  *See id.*

different tests in Amtrak's tunnels.[5] That letter enclosed a "Reinspection Protocol," which lists parts of the assessment that would be "not shared" with Amtrak.[6] This strategy of withholding information from Amtrak was in full force two months later, as the parties prepared for an April 15, 2014 meeting. Defendants' representatives, Thornton Tomasetti, confirmed that the meeting "is intended solely as a technical review of CMC's scope and scope backup for the four tunnels…We will not be discussing any other sites, nor discussing pricing <u>or whether specific scope items are agreed upon</u>."[7]

Amtrak's representatives attempted repeatedly to find out Defendants' assessments of the damage so that the adjustment process could proceed. Repeatedly, Defendants failed to give them any clear or definitive responses, other than assurances that the parties were largely in agreement. The following emails from Amtrak's public adjuster, Randy Goodman, to Thornton Tomasetti are representative of these communications:

> [April 14, 2014] While I understand scope of items will not be discussed tomorrow – you have indicated previously to me that TT has agreed to some of the scope items – but not pricing. You said we would receive a list of what scope items were not in dispute (pricing was not agreed to per your same conversation). When can we expect that listing[?][8]

\*        \*        \*

---

[5] *See* February 17, 2014 Letter from Mr. Steller to Underwriters at Interest, annexed as Ex. C to the Orin Decl., at BEAZ_00000827.

[6] *See id.* at BEAZ_00000831.

[7] *See* Emails exchanged on April 14, 2014, principally among Mark Andrews, Mr. Goodman, Chris Hax, and Mr. Steller, annexed as Ex. D to the Orin Decl. (emphasis supplied).

[8] *See id.* at 1. Defendants did not reveal their position on rail damage at that meeting. Following the meeting, Thornton Tomasetti prepared Meeting Minutes which, among other items, listed track as "tabled for future discussion." *See* Mr. Andrews' draft of meeting minutes from an April 15, 2014 meeting among Mr. Goodman, Mr. Josh Haave, Mr. Hax, Mr. Steller and representatives of Thornton Tomasetti, annexed as Ex. E to the Orin Decl., at AMT00029302.

[July 3, 2014]  [Y]ou again indicated that there is significant and general agreement on scope of work relating to the electrical and mechanical components contained in Submission 2.  That communication was consistent with what you told me and Phil Balderston at our recent inspection of ERT Line 1.  We look forward to receiving the specificity of these agreed scope items within two weeks of our June 24, 2014 meeting, as promised by your team at the meeting.[9]

\*               \*               \*

[September 3, 2014]  You advised me a number of weeks ago that you had received your test results from your consultants except for the ballast testing…When can we expect to receive these referenced test results?[10]

\*               \*               \*

[October 1, 2014]  As previously requested by me on numerous occasions we ask that you please provide us with your loss measurements by location, as well as the test results that have been completed by your consultants.[11]

\*               \*               \*

[October 14, 2014]  On October 1st you indicated you would be sending your team's location loss measurements shortly…We again ask that you provide us your location measurements as soon as possible.  You have told me on numerous occasions that your team is generally in agreement as to scope of the loss by location, but we could expect differences as to pricing in your team's analysis.[12]

\*               \*               \*

---

[9]  *See* July 3, 2014 Letter from Mr. Goodman to Mr. Steller, annexed as Ex. F to the Orin Decl., at 2.

[10]  *See* September 3, 2014 Email from Mr. Goodman to Mr. Steller, annexed as Ex. G to the Orin Decl.

[11]  *See* Email chain that runs from October 1, 2014 to October 16, 2014, principally between Mr. Goodman to Mr. Steller, annexed as Ex. H to the Orin Decl., at 4.

[12]  *See id*. at 3 (October 14, 2014 Email from Mr. Goodman to Mr. Steller).

6

> [October 16, 2014]  We appreciate your continued verbal assurances that there are no significant scope or pricing differences between AMTRAK and the Insurers regarding any matter except principally the overheads.  Still, it is unacceptable that you and your adjustment team continue to contend that you need more time to provide us with the loss measurements by location.  It goes without saying that any scope or pricing reconciliation for AMTRAK's damaged locations cannot move forward until you finally do so.  <u>This one-way information stream, where AMTRAK provides information and the Insurers do nothing except receive it without response or comment, has proven to be completely unproductive.</u>[13]

Pursuant to this strategy of obfuscation, Defendants also withheld information from Amtrak about the testing that Defendants' consultants had been performing in the tunnels.  For example, although Defendants had engaged two tunnel consultants, Lucius Pitkin Inc. ("LPI") and LEA Engineering ("LEA"), to perform tunnel inspections in June 2014, and Mr. Steller advised Mr. Goodman that the results were received in August 2014,[14] Defendants did not provide those reports and results to Amtrak at that time.  Defendants conspicuously failed to do so until the evening of Friday, January 9, 2015 – just a weekend before Amtrak's Monday deadline for naming expert witnesses.[15]  Notably, drafts of the reports had been in circulation earlier among Defendants and LEA had provided its reports to Defendants in final form on December 5, 2014, a full month before Amtrak's deadline.[16]

---

[13] *See id*. at 1 (October 16, 2014 Email from Mr. Goodman to Mr. Steller) (emphasis supplied).

