UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>ARCH SPECIALTY INSURANCE COMPANY;<br>ASPEN SPECIALTY INSURANCE COMPANY;<br>COMMONWEALTH INSURANCE COMPANY;<br>FEDERAL INSURANCE COMPANY;<br>LEXINGTON INSURANCE COMPANY;<br>LIBERTY MUTUAL FIRE INSURANCE COMPANY;<br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON and CERTAIN LONDON MARKET INSURANCE COMPANIES subscribing to Policy Nos. 507/N11NA08240, 507/N11NA08241, 507/N11NA08242, 507/N11NA08244, 507/N11NA08244, 507/N11NA08245 and GEP 2944;<br>MAIDEN SPECIALTY INSURANCE COMPANY;<br>MAXUM INDEMNITY COMPANY;<br>NAVIGATORS INSURANCE COMPANY;<br>PARTNER REINSURANCE EUROPE plc;<br>RSUI INDEMNITY COMPANY;<br>STEADFAST INSURANCE COMPANY;<br>TORUS SPECIALTY INSURANCE COMPANY; and<br>WESTPORT INSURANCE CORPORATION,<br><br>　　　　　　　　　　Defendants. | Civ. Action No.:14-cv-7510 (JSR) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR CLARIFICATION ON THE SCOPE OF TRIAL**

dcdocs-90232.6

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 3

    A.    The Valuation Provisions in the Policies ....................................................... 3

    B.    Amtrak's Property Damage ............................................................................ 4

    C.    The Relief Sought Via the Operative Pleadings ........................................... 6

ARGUMENT ................................................................................................................................ 8

I.    THE TRIAL SHOULD RESOLVE FACT ISSUES, PRINCIPALLY OF DAMAGE, THAT ARE PERTINENT TO AMTRAK'S CLAIM FOR DECLARATORY RELIEF ................................................................................... 9

II.    AMTRAK'S PROPOSAL FOR THE CONDUCT OF TRIAL IS APPROPRIATE ................................................................................................... 13

CONCLUSION ......................................................................................................................... 15

## **TABLE OF AUTHORITIES**

Page

**CASES**

*Certain Underwriters at Lloyd's, London Subscribing to Certificate No. IPSI 12559 v. SSDD, LLC*, No. 4:13-CV-193,
2013 U.S. Dist. LEXIS 76584 (E.D. Mo. May 31, 2013) ............................................ 9

*Compagnie Des Bauxites De Guinee v. Three Rivers Ins. Co.*,
No. 2:04cv393, 2007 U.S. Dist. LEXIS 41539 (W.D. Pa. June 7, 2007) ................... 13

*CSX Corporation v. North River Ins. Co.*,
No. 3:08-CV-00531,
2009 U.S. Dist. LEXIS 133311 (M.D. Fla., Sept. 25, 2009) ...................................... 13

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
261 F. Supp.2d 293 (S.D.N.Y. 2003), *aff'd* 411 F. 3d 384 (2d Cir. 2005) ................. 10

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
279 F. Supp. 2d 235 (S.D.N.Y. 2003) ......................................................................... 9

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
241 F.3d 154 (2d Cir. 2001) ............................................................................... 14, 15

*Employers Ins. of Wausau v. Tektronix, Inc.*,
No. CVV 9908032, Slip. Op. (Or. Cir. Ct. Dec. 30, 2003) ........................................ 15

*Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*,
Civil Action No. 3:99-CV-1623-D,
2002 U.S. Dist. LEXIS 3594 (N.D. Tex. Mar. 5, 2002) ........................................ 9, 10

*Liberty Mut. Fire Ins. Co. v. Scott*,
Case No. 4:04CV21, 2006, U.S. Dist. LEXIS 3332 (E.D. Mo. Jan. 19, 2006) .......... 10

*Smith v. Bear*,
237 F.2d 79 (2d Cir. 1956) .......................................................................................... 9

*Spivey Co. v. Travelers Ins. Co.*,
407 F. Supp. 916 (E.D. Pa. 1976) .............................................................................. 14

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop.*,
No. 01 Civ. 9291, 2006 U.S. Dist. LEXIS 79326 (S.D.N.Y. Oct. 31, 2006) ............. 15