[14] *See supra* note 10.

[15] *See*, *e.g*., LPI Reports, attached as Reference Documents C-9 – C-12 to the report of Paul E. Kelley, titled "Evaluation of Sandy Flooding Claims Related to Concrete in Amtrak's Tunnels," dated February 2, 2015, annexed as Ex. I to the Orin Decl.; Email and letter from Timothy Church, Esq. to Rhonda Orin, Esq., dated January 9, 2015, annexed as Ex. J to the Orin Decl. Defendants concede that the documents were provided on January 9, 2015 in their Brief.  *See* Def. Br. at 7, n.5.

[16] *See*, *e.g.*, Ex. G; LEA Reports, attached as Reference Documents C-13 - C-16 to the Kelley report, annexed as Ex. K to the Orin Decl. (all dated December 5, 2014); Deposition of Jennifer Collins, dated January 26, 2015, annexed as Ex. L to the Orin Decl., at 15:16-15:23 (draft reports

Defendants may contend that the reason they withheld these reports is that they had not committed to the outright denial of rail damage until February 2, 2015, when their expert reports were due. For example, Wilson testified that as late as November and December of 2014, "There was no definitive scope that was completed . . ."[17] He testified that Defendants' position was not finalized until February 2, 2015.[18]

Ultimately, the reasons why Defendants failed to take a clear position regarding rail damage do not matter. Regardless of whether Defendants were deliberately concealing their position or were undecided about which position to take, it is beyond dispute that they were obtuse. Accordingly, there is no basis for Defendants to claim that Amtrak should be precluded from presenting rebuttal testimony from expert witnesses about this fundamentally important issue.

---

submitted to Mr. Steller); Deposition of Robert Vecchio, dated February 6, 2015, annexed as Ex. M to the Orin Decl., at 199:24-201:17 (draft reports submitted to Thornton Tomasetti).

[17] *See* Deposition of Troy Wilson, dated February 20, 2015, annexed as Ex. N to the Orin Decl., at 57:4-59:14; *see id* at 60:6-15 ("It was never finalized until we finalized it in this expert report").

[18] *See id*. at 222:6-25:

> Q: And that's what you're calling the Exhibit B to your expert report is the final spreadsheet. Until then, all of these were working versions?
>
> A: That's – that's correct.
>
>     *   *   *
>
> Q: Everything else was interim?
>
> A: It was work in progress, that is correct.

8

**2.      Defendants Intend To Offer Expert Testimony As to the Absence of Rail Damage.**

On February 2, 2015, Defendants disclosed expert reports by Messrs. Kelley, Pagano and Sheridan,[19] as well as a report from Troy Wilson and Jonathon Held (the "Wilson Report"),[20] among others. Each expert offers testimony pertinent to Defendants' position that there has been no damage to rail. That testimony goes beyond the scope of Amtrak's previously filed expert reports.

The report from Pagano and Sheridan, for example, sets forth the following:

1. Complete replacement is needed for the various mechanical and electrical items, such as lighting, pumps, piping, and galvanized steel, which were partially or completely submerged during the storm;

2. Repair in place (but not replacement) is needed for exposed third rail in the tunnels; and

3. No damage was identified for the metal rails on which the trains ride.[21]

Because rail was not identified as a damaged item by Messrs. Pagano and Sheridan, no value was assigned to rail replacement or repair in the Wilson Report.[22]

The Kelley Report furthered this position, relying on four reports (as well as charts derived from the data in the reports) which state that there was no damage to the third rail or rail in Amtrak's tunnels because of Superstorm Sandy.[23] For example, the Kelley Report states:

> No observable damage to rail or third rail components as a result of CAT-90 Sandy was evident, …[24]

---

[19] *See* Declaration of Constantino Suriano, dated April 17, 2015 ("Suriano Decl."), Exs. 3 and 4.

[20] *See* Expert Report of Troy S. Wilson and Jonathan C. Held, dated February 2, 2015, annexed as Ex. O to the Orin Decl.