*Triyar Cos., LLC v. Lexington Ins. Co.*,
Civil Action No. 3:12-cv-294,
2013 U.S. Dist. LEXIS 90633 (S.D. Tex. June 27, 2013) ......................................... 10

dcdocs-90232.6

## TABLE OF AUTHORITIES
(continued)

Page

*ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*,
   No. 9708-06226, Slip Op. (Or. Cir. Ct. Apr. 7, 2003) .......................................... 14, 15

**STATUTES**

28 U.S.C. §2201(a) ................................................................................................. 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b) ............................................................................................... 11

Fed. R. Civ. P. 12(c) ............................................................................................... 11

Couch on Insurance (3d ed. 2005) .......................................................................... 14

The Plaintiff, National Passenger Railroad Corporation ("Amtrak"), hereby submits this Memorandum of Law in support of its Motion for Clarification on the Scope of Trial (the "Motion").  For the reasons discussed below, Amtrak respectfully requests that the Court adopt the framework proposed herein for the conduct of the trial – which is consistent with the express terms of the insurance policies at issue (the "Policies") and the claims raised in Amtrak's Complaint and Amended Complaint[1] as well as Defendants' Answers and Affirmative Defenses (collectively, the "Operative Pleadings").

## PRELIMINARY STATEMENT

In this lawsuit, Amtrak asserts a cause of action for declaratory judgment (Count I) and breach of contract (Count II) against its "all-risk" property insurance companies in connection with its losses following Superstorm Sandy.  Defendants are the primary and excess insurance companies that are on the risk for property damage, business interruption and other forms of insurance coverage.  A three-week jury trial is scheduled to commence on July 13, 2015.

The parties are not in agreement as to the scope of the trial. Amtrak believes that the trial will resolve certain disputed fact issues that underlie the declaratory judgment that Amtrak seeks.  The principal issue is whether there is covered damage to Amtrak's property at multiple sites in the New York region, including the benchwalls and track in the tunnels under the Hudson and East Rivers.  For any such damage found, Amtrak will then ask this Court to issue a declaration that the insurance companies are obligated to pay "replacement cost new . . . as of the date of replacement," as specified in the Policies.

---

[1] A copy of the Complaint is attached to the Declaration of Marshall Gilinsky, dated June 3, 2015 (the "Gilinsky Decl.") as Ex. 1 and a copy of the Amended Complaint is attached to the Gilinsky Decl. as Ex. 2.

dcdocs-90232.6

A secondary issue for trial, in Amtrak's view, is whether Amtrak is owed consequential damages by certain Defendants who breached their contractual obligations by failing to make partial and interim payments as they fell due.  This claim arises from Defendants' failure to pay more than $30 million to Amtrak as of the date of the Complaint.  Defendants established their own breach by making additional payments shortly after Amtrak sued.  Having received those payments (albeit late), Amtrak is not seeking further compensatory damages.  But it still is seeking consequential damages equal to the legal fees it incurred to force Defendants to honor their obligation to make the overdue payments.

Once this Court issues a Judgment that incorporates the jury's findings of fact and its own rulings on the law, Amtrak expects Defendants to fulfill their contractual obligations, going forward, by paying "replacement cost new" for covered property as such costs are incurred.  That is what is called for by the express terms of the Policies, what Amtrak has sought in the Operative Pleadings – and what is within this Court's authority to order.

Pre-trial discussions with Defendants, however, have made clear that the parties are preparing to try two very different cases.  While Amtrak sees the trial as a vehicle to resolve disputed fact issues of *property damage*, Defendants see it as a vehicle to quantify the scope of *monetary damages* – *i.e.*, limiting the sums that Defendants will be obligated to pay.  For example, it appears that Defendants view Amtrak's estimations of its replacement costs, made during the adjustment process in 2013 and 2014, as the equivalent of a "damages" demand.  Defendants have stated that they intend to devote a large portion of trial to establishing that they do not owe Amtrak $1.2 billion, which was the total of those 2013 and 2014 estimations.[2]  But because the focus of Amtrak's Complaint and Amended

---

[2] Despite Defendants' contentions during the Court conference on May 29, the breach of contract

*footnote continued*

- 2 -

Complaint is on declaratory relief and Amtrak does not seek – and has never sought – an award of $1.2 billion in "damages," Defendants' approach is misplaced.