[21] *See*, *e.g*., Suriano Decl., Ex. 4, at 110 (discussing East River Tunnel Line 1). While the Thornton Tomasetti Report implies that rail damage is addressed elsewhere, there is no other report that addresses rail damage and the Wilson Report relied on the Thornton Tomasetti Report to assign no value to damage to rail.

[22] *See supra* note 20.

[23] *See* Suriano Decl., Ex. 3, at 17-20.

9

During his deposition, Mr. Kelley acknowledged that he relied on the tests of LPI and LEA "to understand the nature of the exposure" in the tubes.[25]

Amtrak responded to these opinions in Defendants' expert reports by requesting permission from the Court to name rebuttal experts. On February 12, 2015, Amtrak moved via telephone for an order to do so.[26] This Court granted Amtrak's request with the following proviso:

> Amtrak may serve the reports [], provided that the reports are limited to rebutting issues raised in defendants' expert reports that either (1) were not responsive to the substance of Amtrak's initial expert witness reports or (2) could not reasonably have been anticipated by Amtrak at the time it filed its initial expert reports. After a trial date is set, but no later than two weeks prior to trial, defendants may move to strike anything in the expert reports that exceeds these parameters.[27]

Amtrak complied with this order by timely submitting the rebuttal expert reports of Messrs. Hax and Hernandez.

## ARGUMENT

### I.   NO PART OF EITHER REBUTTAL REPORT SHOULD BE STRICKEN.

Defendants have failed to identify any aspect of either rebuttal report which should be stricken. They also have failed to identify any part of either report that addresses topics in Defendants' reports that were responsive to Amtrak's experts or that addresses issues that Amtrak could reasonably have foreseen. Their inability to do so demonstrates that no part of either report violates the parameters of this Court's February 13th Order.

---

[24]  *See* Suriano Decl., Ex. 3, at 19.

[25]  *See* Continued Deposition of Paul Kelley, dated March 20, 2015, annexed as Ex. P to the Orin Decl., at 275:11-276:15.

[26]  *See supra* note 1.

[27]  *See id.*

Defendants respond instead by seeking the dismissal of both reports in their entirety. But that request is tantamount to seeking re-argument of this Court's decision to allow Amtrak to name rebuttal experts. There is no basis for appealing that decision at this point. If this Court determines during the trial that rebuttal testimony would be neither necessary nor helpful, this Court will determine how best to proceed at that time -- not now.

As a practical matter, if Defendants are permitted at trial to present expert evidence on rail corrosion, then Amtrak submits that it should be afforded the opportunity to present its own expert testimony in rebuttal. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (a rebuttal expert report is one "intended solely to contradict or rebut evidence on the same subject matter identified by another party…"). Indeed, this is the very purpose of rebuttal evidence. *See*, *e.g.*, *Long Term Capital Holdings v. United States*, No. 01 CV 1290, 2003 U.S. Dist. LEXIS 13256, *7-8 (D. Conn. May 15, 2003) ("An expert rebuttal report does exactly what it says: it rebuts, in the form of a complete statement of all opinions expressed by the author, the report of the opposing party's expert"). *See also Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Grp.*, *Inc.*, Civ. No. 3:11CV715, 2013 U.S. Dist. LEXIS 152775, *12 (D. Conn. Oct. 24, 2013) (archetypal rebuttal testimony "identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise").

## II. THE HAX REPORT ADDRESSES ISSUES IN DEFENDANTS' EXPERT REPORTS THAT COULD NOT REASONABLY HAVE BEEN ANTICIPATED BY AMTRAK AND WERE NOT RESPONSIVE TO ISSUES RAISED BY AMTRAK'S EXPERTS.

There is no merit to Defendants' claim that the Hax Report should be stricken in its entirety because it deals with issues that were set forth already in Mr. Munfah's report, such as damage to rail. Def. Br. at 8. Similarly, there is no merit to Defendants' contention that Amtrak reasonably should have anticipated that Defendants would submit evidence "to refute the notion

11

put forward by HNTB that chloride attack on the track system as a result of Sandy caused damage that required replacement of the entire track system." *See id.* at 9. Both arguments ignore that Defendants had not denied coverage for rail, or otherwise revealed their position on rail damage, by the time that Amtrak was required to name expert witnesses. To the contrary, they had misleadingly suggested, even after the Complaint was filed, that the parties were generally aligned on issues of scope.[28] They accordingly distort the focus of Munfah's analysis and report, which reflected Amtrak's assumption – and what Amtrak thought was Defendants' assumption – that rail was damaged and the only issue in dispute was the appropriate remedy. Defendants' experts turned this assumption on its head on February 2, when they revealed that Defendants are taking the position that no rail damage exists.