The parties have undertaken to reach agreement as to the scope of the trial, but their efforts have been unsuccessful. To facilitate trial preparations for both sides, and to avoid burdening this Court with substantive issues on the eve of trial, Amtrak respectfully requested this opportunity to seek clarification.

## FACTUAL BACKGROUND

### A.   The Valuation Provisions in the Policies

The Policies all contain the same terms regarding the valuation of Amtrak's insurance claim. Specifically, ¶12 sets forth how losses of various types are to be adjusted, valued and paid. Because all or nearly all of the losses at issue in this Action involve damage to structures, machinery or equipment, the following Policy provision is the key to determining the amount that Defendants owe for Amtrak's Claim:

> Buildings, structures, furniture and fixtures, machinery, equipment, improvements and betterments, *shall be valued at the replacement cost new* on the same premises, *as of the date of replacement*.

*See, e.g.,* Lexington Policy, Gilinsky Decl., Ex. 3 at ¶12.B.(1) (emphasis added). The valuation provision for losses to structures is based on the replacement cost new "as of the time of replacement," whereas other types of damaged property are covered based on the value as of the "time of loss." *See id.* at ¶12.A(1) ("Raw Stock . . . shall be valued at replacement cost at the time and place of loss"); ¶12.A(2) ("Stock in process . . . shall be

---

count does not require the devotion of a substantial portion of the trial to the quantification of "damages." That count presents a discrete issue that can be resolved with a limited amount of evidence. The breach itself is established by the fact of Defendants' payment of substantial sums once Amtrak filed its Complaint. The amount of consequential damages owed will be established by evidence of the costs Amtrak incurred due to Defendants' failure to make partial payments – not by any "estimates" of the cost to replace damaged property. *See infra* at 13.

- 3 -

valued at the Insured's selling price of finished stock at the time of loss . . . "); ¶12.A.(3) ("Finished stock . . . shall be valued at the Insured's selling price of finished stock at the time of loss . . . ").

Further, the valuation provision for losses to structures does *not* allow for valuation based on the cost to repair (as opposed to the cost to replace), in contrast to other provisions. *See, e.g., id.* at ¶12.B.(6)(A) (specifying that losses involving rolling stock "shall be adjusted at the *repair or replacement cost* as of the date of replacement, if actually repaired or replaced. If the above mentioned rolling stock is not *repaired or replaced*, the loss shall be adjusted at the actual cash value") (emphasis added).

The Policies' valuation provision also grants Amtrak express permission to replace damaged property with any property anywhere in the United States, and affords Amtrak a reasonable time to replace damaged property while allowing for full coverage valued at replacement cost new, without deduction for depreciation:

> Permission is granted for the Insured to replace the damaged property with any property at the same site or at another site within the territorial limits, of this policy, but recovery is limited to what it would cost to replace on same site. If property damaged or destroyed is not repaired, rebuilt or replaced within a reasonable period after the loss or damage, this Company shall not be liable for more than the actual cash value at the time of loss (ascertained with proper deduction for depreciation) of the property damaged or destroyed. However, limitations imposed by federal, state or municipal building codes shall not result in actual cash valuation.

*Id.* at ¶12.B (8).

The Policies also provide for appraisal of disputes where "the Insured and this Company fail to agree on the amount of the loss." *Id.* at ¶26.

### B.   Amtrak's Property Damage

The heart of this dispute is Amtrak's claim of damage to its tunnels under the Hudson

and East Rivers.  Four of Amtrak's six single-track tubes were inundated with saltwater during Sandy for the first time in their 100-year history.  *See* Gilinsky Decl., Ex. 1 at ¶7.  Amtrak claims that its benchwalls and track beds suffered and are continuing to suffer ongoing chloride damage, that these structures need to be replaced and that the process will require closures of these all-important tunnels.  *See id.* at ¶¶82-85.  Defendants claim, in contrast, that neither the benchwalls nor the track structure suffered any damage whatsoever and that Defendants have no payment obligations for them.  Amtrak suffered damage at other sites as well, but at many of those sites, the existence and scope of damage is not in dispute, as it is with the benchwalls and track beds.[3]  Many of those disputes involve only that, during the adjustment process, the parties' cost estimates were different.  But those differences are irrelevant because, as discussed above, Defendants' payment obligations fall under the scope of the declaratory relief that Amtrak seeks: *i.e.*, "replacement cost new . . . as of the date of replacement."