The best evidence that Defendants offer to "prove" that Amtrak understood this position before the deadline is an email which ironically shows the reverse.[29] In that email, Amtrak's claim representatives speculate about why preliminary spreadsheets that they received in November had not included any pricing for rail. While one representative asked if such pricing was included elsewhere, another representative said he thought Thornton Tomasetti was not including it.[30] What this email chain illustrates is that Defendants achieved their goal of obfuscation. They had left Amtrak's representatives with no alternative except to speculate about the meaning of Defendants' silence about positions that should have been crystal clear.[31]

---

[28] *See supra* pp. 4-8.

[29] *See* Suriano Decl., Ex. 6.

[30] That representative, Jeff Schwenk, testified at deposition that in November 2014 they had just received pricing information for the first time and, at that time, there was no pricing for track or ballast, leaving him to guess that track and ballast were not in the scope of repair. *See* Suriano Decl., Ex. 7 at 79:14-80:12.

[31] There is no reason for coverage to proceed by guesswork. If the Defendants were denying coverage, they could – and certainly should – have just said so.

Other parts of the Hax Report are directly responsive to the recommendations in the Thornton Tomasetti Report that the third rail be washed, rather than replaced.[32] This is another position that went beyond the scope of Amtrak's expert reports and that Amtrak did not discover, and had no reason to anticipate, until it reviewed Defendants' February 2 expert reports. The Hax Report points out the lack of detail in the Thornton Tomasetti Report about how such washing should be achieved.[33] This issue was pursued further with Defendants' expert Michael Pagano at deposition; he confirmed that no thought had been given in the report to the process.[34] The mere fact that Mr. Munfah's report calls for the replacement of the track bed does not turn Defendants' position on washing the rail into one that is purely responsive.

While Defendants committed through the Thornton Tomasetti and Wilson Reports to the position that there was no damage to rail, it is no surprise that the Thornton Tomasetti Report is riddled with substantive contradictions. The Hax Report addresses these contradictions and rebuts them. The contradictions are unavoidable because the position that there has been no rail damage from Sandy is inherently unsupportable. For example, the Thornton Tomasetti Report calls for the complete replacement of steel structures that came into contact with salt water[35] and of electrical systems that were completely submerged.[36] Given that third rail and track are made of steel, and also are part of an electrical circuit, this recommendation should have included complete replacement of rail as well.[37] Such contradictions demonstrate that Defendants' experts

---

[32] *See id*. at 3-5.

[33] *See id*.

[34] *See* Deposition of Michael Pagano, dated March 4, 2015, attached to the Orin Decl. as Ex. Q, at 247:19-254:21.

[35] *See* Suriano Decl., Ex. 4, at 120.

[36] *See id.* at 119.

[37] *See* Suriano Decl., Ex. 2, at 3-6.

13

nydocs1-1049959.5

went beyond the scope of Amtrak's expert reports and that Amtrak could not reasonably have anticipated Defendants' contentions.

### III. THE HERNANDEZ REPORT ALSO ADDRESSES ISSUES IN DEFENDANTS' EXPERT REPORTS THAT COULD NOT REASONABLY HAVE BEEN ANTICIPATED BY AMTRAK AND WERE NOT RESPONSIVE TO ISSUES RAISED BY AMTRAK'S EXPERTS.

The Hernandez Report responds to all of Defendants' statements above, in addition to particular aspects of the report of Mr. Kelley. Defendants are correct that the Hernandez Report responds, in part, to Mr. Kelley's reliance upon statements made in the LPI reports. But they are incorrect in suggesting that Kelley's reliance on LPI and LEA in his report[38] falls within the scope of Amtrak's expert reports and could have been reasonably anticipated by Amtrak. As discussed above, Amtrak was totally unaware of the LPI and LEA reports on which Kelley relied until the Friday evening before its deadline for naming expert witnesses, which appears to be no accident.

There is no merit to Defendants' claim that the Hernandez Report is not responsive to Defendants' expert reports. The Hernandez Report is directly responsive to the Kelley Report, for example, because it addresses the significance (or lack thereof) of LPI's testing methods. The Hernandez Report shows that, contrary to the position of Mr. Kelley and LPI, the tests performed by LPI do *not* support the conclusion that third rail or rail were undamaged as a result of Sandy.[39] All that those tests show is that the wrong tests were performed. Hernandez points out, for example, that the hardness and XRF testing performed by LPI are irrelevant to an

---

[38] *See* Orin Decl., Ex. P at 275:11-276:15.