     Immediately after the storm, initial emergency repairs were undertaken to return the trains to interim service.  Damaged equipment was replaced as needed to achieve that goal, including in the tunnels and their associated structures.  But for the long-term, the process of identifying, planning and executing the remediation of damage to the tunnels is a complex and massive undertaking.  Among other things, it involves: (i) carefully and accurately identifying the nature and extent of the damage; (ii) assessing the appropriate means of rectifying the damage; (iii) planning the construction to rectify the damage expediently, without unduly interfering with passenger rail traffic into and out of Manhattan or along the Northeast Corridor; (iv) reviewing bids and retaining contractors, engineers and

---

[3] *See* Thornton Tomasetti Expert Report, dated February 2, 2015, copy attached to the Gilinsky Decl. at Ex. 4.

other professional firms to perform the necessary work; (v) arranging for financing; and (vi) as soon as possible, undertaking the construction. While that planning is well underway, and Amtrak concurrently is addressing financial issues through this lawsuit, most replacements have not yet been done.

### C. The Relief Sought Via the Operative Pleadings

Amtrak's Complaint and Amended Complaint seek a declaratory judgment that delineates the coverage to which Amtrak is entitled. *See* Gilinsky Decl., Ex. 1 at ¶¶106-14; Ex. 2 at ¶¶102-10. Given the nature of the disagreements between the parties, along with certain provisions regarding the timing of suit,[4] Amtrak initiated this action within a few weeks of the two-year anniversary of the storm. Amtrak sought declaratory relief rather than a quantum of damages because it has yet to incur the replace the bulk of its damaged property. Once this Court issues a judgment declaring the coverage to which Amtrak is entitled, Amtrak will be in a position to proceed with replacements on a large scale.

The only damages demand in the Operative Pleadings arises from Count II, which is for breach of contract. *See* Gilinsky Decl., Ex. 1 at ¶¶115-27; Ex. 2 at ¶¶111-23. That count arises from Amtrak's requests for partial payments of $75,000,000 from its primary insurance companies – and their failure to pay more than $30,000,000 in response. *See* Gilinsky Decl., Ex. 1 at ¶¶121-24; Ex. 2 at ¶¶117-201. Those requests were conveyed to Defendants by Goodman-Gable-Gould ("GGG"), Amtrak's public adjuster.

GGG prepared and submitted ten estimations of loss to Defendants over a two-year period that totaled, collectively, $1.2 billion. The breach of contract count pertains only to the first two of them. The first estimation was submitted on July 19, 2013 in the amount of

---

[4] *See, e.g.,* Gilinsky Decl., Ex. 3 at ¶32.

approximately $54,000,000 for Amtrak's emergency expenses and business interruption losses during and after the storm.[5] The second estimation was submitted on January 21, 2014 in the amount of approximately $210,000,000 for Amtrak's losses at a variety of sites, including damage to the track structure in the tunnels.[6]

Around the time of the first estimation, GGG requested a partial and interim payment of $25,000,000 pursuant to ¶24 of the Policies.[7] That provision states that Defendants' partial payments "shall not be less than the undisputed estimate of loss or damage between the Insured and the Company."[8] GGG increased that request to $75,000,000 around the time of the second estimation.[9] Without any explanation, however, Defendants had made payments of only $30,000,000 by the time Amtrak filed this lawsuit on September 17, 2014, more than nine months later.[10] Prior to the filing of this Action, Defendants attempted to condition any further partial payments on Amtrak agreeing that there was only a single occurrence.[11]

When Amtrak filed its declaratory judgment action in September 2014, it included a cause of action for the failure of Defendants, particularly the insurance companies in the

---

[5] *See* Letter from Randy Goodman to Robert Steller, dated July 19, 2013, copy attached to the Gilinsky Decl. as Ex. 5.

[6] *See* Letter from Randy Goodman to Robert Steller, dated January 21, 2014, copy attached to the Gilinsky Decl. as Ex. 6.

[7] *See* Gilinsky Decl., Ex. 5.

[8] *See* Gilinsky Decl., Ex. 3 at ¶24.

[9] *See* Gilinsky Decl., Ex. 6 at 3.

[10] *See* Gilinsky Decl., Ex. 1 at ¶122.