[39] *See* Suriano Decl., Ex. 1, at 3. Indeed, Amtrak will seek to preclude LEA, LPI, and Langan from testifying as fact witnesses as they are, in actuality, unnamed and unqualified experts.

nydocs1-1049959.5

assessment of rail damage or corrosion.[40]  Likewise, he states that the chloride testing performed by LEA through wipe samples may provide some information about the presence of chlorides, but not about what rail corrosion has taken place already.[41]

Additionally, there is no merit to Defendants' assertion that the Hernandez Report is simply an effort to address correct "perceived deficiencies" in Mr. Munfah's report.  *See* Def. Br. at 6-7.  Mr. Munfah's report was not designed to establish the existence of rail corrosion, which is what is attacked by the Kelley report.  Neither the LPI reports, nor Kelley's reliance upon them, are part of Mr. Munfah's report.  On the other hand, Hernandez's opinions regarding the existence of rail corrosion address the contentions of Kelley, LPI and LEA.

Still further, there is no merit to Defendants' claim that Mr. Kelley's comments about LPI are irrelevant because Mr. Kelley merely quotes from the LPI reports, without relying upon them.  This argument rests on the illusion that Mr. Kelley did not personally adopt the conclusion that "there has not been damage to third rail or rail because of Sandy."  *See* Def. Br. at 6 ("Mr. Kelley is not expressing any expert opinion on the running rail or third rail").  Yet Mr. Kelley affirmatively testified that he relied upon these test results and analyses in his report.[42]  If LPI's conclusions were irrelevant to Mr. Kelley, then he presumably would not have included them in his report.  The more likely conclusion is that he originally found them significant, but now is backing off due to his discovery that they were based on defective testing methods.  But such a change of heart ironically illustrates the importance of the Hernandez Report and the need for Hernandez to remain available as a rebuttal expert at trial.  It does not provide any basis for Defendants to strike the Hernandez Report or keep Mr. Hernandez from testifying.

---

[40]  *See id.* at 3-5.

[41]  *See id.* at 3.

[42]  *See* Orin Decl., Ex. P at 275:11-276:15.

Moreover, Mr. Kelley's use of LPI's statement that there is no observable damage to the third rail and rail[43] – whether as a purported fact he relied upon or as part of his opinion – would put the lie to any claim by Defendants that they do not affirmatively dispute the existence of rail damage.[44] If the Kelley Report truly were limited to the bench walls, then there would have been no need to include this statement. Instead, Defendants are trying to slip an opinion on rail damage through the back door via Mr. Kelley's report. Amtrak shed light on this inappropriate tactic by naming Mr. Hernandez as a rebuttal expert, and this Court's decision to allow Mr. Hernandez to testify in accordance with his expert report will protect the jury from being misled.

It is notable that Defendants did not name LPI as an expert, despite hiring LPI to test the third rail and the rails. Defendants' actions make clear that they would like the Court and any fact-finder to receive less information concerning damage to the third rail and the rails, rather than more. But rail damage is far too important an issue to fall prey to such gamesmanship. There is no room for error in in evaluating whether rail is or is not damaged; as even Defendants are forced to acknowledge, a mistake could have serious consequences for passenger safety.[45]

---

[43] *See* Suriano Decl., Ex. 3, at 19.

[44] The same is true for Mr. Wilson's failure to assign any value to rail in the Wilson Report.

[45] *See* Testimony of Philip Walsh, dated February 25, 2015, annexed as Ex. R to the Orin Decl., at 157:18-158:23 (testifying that rail is important to the safe operation of a railroad and that rail damage can result in derailments).

## **CONCLUSION**

For the foregoing reasons, Amtrak requests that this Court deny the Motion in its entirety.

Dated: May 28, 2015

        /s/
    Rhonda D. Orin, Esq. (RO-0359)
    rorin@andersonkill.com
    Daniel J. Healy, Esq. (DH-7396)
    dhealy@andersonkill.com
    Marshall Gilinsky, Esq. (MG-8398)
    mgilinsky@andersonkill.com
    **ANDERSON KILL, L.L.P.**
    1717 Pennsylvania Avenue, N.W.
    Washington, DC  20006
    Telephone:  202-416-6500

    Finley T. Harckham, Esq. (FH-8219)
    fharckham@andersonkill.com
    Peter A. Halprin, Esq. (PH-2514)
    phalprin@andersonkill.com
    **ANDERSON KILL, P.C.**
    1251 Avenue of the Americas
    New York, NY  10020
    Telephone:  212-278-1000

    *Attorneys for Plaintiff*