[11] *See id.* at ¶98.

primary layer, to pay the requested amount.[12]  Defendants responded by promptly making additional payments of $30,800,000[13] – more than doubling their payments since the storm (and without the unjustified condition that Amtrak relinquish its right to coverage for more than one occurrence in order to receive partial payments).  Defendants' further payments establish, *prima facie*, that at least the primary insurance companies had breached the partial payment provision prior to the filing of this Action.[14]  To the extent that excess insurance companies shared responsibility for those decisions, they shared responsibility for the breach as well.  Defendants did not nullify their breach by making payments *after* Amtrak sued.  Accordingly, Amtrak retains the right to seek consequential damages.

## ARGUMENT

Amtrak has identified two principal issues for trial: (1) what property of Amtrak has suffered covered damage; and (2) whether Amtrak is entitled to consequential damages for Defendants' failure to make partial payments in excess of $30,000,000 until after Amtrak filed suit.  Neither issue requires Defendants to devote trial time to refuting a supposed cause of action for an award of $1.2 billion in "damages," as Amtrak has not sought such an award.  Similarly, neither issue requires Defendants to devote trial time to quantifying their future coverage obligations.  Quantification of the total amount Defendants will owe under the Policies is not possible at this time because coverage for most of the property at issue

---

[12] *See id.* at ¶¶115-27.

[13] *See* Fourth and Fifth Partial Proofs of Loss, copies attached to the Gilinsky Decl. as Ex. 7.

[14] Discovery has confirmed that the failure to pay was a breach of the partial payment provision. Among other things, as of April 2014, the adjuster for all Defendants had assessed Amtrak's losses at approximately $83,100,000, which would have supported partial payments of at least $70,000,000 as of that time.  *See* Report No. 11 of York Specialized Loss Adjusting, dated April 7, 2014 and addressed to Underwriters at Interest, copy attached to the Gilinsky Decl. as Ex. 8.

expressly is based on "replacement cost new . . . as of the date of replacement" and "the date of replacement" has not yet arrived.[15]

## I. THE TRIAL SHOULD RESOLVE FACT ISSUES, PRINCIPALLY OF DAMAGE, THAT ARE PERTINENT TO AMTRAK'S CLAIM FOR DECLARATORY RELIEF

This Action principally is a declaratory judgment action to resolve the important legal and factual issues in dispute. The threshold factual issues will be resolved at trial and the legal issues will be ruled upon by this Court. *See, e.g., Smith v. Bear*, 237 F.2d 79, 86-87 (2d Cir. 1956) (affirming District Court's approach of ruling on the scope of the contract at issue as a matter of law and leaving factual determinations to the jury).

The filing of a declaratory judgment action is common where an insurance coverage dispute requires judicial intervention, even though the full scope of the claim has yet to be determined. Research reveals dozens of cases where Defendants have availed themselves of the declaratory judgment mechanism to determine their coverage obligations, without requesting a ruling as to particular dollar amounts. *See, e.g., Certain Underwriters at Lloyd's, London Subscribing to Certificate No. IPSI 12559 v. SSDD, LLC*, No. 4:13-CV-193, 2013 U.S. Dist. LEXIS 76584 at *14 (E.D. Mo. May 31, 2013) (Lloyd's filed a declaratory judgment action against its policyholder on a property insurance claim and successfully argued that such suit was not barred by the policy's appraisal provision because the valuation of the loss was not at issue in the declaratory judgment action);

---

[15] If Defendants pursue a defense that their coverage obligations are limited to actual cash value at the time of loss, the jury could decide the threshold fact issue of whether it is unreasonable that the replacements have not been made already. *See* Gilinsky Decl., Ex. 3 at ¶12.B (8). While Amtrak believes that an affirmative response is unlikely, if the jury so finds, then prior rulings of this Court identify appraisal as the required approach for determining the disputed amount of each such loss. *See id.* at ¶26; *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F. Supp. 2d 235, 240-41 (S.D.N.Y. 2003) (Rakoff, J.) ("Pursuant to the parties' agreement, and as a general matter under New York law, questions concerning valuation of the loss, as opposed to coverage under the Policy, must be submitted to appraisal").

*Lexington Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, Civil Action No. 3:99-CV-1623-D, 2002 U.S. Dist. LEXIS 3594 at *20 (N.D. Tex. Mar. 5, 2002) (Lexington filed a declaratory judgment action against its policyholder on a property insurance claim, with the coverage issues decided by the District Court and the dollar amount owed decided via appraisal); *Liberty Mut. Fire Ins. Co. v. Scott*, Case No. 4:04CV21, 2006 U.S. Dist. LEXIS 3332 (E.D. Mo. Jan. 19, 2006) (Liberty Mutual filed a declaratory judgment action against its policyholder on a property insurance claim and successfully moved for judgment as a matter of law).

As in those cases, this Action does not seek an award of "damages" or a determination of a specific dollar amount due. *See generally* Gilinsky Decl., Ex. 1 at ¶¶113-14; Ex. 2, at ¶¶109-10. In fact, given the applicable policy wording and the well-established precedent of this Court, Amtrak did not believe that it *could have* sued Defendants for breach of contract for a prospective failure to pay or sought "damages" for that conduct. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295-96 (S.D.N.Y. 2003) (Rakoff, J.) (holding that a declaratory judgment action was appropriate for resolving disputed insurance coverage issues, but dismissing the policyholder's claims for breach of contract because the insurance company did not yet have any duty to pay under the terms of the insurance contract), *aff'd* 411 F.3d 384, 389 (2d Cir. 2005); *Triyar Cos., LLC v. Lexington Ins. Co.*, Civil Action No. 3:12-cv-294, 2013 U.S. Dist. LEXIS 90633 at *13-14 (S.D. Tex. June 27, 2013) (same). The holding of this Court in *Duane Reade* would have called for such a count to be dismissed.

The declaration sought in Amtrak's Complaint and Amended Complaint – that the Policies cover Amtrak's losses based on multiple "occurrences," beyond the $125,000,000 sublimit applicable to losses "by the peril of flood" and valued based on "replacement cost

new . . . as of the date of replacement" – is thus the correct form of relief for Amtrak to request.  *See* 28 U.S.C. §2201(a) ("In a case of actual controversy within its jurisdiction, except with respect to [actions not applicable here], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.").  The requested declaration will resolve the key dispute between the parties and provide a framework under which Defendants will make payments for Amtrak's covered losses as they come due.

Defendants silently affirmed the propriety of this cause of action through their failure to seek its dismissal on any ground.  While Defendants were aggressive in seeking the dismissal of other parts of Amtrak's complaint – such as Amtrak's request for consequential damages and its inclusion of Partner Reinsurance Europe plc as a defendant – they raised no objection to Amtrak's request for declaratory relief.[16]  With discovery complete and trial scheduled to begin in less than six weeks, it is far too late for them to do so now.  *See* Fed. R. Civ. P. 12(b)(6) (requiring Motions to Dismiss to be filed via Defendants' responsive pleading); Civil Case Management Plan, at ¶E (ECF No. 8, Filed October 21, 2014) (requiring post-discovery summary judgment motions to be brought upon notice within one week of the close of discovery); Fed. R. Civ. P. 12(c) (requiring Motions for Judgment on the Pleadings to be filed "early enough not to delay trial").

In light of the relief that Amtrak is seeking, as set forth in the Operative Pleadings,

---

[16] *See* Motion to Dismiss (ECF No. 56, Filed December 5, 2014); Defendant Partner Re's Motion to Dismiss and/or for Other Relief Pursuant to Fed. R. Civ. P. 12(b)(7) & 19 (ECF No. 58, Filed December 5, 2014) and as re-filed (ECF No. 95, Filed December 12, 2014); Partner Re's Motion for Summary Judgment (ECF No. 161, Filed February 20, 2014).

there is no reason to devote substantial time during trial to either side's cost estimations or to an effort to quantify Defendants' future payment obligations. The proper approach is for this Court to include a declaration that Defendants are obligated to pay "replacement cost new . . . as of the date or replacement" as part of its judgment resolving this case.

If Defendants would like this Court to include provisions in that judgment designed to afford them a specific opportunity to participate in the process of reviewing the replacement costs before they are incurred, they should seek permission to make a motion outlining the provisions that they request. Such a motion would be appropriate after the jury trial, once the jury has found covered property damage. The motion could include, for example, a proposal for dispute resolution procedures that would enable the parties to resolve differences about particular payments without resort to judicial process. Amtrak would have no objection if Defendants made a motion that identifies reasonable and constructive procedures; to the contrary, Amtrak would agree with that approach.

In light of Defendants' post-Complaint payments, the only "damages" currently sought by Amtrak are the consequential damages that flowed from Defendants' original breach of the partial payment provision. Amtrak submits that the only evidence needed to resolve this issue is the undisputed fact of the post-Complaint payments, together with the evidence of the consequential damages that Amtrak unfairly was forced to incur to force Defendants to make them.[17] But in any event, this limited cause of action for breach of contract does not require or justify devoting days or possibly weeks of trial to an effort to

---

[17] At a prior hearing on the consequential damages issue in this Action, counsel for Defendants agreed with the Court's assessment that where the policyholder shows that no reasonable insurance company would have been expected to have refused to make the partial payment at issue, that Amtrak can recover attorneys' fees with respect to that particular part of the claim. *See* Hearing Transcript, dated February 3, 2015, copy attached to the Gilinsky Decl. as Ex. 9, at 69.

quantify Defendants' future payment obligations.  If Defendants assert that this cause of action turns proof of Amtrak's $1.2 billion in estimates into a fact issue for trial, they would be wrong.

II. **AMTRAK'S PROPOSAL FOR THE CONDUCT OF TRIAL IS APPROPRIATE**

Amtrak's proposal for the efficient resolution of this action is as follows:

- The Court resolves the following legal issues regarding the applicability of limits and sublimits, pursuant to Defendants' Rule 56 Motions: (i) does the "flood" sublimit apply? (ii) does chloride damage constitute "ensuing loss" that falls outside that sublimit? (iii) does chloride damage implicate more than one set of policy limits, pursuant to the definition of "occurrence"? and (iv) does the DICC provision establish coverage up to an additional sublimit for property that needs to be replaced even though it was not physically damaged?[18]

- The jury resolves the fact issues raised via the Operative Pleadings (plus any residual fact issues left unresolved following the Court's legal rulings above):  (i) did any of Amtrak's property suffer "direct physical loss [ ] or damage"? (ii) did the insurance companies prove that all such damage was excluded as "wear and tear"? and (iii) is Amtrak entitled to recover consequential damages for Defendants' pre-lawsuit breach of the partial payment provision in the Policies and, if so, in what amount?

- Based on these legal and factual determinations, the Court enters a declaratory judgment setting forth the scope of coverage to which Amtrak is entitled and ordering Defendants to make payment under the applicable terms of the Policies

---

[18]  Defendants worded their request for relief in their motion regarding the DICC in the negative: *i.e.*, did the provision fail to establish coverage for the replacement of "the sections of [Amtrak's] benchwalls and track bed that it acknowledges were undamaged."  *See* Insurers' Memorandum of Law in Support of Motion (Re-Filed ECF No. 229, April 30, 2015), at 1.  Aside from being confusing, this request is contrary to the policy language.  Once structures, like benchwalls, are established as damaged, Defendants' contractual obligation is to replace them.  Defendants do not have the option of repairing sections of them in lieu of paying for full replacement.  *See* Memorandum of Law in Opposition to Defendants' Motion (Re-Filed ECF No. 224, April 24, 2015) at 3-4, 19-24; *see also CSX Corporation v. North River Ins. Co.*, No. 3:08-CV-00531, 2009 U.S. Dist. LEXIS 133311 (M.D. Fla., Sept. 25, 2009) (pursuant to a policy that covered replacement without an option for repair, Court required insurance companies to pay $3.4 million for the *replacement* of two diesel locomotives that had been partially submerged in water during Hurricane Katrina, even though they could have been *repaired* for only $1.6 million); *Compagnie Des Bauxites De Guinee v. Three Rivers Ins. Co.*, No. 2:04cv393, 2007 U.S. Dist. LEXIS 41539 (W.D. Pa. June 7, 2007), at **29-30 ("The parties [] carefully segmented those forms of property loss that would be valued at replacement cost new, regardless of whether such property could be repaired" and also "regardless of the degree of damage or destruction").

- 13 -

- – *i.e.*, based on "replacement cost new . . . as of the time of replacement."

- If Defendants wish this Court to include provisions in its judgment that are designed to afford them a specific opportunity to participate in the process of reviewing the replacement costs before they are incurred and proposing dispute resolution procedures, Defendants could seek permission to make a motion outlining the provisions that they seek. Amtrak would agree with this manner of proceeding.

This proposed approach, which involves integrating the District Court's legal rulings with a jury's factual findings during the ensuing trial, is common in declaratory judgment actions regarding insurance coverage disputes. *See, e.g.,* Couch on Ins. 232:49 (3d ed. 2005) ("A declaratory judgment action may be legal or equitable, and the right to trial of such action by jury is commonly considered to depend upon the nature of the claim or issue presented. If the issues involved are of fact and would ordinarily be determined by a jury, a jury trial must be held in the declaratory judgment action"); *Spivey Co. v. Travelers Ins. Co.*, 407 F. Supp. 916, 918 (E.D. Pa. 1976) ("Thus assuming a jury were to render a verdict in favor of plaintiff on the above-mentioned factual issues, this Court could then fashion a decree ordering defendants to pay plaintiff" for amounts due now or in the future).

It also is common for insurance coverage litigation to be resolved based on declaratory judgments that delineate the insurance companies' obligation to make payments as they come due in the future. *See, e.g., E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 173 (2d Cir. 2001) ("it was within the district court's discretion to establish a protocol for the payment of future [DES liability] claims, namely the requirement that the Excess Insurers are obliged to pay on future claims within 30 days of presentment, because the Excess Insurers' policies contain language to that effect"); *Spivey*, 407 F. Supp. at 918 ("The future or contingent nature of payments that might be made in the years to come does not destroy the appropriateness of declaratory relief."); *ZRZ Realty Co. v.*

*Beneficial Fire and Cas. Ins. Co.*, No. 9708-06226, Slip Op. (Or. Cir. Ct. Apr. 7, 2003) at ¶24 and Second Findings of Fact and Conclusions of Law, dated Dec. 13, 2002, at pp. 76-77 (copies attached to the Gilinsky Decl. as Exs. 10 and 11) (calling for the insurance companies to pay for future environmental cleanup costs as such costs become due); *Employers Ins. of Wausau v. Tektronix, Inc.*, No. CVV 9908032, Money and Declaratory Judgment (Or. Cir. Ct. Dec. 30, 2003) at pp. 16-17 (copy attached to the Gilinsky Decl. as Ex. 12) (calling for the insurance companies to pay for future defense costs and environmental cleanup costs as such costs become due).

This common sense approach is mandated by the unusual policy language here, which evaluates the replacement cost "as of the date of replacement" rather than the more commonly found provision: "as of the time and place of loss." *See, e.g., SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop.*, No. 01 Civ. 9291, 2006 U.S. Dist. LEXIS 79326, at *6 (S.D.N.Y. Oct. 31, 2006). Such prospective payment arrangements are commonly used in long-tail liability insurance disputes, such as disputes involving the payment of future environmental remediation costs. *See, e.g., E.R. Squibb*, 241 F.3d at 173; Gilinsky Decl., Exs. 10-12. While Defendants have argued in pre-trial discussions that such approaches are never used for property policies and therefore cannot be put into place here, this position lacks merit. There is no meaningful difference between the prospective coverage obligations in long-tail liability insurance disputes and Defendants' promise in Amtrak's Policies to make prospective payments "as of the date of replacement." Here, where the policy language calls for a comparable approach, it is entirely proper to draw upon long-tail liability insurance disputes in crafting a tried-and-true method to resolve this action.

## CONCLUSION

For the reasons above, Amtrak respectfully requests that the Motion be granted.

Dated:  June 3, 2015

                                 By:  /s/ _____
                                        Rhonda D. Orin, Esq. (RO-0359)
                                        rorin@andersonkill.com
                                        Daniel J. Healy, Esq. (DH-7396)
                                        dhealy@andersonkill.com
                                        Marshall Gilinsky, Esq. (MG-8398)
                                        mgilinsky@andersonkill.com
                                        ANDERSON KILL, L.L.P.
                                        1717 Pennsylvania Avenue, N.W.
                                        Washington, DC  20006
                                        Telephone:  202-416-6500

                                        Finley T. Harckham, Esq. (FH-8219)
                                        fharckham@andersonkill.com
                                        Peter A. Halprin, Esq. (PH-2514)
                                        phalprin@andersonkill.com
                                        ANDERSON KILL, P.C.
                                        1251 Avenue of the Americas
                                        New York, NY  10020
                                        Telephone:  212-278-1000

                                        Attorneys for Plaintiff